# EXHIBIT 2

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2021-015089-CA-01
SECTION: <u>CA43</u>
JUDGE: <u>Michael Hanzman</u>

In re:
Champlain Towers South Collapse Litigation
_____/

## ASSOCIATION'S CROSSCLAIM FOR
## <u>DAMAGES AGAINST BECKER & POLIAKOFF, P.A.</u>[1]

Defendant Champlain Towers South Condominium Association, Inc., through its Court-appointed Receiver Michael I. Goldberg (the "Association"), sues co-Defendant, Becker & Poliakoff, P.A. ("Becker"), and alleges:

1.      This is an action seeking damages in excess of $750,000.00, arising from Becker's breaches of its duties to properly advise, counsel and inform the Association on critical matters. These crossclaims are ancillary to this Receivership proceeding.

2.      Venue is appropriate in this Court. Becker practices from several offices through the State of Florida, including its Miami-Dade County office located in Coral Gables, Florida.

3.      At all times material hereto, the Association was a condominium association organized and operating pursuant to Florida Statutes Chapter 718 as amended from time to time (the "Condominium Act"). Pursuant to Florida Statutes, the Association was vested with the authority and obligation to maintain, manage and operate the condominium property commonly known as "Champlain Towers South" situated in the Town of Surfside, Miami-Dade County,

---

[1] The Receiver through other counsel will separately file his answer and affirmative defenses to the Second Amended Complaint and any additional crossclaims.

11020754

Florida (the "Condominium"). The Association was also vested with the power to contract and sue with respect to matters for which the Association was legally responsible.

4.      The Condominium was a 136-unit high-rise condominium building situated at the southernmost border of the Town of Surfside, at 87th and Collins Avenue.

5.      The Association's governing documents imposed upon the Association the duty to maintain all parts of the building in a safe condition:

> Except to the extent (i) expressly provided to the contrary in this Declaration, or (ii) proceeds of the insurance are made available therefor, the Association shall be responsible, at Common Expense, for maintenance, repair and replacement of:
>
> (a)      ***All Common Elements, Limited Common Elements and Association Property***, except as otherwise provided in this Declaration;
>
> (b)      ***All portions of the Condominium*** (except interior wall surfaces of Units) ***contributing to the support of the Building***, which portions shall include, but not be limited to, the outside walls of the building, chasing and load bearing railings, walls or columns, or boundary walls of Units;
>
> . . . .
>
> (d)      ***All floor and ceiling slabs, including, but not limited to, the slabs of all terraces and balconies***, except for decorative surfaces installed by Unit Owners to the extent any such surfaces may be permitted, including, but not limited to, waterproofing the balcony floors;
>
> . . . .
>
> (j)      Exterior painting, ***structural maintenance of the Buildings, roofing, maintenance of roads, sidewalks, parking areas, drives, streets, and driveways*** (except as otherwise provided herein to the contrary), ***and general exterior maintenance***, but shall not include maintenance, repair and replacement of sliding glass doors, hurricane shutters, nor any alteration or addition to the Condominium Property made by a Unit Owner or his or her predecessors in title, nor any portions of the Condominium Property

11020754

exposed to the elements or any structural element for which this Declaration delegates responsibility to the Unit Owner;

(j)     All property owned by the Association and other property contemplated by and to the extend the same is consistent with the terms hereof **....**

§ 7.1, at D10-D11 of the Amended and Restated Declaration of Condominium of Champlain Towers South Condominium, recorded April 30, 2019, in the Public Records of Miami-Dade County, Florida, at Official Book 31420, Page 1163 (the "Declaration"). The Amended and Restated By-Laws of Champlain Towers South Condominium Association, Inc. were recorded contemporaneously with the Declaration on April 30, 2019, in the Public Records of Miami-Dade County, Florida, at Official Book 31420, Page 1230 (the "By-Laws").

6.      Pursuant to the Declaration and the Condominium Act, the Association, among other things, held the power to: acquire or convey title to real property (excluding Units in the Condominium) and to hold, convey lease and mortgage Association property for the use and benefit of its members; contract, sue or be sued with respect to the exercise or non-exercise of its powers; and institute, maintain, settle, or appeal actions or hearings in its name on behalf of all unit owners concerning matters of common interest to most or all unit owners, including, but not limited to, the common elements, and the roof and structural components of a building or other improvements.

7.      Following the tragic collapse of the Condominium on June 24, 2021, in which 98 lives were lost, Michael I. Goldberg was appointed Receiver over the Association pursuant to this Court's Agreed Order Appointing Receiver entered July 2, 2021. Pursuant to that Order, and since its entry, title to all property, real or personal, all contracts and all rights of action of the Association, is vested by operation of law in the Receiver and the Receiver is the only person vested with corporate authority to take any actions on behalf of the Association.

11020754

## BECKER'S UNIQUE EXPERTISE AND DEPTH OF TALENT

8.     Cross-defendant Becker is a Florida professional association with offices throughout Florida and elsewhere. Becker has been named as a defendant in the Plaintiffs' main action and is subject to this Court's jurisdiction.

9.     Becker grew in size and prominence because of its pioneering role creating the law pertaining to the operation of common ownership housing such as condominiums, with many of the leading cases in the field bearing the firm's name. In keeping with its commitment to their clients and the industry, Becker's attorneys provide over 200 educational classes per year for association board members and managers, and also advocate on behalf of clients through the firm's lobbying arm, the Community Association Leadership Lobby (CALL).

10.    Becker's attorneys have been recognized as individual leaders in the field of construction and condominium law, through published works, public service, legislative activities, and industry group leadership positions. Several Becker attorneys are members of the prestigious College of Community Association Lawyers (CCAL).

11.    Becker has more Board-Certified Attorneys in Condominium and Planned Development Law than any other law firm in the state of Florida.

12.    Becker also has offered the services of a large, dedicated team of Board-Certified Construction attorneys. Becker's Construction Law Practice Group is well-known for its specific knowledge and experience in the construction industry and experience effectively protecting the interests of its clients. Practice Group Chair Mr. Steven Lesser is Past Chair of the American Bar Association's Forum on Construction Law, the largest organization of construction lawyers in the United States, with over 6,000 construction professionals around the world. He also previously served as Chair of The Florida Bar's Construction Law Certification Committee, the

11020754

committee that administers an examination and evaluates whether attorney candidates possess the requisite level of expertise to warrant the designation as Board Certified by The Florida Bar.

13.     Becker routinely provides a variety of services to its community association clients, including answering day-to-day questions regarding operational, technical, regulatory and practical issues, assisting boards of directors on fiscal matters such as budgeting, levying special assessments and establishing reserves, and addressing maintenance and repair issues. Becker's advice to its community association clients on construction matters is aided by Becker's significant experiences as counsel to many local developer clients.

14.     Becker has handled a variety of complex construction-related cases, many of which have involved complex delay issues with a multitude of defendants, and scores of construction defects. Becker has stated that its construction attorneys have represented clients in both transactions and disputes ranging from single- and multi-family dwellings to large commercial buildings, planned unit developments, multi-use retail, industrial and governmental projects.

15.     Although Becker had rendered legal services and advice to the Association for many years, Becker's representation of the Association was documented more recently through an April 20, 2017 written retainer agreement, attached hereto as **Exhibit "1"**.

16.     In its written retainer agreement and as part of its marketing of its services, Becker promoted its assignment to the Association of a "Client Relationship Manager, an attorney who is responsible for counseling the Association on day-to-day operational matters." Becker also touted its construction team comprised of "seventeen (17) Board Certified Construction Attorneys – no other Florida firm has more expertise in Construction law."

11020754

17.     In its 2017 written retainer agreement with the Association, Becker also promoted "our capabilities and the unique advantages of working with our team" and assured the Association "that no other firm can offer the multitude of services, depth of experience and understanding of your issues at affordable rates as Becker & Poliakoff."

18.     As Becker has explained publicly in its advertising profiles, "Becker brings decades of broad expertise to their community association clients. Their business philosophy is to first focus on being a highly responsive law firm, deeply attentive to each client's needs. They are prepared to help associations with the myriad of legal issues, both ordinary and extraordinary, that volunteer directors may encounter, from updating governing documents, collecting delinquent assessments, pursuing rights with regard to defect and insurance claims, or conducting online voting, to negotiating with the development going up next door". *See* Becker's Florida Community Association Professionals Partner Profile, attached hereto as **Exhibit "2"**.

19.     Becker promoted itself as a "safety net" to directors of condominium associations in fulfilling their fiduciary duties to the Condominium's members. Becker has cautioned that "[s]erving on a community association board is tough enough—don't do it without the necessary legal backup support" and that working with legal counsel can protect both the association and individual board members from liability.

20.     Becker knew that pursuant to Florida Statutes Section 718.1265, the Declaration and the Association's By-Laws, the Association was authorized to exercise "emergency powers" that included the power (without unit owners' approval) to borrow money and pledge Association assets as collateral to fund emergency repairs and carry out the duties of the Association if and when operating funds were insufficient. Becker also knew that the Association was permitted to exercise its "emergency powers" as long as reasonably necessary to protect the

11020754

health, safety and welfare of the Association and the unit owners, and as reasonably necessary to mitigate further damage to the Condominium and make emergency repairs.

21.     The Association considered Becker its legal advisor and general counsel regarding day-to-day operational matters and also concerning major decisions affecting the Condominium.

22.     Becker was obligated to exercise independent professional judgment and render candid and thoughtful advice and counsel to the Association, especially given that the Association's Board of Directors was a revolving door of several unit owners during the years immediately prior to the tragic collapse of the Condominium, and its members were inexperienced in several matters that affected their exercise of fiduciary duties.

23.     In representing the Association, Becker was obligated to exercise independent professional judgment and render candid advice, particularly when representing a client inexperienced in legal matters.

24.     The Association's board of directors was a volunteer group of residents with various backgrounds. Over the last 5 years prior to the collapse, several directors had resigned, reducing the institutional knowledge and continuity of the board when facing several serious challenges, and heightening the Association's reliance on (and trust in) Becker's advice and counsel. Becker well understood the limitations of the Association's Board of Directors.

25.     During critical times leading up to the tragic collapse of the Condominium in June 2021, none of the members of the board of directors was an engineer. Becker, on the other hand, was deeply experienced in construction defect litigation, interactions with forensic engineers and the use of engineers as consultants and experts to assist Becker in providing advice and counsel to its community association clients.

11020754

26.     Becker undertook its duty and role as legal advisor and counsel (the "safety net") for the Association, but it failed to carry out those duties reasonably and with the requisite attention and care on critical matters affecting the structural integrity and safety of the Condominium.

## A CRITICAL OPPORTUNITY LOST

27.     On October 8, 2018, Morabito Consultants issued a structural engineering report to the Association (c/o its then-Treasurer, Maggie Manrara). The Association had commissioned Morabito to conduct a structural engineering study in 2018 in advance of the Association's expected 40-year re-certification request regarding the Condominium's structural and mechanical components.

28.     Becker, with its particular expertise and experience, should have recognized that Morabito's 2018 Structural Engineering Report disclosed serious structural problems plaguing the Condominium that were alarming and required immediate attention, given the scope and extent of the Condominium's structural degradation, the stated risk of exponential worsening, and the significant estimated costs to repair or replace structural elements of the Condominium as disclosed by the report.

29.     Becker, with its particular expertise and experience, should have recognized that the 2018 Morabito Structural Engineering Report identified several aspects of the Condominium that required immediate repairs, including without limitation:

a.      Structural damage to the *majority* of the balconies;

b.      concrete spalling or cracking of the concrete slab edges of the balconies was *fairly typical*;

8

11020754

    c.     approximately *half* of the balcony soffits showed evidence of deterioration under the painted finished surface; this damage was characterized by Morabito as *systemic*;

    d.     plywood and light fixtures at *several* areas of the entrance drive soffits were deteriorated;

    e.     several units were experiencing water infiltration through window frames and glazing because the windows were nearing the end of their functional lifespan; and

    f.     *significant* cracking in the Condominium's stucco exterior facade was observed.

30.    Morabito also observed the non-existence of window washing/suspension hooks that should have been installed to the underside of the top-level balconies and spread throughout the roof. Morabito noted in its report that this failure to have suspension hooks installed was an ongoing OSHA violation.

31.    Morabito observed serious damage to the concrete structural slab below the Pool Deck and Entrance Drive supporting the Condominium and the need for a complete replacement of waterproofing in those areas. Morabito noted that the failure to timely address the waterproofing issues could cause the concrete deterioration to expand exponentially. In the Parking Garage, Morabito also specifically noted cracked or spalled concrete members, concrete slabs and joints, and reported that *signs of distress/fatigue* were observed.

32.    As part of its 2018 Morabito Structural Engineering Report, Morabito also prepared and provided to the Association an estimate of the probable costs to perform the required structural repairs and maintenance that Morabito had recommended. Morabito's 2018

detailed cost estimate for required repairs (attached to the 2018 Morabito Structural Engineering Report) was almost $***10,000,000.00***. To put that repair estimate into perspective, the annual operating budget for the Condominium for 2017 approximated $1,250,000.00. The Association expected its Reserve Accounts through 2017 to approximate $1,100,000.00.

33.     On November 5, 2018, shortly after the 2018 Morabito Structural Engineering Report had been issued, Susana Rodriguez, a concerned unit-owner (Unit 607) and resident of the Condominium, contacted Becker directly via certified mail, expressing her grave concerns over the "structural integrity and concrete deterioration of Champlain Towers South (the Condominium)." Ms. Rodriguez went so far as to attach the 2018 Morabito Structural Engineering Report to her certified letter to Becker. A copy of Ms. Rodriguez's November 5, 2018, letter to Becker (sent by certified mail, return receipt requested) along with its attachments (that included the 2018 Morabito Structural Engineering Report) is attached hereto as **Exhibit "3"**.

34.     Through another November 5, 2018, e-mail (attached hereto as **Exhibit "4"**), additional Becker representatives received actual notice of Ms. Rodriguez's November 5, 2018, letter to Becker that had included the 2018 Morabito Structural Engineering Report.

35.     Rodriguez implored Becker to promptly provide its experienced advice and counsel to the Association's Board of Directors regarding the serious safety concerns revealed in the 2018 Morabito Structural Engineering Report, noting that:

> The BOD [board of directors] have (*sic*) a fiduciary responsibility to maintain the structure of the building and needs to commence the concrete restoration and possibly use funds from this hallway project since it is necessary maintenance and an emergency at this point….The building needs to [be] repaired correctly and before any other aesthetic project.

These are concepts and admonitions that *Becker* should have communicated to the Association as part of Becker's duty to advise and counsel the Association regarding the fulfillment of the Association's fiduciary duties.

36.    Becker, with its particular knowledge and expertise, should have recognized the risks posed by the damage described in the Morabito report, and at a minimum, should have counseled the Association to inquire whether any of the identified issues raised safety concerns and whether any additional testing was required to determine if there was any immediate threat to the life and safety of the Condominium building's residents and invitees. Becker also should have counseled the Association regarding its emergency powers available under the Condominium Act to fund emergency repairs as long as reasonably necessary to protect the health, safety and welfare of the Association and the unit owners, and as reasonably necessary to mitigate further damage to the Condominium.

37.    With the Morabito report in hand, and its readily-apparent import exclaimed by a Champlain unit owner, Becker was duty bound to act with a reasonable degree of care, skill, and dispatch to (1) address (and not ignore) the critical and pervasive maintenance and repair issues revealed by the Morabito report, (2) investigate Morabito's findings and conclusions further so that Becker could knowledgeably advise the Association as to its fiduciary duties to act, and (3) assist the Association in budgeting, levying special assessments and establishing reserves to promptly remedy the significant structural concerns outlined in the Morabito report before the structural problems could grow "exponentially".

38.    Becker completely disregarded the findings and conclusions in the 2018 Morabito report even though Becker was on actual notice of the issuance of the 2018 Morabito report, and despite the fact Becker had actually received a copy of the 2018 Morabito Report from at least

11

11020754

one very concerned unit owner. Becker should have provided the Association's Board of Directors with experienced advice and counsel regarding the legal and practical importance of the Report's findings and conclusions, and what actions the Association should undertake to fulfill its fiduciary duty to maintain and repair the Condominium's common elements and protect its unit owners.

39.     Rather than provide advice and counsel to the Association's Board of Directors, on December 3, 2018, almost a month after receiving Ms. Rodriguez's alarming letter and a copy of the 2018 Morabito Structural Engineering Report, Becker simply forwarded Rodriguez's letter to the Association's Board of Directors and inquired whether they would like Becker's assistance in drafting a "substantive response".

40.     On December 13, 2018, Becker provided Ms. Rodriguez the "substantive response" letter, which explained that "Your letter sets forth various concerns related to concrete restoration but does not actually ask a question as to this issue," and that "no response can be provided when no question has been asked."

41.     Becker's response then simply concluded as follows:

> In terms of legal guidance and opinions you want to ensure the Association is getting from its counsel, please note that the Board and Association's counsel (i.e., this Firm) work together on various matters but that need not be in the presence of the membership as such, the membership will not be privy to those discussions. Additionally, while your letter seeks this Firm's 'feedback and legal opinion' on the matters set forth in the letter, the Firm is retained by the Association which is the corporation which operates the condominium. The Firm does not provide feedback or legal opinions to anyone other than the Association through its Board of Directors. As such, your request cannot be complied with."

42.     Presumably Becker could not have responded to the Rodriguez letter without examining her stated assertions and concerns, and also the 2018 Morabito Report that Rodriguez had enclosed with her letter to Becker. Alternatively, Becker simply ignored the grave concerns

expressed by Ms. Rodriguez in her letter and the conditions described in the 2018 Morabito Report she had furnished to Becker.

43.     Becker's "response" to Ms. Rodriguez's clear expression of grave concern was terse and dismissive. Becker totally ignored all of the safety concerns described in the 2018 Morabito Report that Ms. Rodriguez plainly pointed out to the Association's lawyers. Becker elected to dismiss Ms. Rodriguez's written concerns. Worse, Becker failed to provide the Association with Becker's "feedback and legal opinions" requested in Ms. Rodriguez's letter. Becker ignored the 2018 Morabito Report that, with Becker's expertise and experience, should have clearly alerted Becker to the serious structural concerns affecting the Condominium that directly implicated the Association's exercise of its fiduciary duties.

44.     Only *after* the collapse of the Condominium, Donna Berger, a shareholder in Becker's Community Association Practice, posed these questions to FOX News: "I would like to know if Morabito ever did any subsurface testing and whether the demolition of the building next door and the vibrations felt when pilings for the new building (87 Park) were being drilled may have destabilized the Champlain Towers South building and parking structure." Becker should have made these same inquiries years before, when Becker knew or should have known of the Condominium's structural disrepair and the ongoing risks of exponentially greater structural degradation.

45.     Becker, in the exercise of its professional responsibilities and deep experience in construction matters, should have advised the Association promptly that visual proof of concrete spalling (cracking) meant that the re-bar holding the concrete together is rusting and deteriorating beneath the surface.

13

11020754

46.     Ms. Rodriguez was certainly not the only Condominium resident who brought her specific and detailed prophetic concerns about the safety of the Condominium building to Becker, as evidenced by Ms. Berger's admission that Becker had received numerous reports from the Condominium residents expressing great concern about the structural integrity of the building, including reports that the Condominium was shaking and being damaged as a result of the 87 Park construction next door. Still, Becker turned a blind eye to these concerns.

47.     On November 10, 2021, in a deposition taken in this case, Becker's Client Relationship Manager testified under oath that he never reviewed the 2018 Morabito Report until three years later, and only *after* the tragic collapse of the Condominium, even though Becker had received the November 2018 Rodriguez letter (and a copy of the 2018 Morabito Report) and despite the fact that a Becker attorney had attended the November 15, 2018 meeting of the Association's Board of Directors at which the 2018 Morabito Report was an agenda item.

48.     Becker did not contact Morabito regarding the visual depictions, findings and conclusions, and recommendations described in the 2018 Morabito Report, even though Morabito had calculated that almost $10 million in recommended repairs would be required in the near term.

49.     Becker never furnished Morabito with the November 2018 letter from Ms. Rodriguez to determine whether Morabito concurred with her grave assessment of the Condominium's structural condition. Becker never consulted with Morabito about its 2018 findings at all.

50.     With the critical information Becker had received and possessed, Becker should have advised and counseled the Association to delve deeper into Morabito's visual proof of degradation of the Condominium's concrete supports, and should have aided its client in

14

undertaking immediate and decisive action to fulfill the Association's fiduciary duties to preserve, maintain and repair the Condominium, including providing advice and counsel regarding the exercise of the Association's emergency powers granted under the condominium statutes.

## MORE CRITICAL OPPORTUNITIES LOST

51.     In November 2019, Becker Attorney Michael Gongora was invited to attend the Association's budget meeting, in part because the Association's Board of Directors had "questions on our reserves". One of the Association's directors had expressed "doubts about our reserves" because the Association had never performed a "reserve study".

52.     Without any reference whatsoever to the 2018 Morabito Report issued a year earlier, Attorney Gongora advised the Association that its 2019 reserve schedule "is fine *since you have no information to base it off of at this time other than last year's schedule*." Of course, a year earlier the 2018 Morabito Report Becker had received described significant concrete deterioration affecting the Condominium that could grow exponentially without prompt remedial action - Morabito's 2018 Report also included an almost *$10,000,000.00* price-tag for the required repairs or replacements. Becker's advice to the Association's Board of Directors a year later totally ignored the documented need for millions of dollars in urgent repairs at the Condominium.

53.     In February 2020, the Association was considering the repair or replacement of sliding glass doors at the Condominium. Becker's Client Relationship Manager assigned to the Association expressed his "need to see engineering letters designating the required form (number of panels) for sliding glass doors and the engineering concerns supporting their recommendations."  Becker's Client Relationship Manager stated to the Association that the

11020754

"strength of the engineering support for a different number of panels will be critical to the Board's determination on this issue." Becker's scrutiny of engineering concerns and technical support regarding sliding glass doors was appropriate legal advice and counsel.  Unfortunately, Becker failed to provide that required level of service on far more critical matters such as the concrete degradation affecting the Condominium's structural support systems that had been documented in the 2018 Morabito Report - - over a year before.

54.    In October 2020, the Association again hired Morabito to perform additional inspections and remediation work. Morabito's 2020 inspections and testing reported that the Condominium's structural problems and concrete damage *had worsened exponentially since 2018*. The additional damage to the building in only two years was so substantial that Morabito expressed concern that the necessary remediation efforts would negatively impact surrounding buildings.

55.    Becker had actual notice and possession of the 2018 Morabito report and Morabito's 2020 report; actual knowledge of the exponentially deteriorating condition of the Condominium, and actual knowledge of the concerns of the Condominium's residents relating to the structural integrity of the Condominium. Becker was duty-bound to provide advice and counsel to the Association regarding the Association's fiduciary obligation to appropriately address the structural damage revealed by the Morabito reports and the imminent risks posed to the Condominium under the Association's management.

56.    Despite Becker's notice and/or knowledge of these critical structural conditions, Becker failed to properly investigate relevant matters and then advise and counsel the Association. Instead, Becker only paid attention to cosmetic matters or generic legal issues

which did not pose such stark risks to the Condominium, thereby violating its professional obligations to the Association.

## <u>YET ANOTHER OPPORTUNITY LOST</u>

57.    Becker also had actual knowledge that the development of the neighboring parcel (the "87 Park Development") had resulted in serious safety concerns among the Association's residents about the adverse effects on the Condominium's structural integrity, including its subterranean support systems, caused by subterranean de-watering and pile driving occurring at the 87 Park Development.

58.    At the specific request of the Association's directors, Becker attorneys were brought into then-ongoing negotiations between the Association and representatives of the 87 Park Development to address the substantial adverse effects that the 87 Park Development ground preparations had on the Condominium. Based on the high level of trust developed between the Association and Becker's attorneys and given Becker's well-known specialization in construction-related matters, the Association specifically sought Becker's review of and advice regarding a 'term sheet' that had been crafted to document the terms of a settlement between the Condominium and the neighboring property owner(s) of claims directly resulting from the foundational development of that property. Residents of the Condominium had long voiced concerns about the effect of 87 Park's development on the structural integrity of the Condominium. Becker was directly and acutely aware that the Condominium residents were concerned about the structural integrity of the Condominium as a result of serious vibrations and de-watering that occurred just a few feet away of the Condominium's property line.

59.    The term sheet on which Becker was asked to review and advise the Association conspicuously contained, among other things, a proposed release of claims that the Association

17

held against the 87 Park Development. Yet Becker, the Association's general counsel, did not adequately investigate the nature and severity of those claims (even knowing of Morabito's earlier observations of substantial structural problems at the Condominium, including along its southern wall abutting 87 Park), and it failed to properly advise the Association of its rights and available remedies.

60.     Becker could not have reasonably advised the Association regarding the general release of claims which the 87 Park Development was bargaining to obtain from the Association, without first conducting adequate investigations into the nature of those claims (with the assistance of technical experts as necessary), the existence and strength of investigated facts relating to those claims, and the risks faced by the Association if its directors elected to agree to grant any release of claims in favor of the 87 Park Development. Despite having received yet another engineering report from Morabito in 2020, this one advising that the 87 Park Development's construction of the walkway on 87th Terrace was causing water to flow toward the Condominium and was directly damaging the Condominium's foundation structure by causing water to infiltrate the Condominium, Becker failed to investigate the facts and circumstances underlying these damages. Becker did not conduct a reasonable investigation into the scope and severity of the 87 Park Development's damage to the Condominium, the potential consequences of such damage, the manner in which that damage should be remedied, or the reasonable costs to remedy.

61.     Becker failed to conduct (or aid the Association in conducting) any reasonable investigation into the history of complaints from the Condominium's unit owners about the severe ground-shaking and vibrations that were caused by the 87 Park Development's construction activities just a few feet away from the Condominium. Becker did not conduct or

advise that the Association should engage others to conduct an investigation into any technical recordings conducted during the development of the adjoining property's foundations; Becker totally ignored the substance of the 2020 Morabito report that the Association had commissioned to investigate the significant structural problems believed to be caused by the adjoining property owner's activities. The 2018 Morabito inspection report had already warned that the Condominium's structural damage posed extreme risks to the Condominium, and the 2020 Morabito inspection report also revealed additional structural damage to the Condominium that posed additional risks. Despite Becker's Actual notice of these serious conditions and knowing that the Association had sought and relied upon Becker's advice and counsel on nearly all aspects of the Condominium's management, Becker failed to advise, counsel, or cause the Association to timely or adequately address these extreme risks to the Condominium.

62.     Becker's attorneys (particularly its construction attorneys) were well-experienced in working side-by-side with technical experts such as structural engineers in order to provide competent and knowledgeable advice and counsel to Becker's clients.

63.     Becker should have utilized its deep bench of construction attorneys to investigate the adverse effects that the Association's common elements had reportedly suffered as a result of the subterranean development of the 87 Park Development, including an investigation of any geotechnical studies of that subterranean work. Based on its unique expertise in such issues, Becker already knew (or should have known) from the 2018 Morabito report that the Condominium had exhibited significant degradation of its concrete weight-bearing supports. In addition, Becker had knowledge of serious safety concerns raised by Condominium unit owners about 87 Park Development's subterranean work and the structural integrity of the Condominium.

19

64.     As a result of these multiple failures, Becker did not exercise the requisite level of professional service and care when counseling the Association concerning its obligations, rights and remedies relating to 87 Park Development.

65.     Becker's attorneys have purportedly supported reasonable reserve strategies, including state legislatively-required reserve studies. Yet Becker's lawyers failed to properly counsel the Association about its obligation to address the adequacy of its reserves on a timely basis, particularly in concert with the structural integrity concerns about which Becker attorneys had been keenly aware since 2018.  Indeed, the Association did not conduct a reserve study until 2020, two years after its attorneys had received the 2018 Morabito report that had described the need for significant and immediate repairs at a cost that dwarfed the Association's annual operating budget including reserves.

## BECKER'S APPARENT CONFLICT OF INTEREST

66.     The 87 Park Development is situated on land that is subject to the jurisdiction of the City of Miami Beach.

67.     Becker attorneys were tasked by the Association to provide advice and counsel regarding proposed terms and conditions of a settlement arrangement proposed between the Association and the 87 Park Development. Among other things, the proposed settlement arrangement between the Association and the 87 Park Development contemplated the Association's general release of claims relating to the development of the 87 Park Development.

68.     A slender public right-of-way owned by the City of Miami Beach had separated the 87 Park Development from the southern edge of the Condominium. As part of its effort to maximize its investment, the 87 Park Development actually acquired that public right-of-way through a deal with the City of Miami Beach. The acquisition of that right-of-way by the 87 Park

11020754

Development allowed 87 Park Development to develop its investment property just a few feet from the Condominium. The residents of the Condominium had voiced concern and outrage over the fact that the 87 Park Development had acquired the public right-of-way and how 87 Park Development's work to develop its parcels for construction had significantly disturbed the Condominium and had raised serious structural stability concerns.

69.    At times material to the Association's negotiations with the 87 Park Development and amidst its residents' stated concerns about 87 Park Development's deal with the City of Miami Beach which allowed 87 Park Development's foundation work to occur just a few feet from the Condominium property, one of Becker's attorneys, Michael Gongora, was a City Commissioner with the City of Miami Beach.

70.    Gongora was elected as Commissioner of the City of Miami Beach from November 2006 through November 2007, again elected as Commissioner of the City of Miami Beach from November 2009 through November 2013, and again elected as Commissioner of the City of Miami Beach from November 2017 through November 2021. The Receiver's factual inquiries indicate that Gongora also was a member of the Miami Beach Community Development Advisory Committee, the Miami Beach Zoning Board of Adjustment, the Miami Beach Design Review Board and the Miami Beach Condominium Reform Task Force, and also a Special Master determining Miami Beach Code Enforcement matters.

71.    Having conducted a review of those documents produced thus far in this action by Becker, the Receiver has not discovered that Becker had disclosed Mr. Gongora's close affiliation with the City of Miami Beach to the Association, even though Attorney Gongora provided regular legal advice and counsel to the Association at its Board of Directors' meetings and concerning the Association's disputes with the 87 Park Development.

11020754

72.     Becker should have disclosed to the Association that one of the attorneys assigned by Becker to advise and counsel the Association was directly linked to the City of Miami Beach, especially because of the serious questions that had been raised by the Association and its members about the dealings between the City of Miami Beach and 87 Park Development that had allowed 87 Park Development to conduct foundation preparations just a few feet from the southern edge of the Condominium.

## COUNT I – PROFESSIONAL NEGLIGENCE

73.     The Association realleges Paragraphs 1 through 72.

74.     Becker and its founding attorneys played a vital role in enacting Florida's Condominium Act over 40 years ago.

75.     Publicly recorded Condominium documents reveal that Becker acted as the Association's general counsel for decades prior to the tragic collapse of the Condominium on June 24, 2021.

76.     Becker again was formally engaged by the Association in April 2017 by written contract. Becker undertook general counsel duties to the Association, and members of the Association's Board of Directors regularly looked to Becker for advice and counsel on a host of matters, including, without limitation, employment, dues and assessment collections, corporate governance, ballot and voting rules, strategies to assist the Board of Directors to garner sufficient votes from the unit owners on various matters, approaches to reserve funding, matters relating to the re-purposing of previously collected assessments, approvals of specific capital improvement projects, direct interaction with engineers and construction experts including providing commentaries and recommendations based on engineering reports, and step-by-step response strategies in relation to engineering reports.

11020754

77.     Various members of the Association's Board of Directors documented their high level of trust in and deference to Becker when seeking Becker's advice on several matters affecting the Condominium, both procedural and substantive.

78.     Becker was employed by the Association to provide general advice and counsel to the Association as the Association sought to fulfill its fiduciary duties. Becker owed the Association a clear duty to provide its services at a level commensurate with attorneys practicing in Florida and in South Florida in the areas of condominium laws and construction matters, and with reasonable care and diligence. Becker's holding itself out as expert in condominium law and its ground-breaking role in the creation and development of condominium laws in Florida only heightened the level of service and competency Becker's lawyers were obligated to exercise and employ when providing services to the Association. No other law firm in Florida matched Becker's experience, know-how and awareness of condominium-related matters and issues (including construction-related matters), and how to best resolve them.

79.     Becker recognized the importance of its community association attorneys guiding their clients by formulating an organized plan that is designed to discover and evaluate the nature and extent of any defects or deficiencies affecting the Condominium and potentially arising from the original design and construction of the condominium building(s); the identity of parties responsible for the design and construction of the condominium building(s), and the amount of recoverable damages associated with remedying the defective conditions. Becker recognized its attorneys' duty to advise community association clients regarding the matters about which inspecting engineers should advise the association, including the methods and expense of repairing or replacing any defective conditions, and the possible effects of not implementing the curative measures.

80.     Becker also recognized its attorneys' duty to advise community association clients by conducting meetings among Becker's attorneys, the association's management and engineering consultants to discuss the findings of engineering reports, resolve any outstanding issues relating to any additional defects not inspected previously (but perhaps referenced in unit owner complaints), and discuss the necessity for conducting additional inspections and destructive testing, and the associated costs.

81.     Becker breached these acknowledged duties owed to the Association. Unfortunately, Becker's lawyers failed to perform and meet a basic standard of conduct and level of care when representing the Association in matters that directly concerned the structural integrity of the Condominium and the Association's fulfilment of its fiduciary duties to preserve, operate and maintain the Condominium.

82.     Becker did not advise and counsel the Association to directly and promptly address the serious structural concerns illustrated and discussed in the 2018 Morabito report. Becker's lawyers failed to reasonably advise and counsel the Association regarding the technical and practical aspects of the structural issues Morabito had disclosed in his reports. Instead, during the 2019 and 2020 timeframe, Becker's lawyers focused their attention and that of the Association on cosmetic capital outlays rather than the critical structural integrity issues that Becker was made aware of years before.

83.     Becker also counseled the Association on how to re-purpose previously collected special assessments to new capital projects at the Condominium. Unfortunately, Becker did not make the obviously appropriate recommendation that the Association use its resources (including re-purposed special assessment funds) to address and remedy the most critical issues presented to

24

the Association:  the structural integrity of its building in which its owners resided and slept with a false sense of security.

84.    As a direct and proximate result of Becker's negligence, the Association has been damaged and has been exposed to extreme economic risks.

WHEREFORE, the Association demands judgment for damages against Becker & Poliakoff, P.A., and such further relief as this Court deems proper.

## COUNT II – BREACH OF FIDUCIARY DUTY

85.    The Receiver realleges Paragraphs 1 through 72.

86.    Becker and its founding attorneys played a vital role in enacting Florida's Condominium Act over 40 years ago.

87.    Publicly recorded Condominium documents reveal that Becker acted as the Association's general counsel for decades prior to the tragic collapse of the Condominium on June 24, 2021.

88.    Various members of the Association's Board of Directors documented their high level of trust in and deference to Becker when seeking Becker's advice on several matters affecting the Condominium, both procedural and substantive.

89.    Becker owed fiduciary duties to the Association. Becker held a confidential and special relationship with the Association, and the Association looked to Becker for advice and counsel on a host of matters, including, without limitation, advice and counsel to guide the Association's efforts to fulfill its fiduciary duties.

90.    Becker was employed by the Association to provide general advice and counsel to the Association as the Association sought to fulfill its fiduciary duties. Becker owed the Association a clear duty to provide its services with diligence, fidelity and loyalty, and to meet

11020754

the high degrees of trust and confidence the Association placed in Becker. Becker's holding itself out as expert in condominium law and its ground-breaking role in the creation and development of condominium laws in Florida only heightened the level of trust and confidence the Association rightfully expected and deserved as Becker's lawyers provided advice and counsel to the Association. No other law firm in Florida matched Becker's experience, know-how and awareness of condominium-related matters and issues (including construction-related matters), and how to best resolve them.

91.    Becker recognized the importance of its community association attorneys guiding their clients by formulating an organized plan that is designed to discover and evaluate the nature and extent of any defects or deficiencies affecting the Condominium and potentially arising from the original design and construction of the condominium building(s), the identity of parties responsible for the design and construction of the condominium building(s), and the amount of recoverable damages associated with remedying the defective conditions. Becker recognized its attorneys' duty to advise community association clients regarding the matters about which inspecting engineers should advise the association, including the methods and expense of repairing or replacing any defective conditions, and the possible effects of not implementing the curative measures.

92.    Becker also recognized its attorneys' duty to advise community association clients by conducting meetings among Becker's attorneys, the association's management and engineering consultants to discuss the findings of engineering reports, resolve any outstanding issues relating to any additional defects not inspected previously (but perhaps referenced in unit owner complaints), and discuss the necessity for conducting additional inspections and destructive testing, and the associated costs.

11020754

93.     Becker breached these acknowledged duties owed to the Association. Unfortunately, Becker's lawyers failed to properly exercise and fulfill their fiduciary duties when representing the Association in matters that directly concerned the structural integrity of the Condominium building and the Association's fulfilment of its fiduciary duties to preserve, operate and maintain the Condominium.

94.     Becker did not advise and counsel the Association to directly and promptly address the serious structural concerns illustrated and discussed in the 2018 Morabito report. Becker's lawyers failed to reasonably advise and counsel the Association regarding the technical and practical aspects of the structural issues Morabito had disclosed in his reports. Instead, during the 2019 and 2020 timeframe Becker's lawyers focused their attention and that of the Association on cosmetic capital outlays rather than the critical structural integrity issues that Becker was made aware of years before.

95.     Becker also counseled the Association on how to re-purpose previously collected special assessments to new capital projects at the Condominium. Unfortunately, Becker did not make the obviously appropriate recommendation that the Association use its resources (including re-purposed special assessment funds) to address and remedy the most critical issues presented to the Association:  the structural integrity of its buildings in which its owners resided and slept with a false sense of security.

96.     As a direct and proximate result of Becker's breaches of its fiduciary duties, the Association has been damaged and has been exposed to extreme economic risks.

WHEREFORE, the Association demands judgment for damages against Becker & Poliakoff, P.A., and such further relief as this Court deems proper.

11020754

## COUNT III – COMMON LAW INDEMNITY

97.     The Receiver realleges Paragraphs 1 through 72.

98.     Becker undertook general counsel duties to the Association, and members of the Association's Board of Directors regularly looked to Becker for advice and counsel on a host of matters, including, without limitation, employment, dues and assessment collections, corporate governance, ballot and voting rules, strategies to assist the Board of Directors to garner sufficient votes from the unit owners on various matters, approaches to reserve funding, matters relating to the re-purposing of previously collected assessments, approvals of specific capital improvement projects, direct interaction with engineers and construction experts including providing commentaries and recommendations based on engineering reports, and step-by-step response strategies in relation to engineering reports.

99.     Various members of the Association's Board of Directors documented their high level of trust in and deference to Becker when seeking Becker's advice on several matters affecting the Condominium, both procedural and substantive. Becker held a confidential and special relationship with the Association, and the Association looked to Becker for advice and counsel to guide the Association's efforts to fulfill its fiduciary duties.

100.     Becker was employed by the Association to provide general advice and counsel to the Association as the Association sought to fulfill its fiduciary duties. Becker owed the Association a clear duty to provide its services at a level commensurate with attorneys practicing in Florida and in South Florida in the areas of condominium laws and construction matters. Becker's holding itself out as expert in condominium law and its ground-breaking role in the creation and development of condominium laws in Florida only heightened the level of service and competency Becker's lawyers were obligated to exercise and employ when providing

28

services to the Association. No other law firm in Florida matched Becker's experience, know-how and awareness of condominium-related matters and issues (including construction-related matters), and how to best resolve them.

101.    Becker recognized the importance of its community association attorneys guiding their clients by formulating an organized plan that is designed to discover and evaluate the nature and extent of any defects or deficiencies affecting the Condominium and potentially arising from the original design and construction of the condominium building(s), the identity of parties responsible for the design and construction of the condominium building(s), and the amount of recoverable damages associated with remedying the defective conditions. Becker recognized its attorneys' duty to advise community association clients regarding the matters about which inspecting engineers should advise the association, including the methods and expense of repairing or replacing any defective conditions, and the possible effects of not implementing the curative measures.

102.    Becker also recognized its attorneys' duty to advise community association clients by conducting meetings among Becker's attorneys, the association's management and engineering consultants to discuss the findings of engineering reports, resolve any outstanding issues relating to any additional defects not inspected previously (but perhaps referenced in unit owner complaints), and discuss the necessity for conducting additional inspections and destructive testing, and the associated costs.

103.    Becker breached these acknowledged duties owed to the Association. Unfortunately, Becker's lawyers failed to perform and meet a basic standard of conduct and level of care when representing the Association in matters that directly concerned the structural

11020754

integrity of the Condominium and the Association's fulfilment of its fiduciary duties to preserve, operate and maintain the Condominium.

104.     Becker did not advise and counsel the Association to directly and promptly address the serious structural concerns illustrated and discussed in the 2018 Morabito report. Becker's lawyers failed to reasonably advise and counsel the Association regarding the technical and practical aspects of the structural issues Morabito had disclosed in his reports. Instead, during the 2019 and 2020 timeframe, Becker's lawyers focused their attention and that of the Association on cosmetic capital outlays rather than the critical structural integrity issues that Becker was made aware of years before.

105.     Becker also counseled the Association on how to re-purpose previously collected special assessments to new capital projects at the Condominium. Unfortunately, Becker did not make the obviously appropriate recommendation that the Association use its resources (including re-purposed special assessment funds) to address and remedy the most critical issues presented to the Association:  the structural integrity of its building in which its owners resided and slept with a false sense of security.

106.     The Association has been named as a defendant in this action and is exposed to extreme and ongoing economic risks and damages in connection with the claims alleged against the Association by the Plaintiffs.

107.     The Association is exposed to those extreme and ongoing economic risks and damages as a result of Becker's breach of its duties to the Association.

108.     The Association has incurred damages, and may be further damaged and/or obligated to pay aggrieved parties, because of the Association's vicarious, constructive, derivative or technical liability for Becker's breaches of duties owed to the Association.

11020754

109.    Becker should bear all costs, expenses, damages and obligations that the Association has paid or incurred (and may pay or incur in the future) and that are attributable to Becker's wrongdoing.

WHEREFORE, the Association demands judgment for damages against Becker & Poliakoff, P.A., and such further relief as this Court deems proper.

### DEMAND FOR JURY TRIAL

The Receiver demands a trial by jury on all issues raised in this Crossclaim.

BERGER SINGERMAN LLP
*Attorneys for the Receiver*
1450 Brickell Ave., Ste. 1900
Miami, Florida 33131
Telephone: (305) 755-9500
Fax: (305) 714-4340


By: *s/ Paul Steven Singerman*
Paul Steven Singerman
Florida Bar No. 378860
Anthony J. Carriuolo
Florida Bar No. 434541
Jordi Guso
Florida Bar No. 863580
Singerman@bergersingerman.com
acarriuolo@bergersingerman.com
Jguso@bergersingerman.com
mnewland@bergersingerman.com
DRT@bergersingerman.com


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 30, 2021 a copy of the foregoing was electronically filed with the Clerk of Court by using the Florida Courts E-Filing Portal and furnished a copy of same to all counsel of record through the Florida Court's E-Filing Portal.

By: *s/ Anthony J. Carriuolo*
Anthony J. Carriuolo

11020754

# EXHIBIT 1



Kenneth S. Direktor, Esq.
Shareholder
Phone: (954) 965-5050   Fax: (954) 985-4176
kdirektor@bplegal.com

1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301

April 20, 2017

**Via E-Mail: Pedro.Forment@jacksonlewis.com**
**Via U.S. Mail**

Champlain Towers South Condominium Association, Inc.
8777 Collins Avenue
Surfside, FL 33154

Re:     **Community Association Annual Retainer Agreement for Champlain Towers South**
        **Condominium Association, Inc.**

Dear Members of the Board:

Thank you for your inquiry about legal services provided by Becker & Poliakoff.  Enclosed is the
Firm's Annual Retainer Agreement along with other materials to familiarize you with our Firm,
the attorneys with whom you will work, and a few of the publications we provide to our clients
to assist in the efficient operation of their communities.

**Background**

Since our founding in 1973, we have recognized that condominium, cooperative and
homeowners associations have unique issues. We dedicate ourselves to understanding these
issues, your issues, better than anyone and creating a law firm to help our clients resolve
problems with practical, affordable solutions. Our clients benefit from the combined knowledge
and experience of the largest team of professionals dedicated exclusively to community
association law.

**Approach**

Our team approach ensures cost efficiency which is especially important during difficult
economic times. Each community is assigned a Client Relationship Manager, an attorney who is
responsible for counseling the Association on day-to-day operational matters. If your Association
is involved in a dispute or needs assistance in areas such as Construction Law, Government
Relations, Telecommunications, just to name a few, your Client Relationship Manager will
coordinate with the other attorneys in the Firm to ensure that all your Association's legal needs
are met.

Champlain Towers South Condominium Association, Inc.
April 20, 2017
Page 2

For example, our litigation attorneys assist with covenant enforcement, collections/foreclosure and other disputes. Our construction team includes seventeen (17) Board Certified Construction Attorneys – no other Florida firm has more expertise in Construction law.  Our government attorneys assist associations with local and state government agencies or changing land use or zoning classifications. Our telecommunications attorneys work on cable agreements, technology and security contracts and protecting the association's intellectual property.

**Fees & Benefits**

The Association's only fixed obligation is the annual fee of $200.00.  Payment of the annual fee will cover the Association from the present to December 31, 2017. The Agreement entitles your Association to the following benefits which are *exclusive to clients* who have an Annual Retainer Agreement with our Firm:

    1.    Preferred hourly billing for all Becker & Poliakoff attorneys performing work under the Annual Retainer Agreement.  This includes general association matters, mediation, arbitration and litigation services.

    2.    Preparing a standard Annual Meeting notice package [notice(s), general or statutory limited proxy (as applicable) and voting certificate] for the Association's Annual Meeting occurring in the calendar year of the Annual Retainer Agreement. The Annual Meeting Questionnaire is now available on-line.  You will receive a custom encrypted link to your Annual Meeting Questionnaire every year with guided instructions on how to fill out and submit electronically after completion. In addition, to have your annual meeting notice package prepared at no cost, you must return the Annual Meeting Questionnaire to your attorney at least 21 days prior to the date on which your first notice must be mailed.  Any changes requested after you have received your Annual Meeting Notice Package will be charged at your attorney's billing rate.  NOTE: The Association will be billed for preparing voting documents for any vote other than the election of the Board of Directors.  The attendance of an attorney at the Annual Meeting, preparing amendments or anything else not specifically included in the standard notice package set forth above are not included under the annual retainer fee and will be billed at the hourly fee in Exhibit "B" to this Agreement.

    3.    Annual Retainer Clients receive a more than 50% discount ($750.00 reduced to $350.00) on the use of online voting software known as BPBALLOT. For more information please visit www.BPBALLOT.com.

    4.    Membership in the Firm's Community Association Leadership Lobby ("CALL") is exclusive to annual retainer clients and CALL members and includes the following: access to the password-protected areas of the CALL website: www.callbp.com, year-round CALL

Champlain Towers South Condominium Association, Inc.
April 20, 2017
Page 3

email alerts explaining and tracking Florida legislation and other timely topics impacting shared ownership communities as well as advance registration for Firm and CALL events. This lets you know everything that is going on in Tallahassee, what laws they may be thinking of passing that may impact you, how we as a Firm stand on each issue, and whether or not we would like for you to reach out to your elected officials regarding any issues. In addition, we will send out a legislative update each year which notifies you about any new law that has been passed and how it will impact your community. To obtain your password to access the CALL website, please call us at 1.844.435.2255 or email us at call@bplegal.com.

5.      Access to Firm publications keeping the Association informed of selected new case decisions, legislation, or other matters of interest to the Association. We offer many blogs, newsletters, and special alerts that each focus on various specialized topics that may be of interest to you, such as our Florida Condo and HOA blog and our Community Association Law Blog, which may appeal to Board Members, our Manager's Minute Blog, which focuses on issues that are relevant to managers, our Fla Construction Law Authority Blog, which deals with construction related topics, our Green Building Law Blog, which may be of interest if you are considering going green, and of course, our Community Association Update Newsletter.

6.      Free, client-focused programming, including educational presentations sponsored by the Firm. We offer approximately 300 client courses annually all over the state on a variety of topics, including, for example, Board Certification, 40 year recertification, Pets, Dealing with Difficult Unit Owners, and Bylaws, among others. All classes for CAM credit or otherwise required by the DBPR are approved by the State and offer CAM (Manager) credit.

7.      Access 24 hours per day, 365 days per year to the Firm's collection/foreclosure case information Website: http://bpcollections.com. This Client portal, which is password protected, allows you access to your collection/foreclosure matter(s) at any time of day or night, so that you no longer have to call or get billed to find out the status on your matter(s). The portal is updated regularly and also enables you to view and/or print status reports on any one or all of your collection/foreclosure matter(s).

8.      Client CARE Center, providing Becker & Poliakoff clients with easy access to a client service Concierge.  The Client CARE Center is here to serve our valued clients as client service is our #1 top priority. Our Director of Client Service may reach out to you and stop by for a complimentary visit to meet you, to learn about your community, and to supply you with one of our educational CAREkits. If you would like to know more about the services our valued clients receive through our Client CARE Center, please call us at 954-

BECKER_003963

Champlain Towers South Condominium Association, Inc.
April 20, 2017
Page 4

364-6090 or toll-free at 1-844-CAREBP1 (1-844-227-3271) and/or you can reach us via email at care@bplegal.com. We look forward to speaking with you.

The extent and limit of legal services are determined by you. There are no monthly minimum fees and this agreement can be terminated at any time. After reviewing the Retainer Agreement, if you have any questions, or if your Association would like a no cost meeting at our office to discuss the terms of the Retainer Agreement, please feel free to call me.

Should the Association wish to engage the firm, the following should be returned to us:

1.  Executed 2017 Annual Retainer (attached).

2.  $200.00 check made payable to Becker & Poliakoff, P.A.

3.  New Client Information Form (attached).

4.  Copy of RECORDED Association documents.

Again, thank you for the opportunity to present our capabilities and the unique advantages of working with our team. We are confident that no other firm can offer the multitude of services, depth of experience and understanding of your issues at affordable rates as Becker & Poliakoff.

I look forward to the opportunity to work with your Association.

Sincerely,

Kenneth S. Direktor
Shareholder
For the Firm
KSD/og



**BECKER &**
**POLIAKOFF**
Legal and Business Strategists

## COMMUNITY ASSOCIATION AUTHORITY TO REPRESENT
## AND RETAINER AGREEMENT

This Agreement is effective from _May 1 2017_ 2017 to December 31, 2017.

This Agreement can be renewed for additional one year periods, **AT THE ELECTION OF THE ASSOCIATION**, by paying the Annual Retainer Fee for the next calendar year period. The billing rate and the terms of this Agreement effective for any renewal term remain the same, unless a change is announced by the Firm in writing before the renewal begins. **This Agreement may be terminated at any time by either party by giving written notice to the other party.**

### Champlain Towers South Condominium Association, Inc. ("Association"),

by and through its Board of Directors, retains the law firm of BECKER & POLIAKOFF, P.A. (Firm), to represent it as legal counsel in the matters described in this Agreement and its Exhibits. This retainer and representation is solely and exclusively for the benefit of the Association, as a corporate entity, and not for any other party or third parties. There are no intended third party beneficiaries, including, but not limited to members of the Association; residents living in the community operated by the Association or guests of such residents; officers, directors, employees, or agents of the Association.

Paying the Annual Retainer Fee sum of Two Hundred ($200.00) Dollars entitles the Association to the services listed in Exhibit "A" <u>at no extra charge</u>.

The Firm will provide general legal services upon the request of the Association or as authorized by this Agreement concerning the day-to-day operation of the Association, including litigation, arbitration and mediation matters, on the reduced hourly fees stated in Exhibit "B" to this Agreement, subject to the terms and conditions in Exhibit "A".

The undersigned officer or agent of the Association represents and certifies that he(she) is authorized by the Board of Directors to execute this Agreement and agrees to the terms contained in the attached Exhibits on behalf of the Association and its membership.

"ASSOCIATION"

BY: _____ (SEAL)
Print Name: _Pedro Forrest_
Print Title: _President_

The above employment is accepted on the terms set forth herein.

BECKER & POLIAKOFF, P.A.

BY _____ (SEAL)
KENNETH S. DIREKTOR, ESQ.
Association Practice Group Leader

1

«MATTER_S_»

BECKER_003965

EXHIBIT "A"

### SERVICES PROVIDED UNDER ANNUAL RETAINER AGREEMENT AT NO EXTRA CHARGE

1. Preferred hourly billing for all Becker & Poliakoff attorneys performing work under the Annual Retainer Agreement. This includes general association matters, mediation, arbitration and litigation services.

2. Preparing a standard Annual Meeting notice package [notice(s), general or statutory limited proxy (as applicable) and voting certificate] for the Association's Annual Meeting occurring in the calendar year of the Annual Retainer Agreement. The Annual Meeting Questionnaire is now available on-line. You will receive a custom encrypted link to your Annual Meeting Questionnaire every year with guided instructions on how to fill out and submit electronically after completion. *In addition, to have your annual meeting notice package prepared at no cost, you must return the Annual Meeting Questionnaire to your attorney at least 21 days prior to the date on which your first notice must be mailed. Any changes requested after you have received your Annual Meeting Notice Package will be charged at your attorney's billing rate.* **NOTE: The Association will be billed for preparing voting documents for any vote other than the election of the Board of Directors. The attendance of an attorney at the Annual Meeting, preparing amendments or anything else not specifically included in the standard notice package set forth above are not included under the annual retainer fee and will be billed at the hourly fee in Exhibit "B" to this Agreement.**

3. Annual Retainer Clients receive a more than 50% discount ($750.00 reduced to $350.00) on the use of online voting software known as BPBALLOT. For more information please visit www.BPBALLOT.com.

4. Membership in the Firm's Community Association Leadership Lobby ("CALL") is exclusive to annual retainer clients and CALL members and includes the following: access to the password-protected areas of the CALL website: www.callbp.com, year-round CALL email alerts explaining and tracking Florida legislation and other timely topics impacting shared ownership communities as well as advance registration for Firm and CALL events. This lets you know everything that is going on in Tallahassee, what laws they may be thinking of passing that may impact you, how we as a Firm stand on each issue, and whether or not we would like for you to reach out to your elected officials regarding any issues. In addition, we will send out a legislative update each year which notifies you about any new law that has been passed and how it will impact your community. To obtain your password to access the CALL website, please call us at 1.844.435.2255 or email us at call@bplegal.com.

5. Access to Firm publications keeping the Association informed of selected new case decisions, legislation, or other matters of interest to the Association. We offer many blogs, newsletters, and special alerts that each focus on various specialized topics that may be of interest to you, such as our Florida Condo and HOA blog and our Community Association Law Blog, which may appeal to Board Members, our Manager's Minute Blog, which focuses on issues that are relevant to managers, our Fla Construction Law Authority Blog, which deals with construction related topics, our Green Building Law Blog, which may be of interest if you are considering going green, and of course, our Community Association Update Newsletter.

6. Free, client-focused programming, including educational presentations sponsored by the Firm. We offer approximately 300 client courses annually all over the state on a variety of topics, including, for example, Board Certification, 40 year recertification, Pets, Dealing with Difficult Unit Owners, and Bylaws, among others. All classes for CAM credit or otherwise required by the DBPR are approved by the State and offer CAM (Manager) credit.

7. Access 24 hours per day, 365 days per year to the Firm's collection/foreclosure case information Website: http://bpcollections.com. This Client portal, which is password protected, allows you access to your collection/foreclosure matter(s) at any time of day or night, so that you no longer have to call or get billed to find out the status on your matter(s). The portal is updated regularly and also enables you to view and/or print status reports on any one or all of your collection/foreclosure matter(s).

8. Client CARE Center, providing Becker & Poliakoff clients with easy access to a client service Concierge. The Client CARE Center is here to serve our valued clients as client service is our #1 top priority. Our Director of Client Service may reach out to you and stop by for a complimentary visit to meet you, to learn about your community, and to supply you with one of our educational CAREkits. If you would like to know more about the services our valued clients receive through our Client CARE Center, please call us at 954-364-6090 or toll-free at 1-844-CAREBP1 (1-844-227-3271) and/or you can reach us via email at care@bplegal.com. We look forward to speaking with you.

BECKER_003966

EXHIBIT "B"

BECKER & POLIAKOFF, P.A.

FORT LAUDERDALE

ANNUAL RETAINER BILLING RATES
(January 1, 2017 - December 31, 2017)

| ATTORNEY | HOURLY BILLING RATES |
|----------|---------------------|
| Kenneth S. Direktor | $395.00 |
| Donna D. Berger | $345.00 |
| Lee H. Burg | $325.00 |
| Howard J. Perl | $300.00 |

NOTE: Other attorneys, not included on this list, will from time to time perform work for your Association. At such time, you will be advised of their billing rates. Rates for collection work are set forth in the Exhibits to this Retainer.

Law Offices
Becker & Poliakoff, P.A.
1 East Broward Blvd., Suite 1800 • Ft. Lauderdale, FL  33301
Telephone (954) 987-7550

BECKER_003967

EXHIBIT "C"

TERMS AND CONDITIONS
FOR COMMUNITY ASSOCIATION ANNUAL RETAINER AGREEMENT

THE FIRM WILL ALSO HANDLE THE FOLLOWING MATTERS:

1. <u>Assessment Collection</u>: The Association can ask the Firm to collect delinquent assessments. Most standard collection and foreclosure work will be billed as detailed in the Uniform Collection Policy and Retainer Agreement attached as Exhibit "D" and the Foreclosure Retainer Agreement contained in Composite Exhibit "E". Unless a different fee is specified, other Collection work, including standard foreclosure actions, will be billed at the rate of $175.00 per hour, according to the terms of this Agreement, the Collection Retainer Agreement, and the Foreclosure Retainer Agreement. Defending standard foreclosures will be handled according to the terms of this Agreement and the Defense of Foreclosure Retainer Agreement in Composite Exhibit "E".

2. <u>Enforcement of Rules and Regulations and Covenants</u>: After receiving a written request from the Association concerning a violation of the covenants or rules and regulations and verifying the violation, a letter will be sent to the violator advising of the violation and requesting compliance with the covenants and/or rules and regulations. By authorizing the Firm to send a violation letter, the Association also authorizes the Firm to reply to or communicate with any person who responds on behalf of the violator. This service is provided at the hourly rate set forth in Exhibit "B". If the letter fails to achieve the desired results, upon the written request of the Association, an action will be commenced in court or in arbitration, or pre-suit mediation will be initiated, as may be required by law, and handled in accordance with the terms of this Agreement and the Covenant Enforcement Retainer Agreement attached as Exhibit "F". The rates and terms set forth in Exhibit "F" apply only to routine covenant and rules enforcement matters against members of the Association. Non-routine covenant enforcement matters (as determined by the Firm) and representation in matters adverse to parties other than members of the Association are subject to such terms and conditions as the Firm determines to be reasonable, as set forth below regarding legal services not covered by this Retainer.

3. <u>Corporate Status</u>: Unless the Association instructs the Firm, in writing, not to provide the service, the Firm will check the Association's corporate status annually with the Florida Secretary of State and report to client, if client has any status other than active or if any deadline for presenting the status is approaching. This service is provided at the hourly rate in Exhibit "B", but is not billable unless we determine that the filing is delinquent or the Association has been administratively dissolved.

4. <u>Registered Agent</u>: At the Association's request, the Firm will serve as registered agent for the Association at no charge. As registered agent, the Firm may receive service of process and official notices from governmental agencies and other parties on behalf of the Association. The Firm will forward them to the Association with instructions on handling. This service will be provided at the hourly rate in Exhibit "B".

5. <u>Legal Opinions for Audits</u>: Generally accepted accounting principles require a legal opinion on the Association's potential liability in connection with an audit. Every file and matter the Firm handled for the Association over the past fiscal year must be reviewed and analyzed in order to render the legal opinion required by the Association's accountant. The Firm takes on liability for these opinions. Therefore, the Association will be value-billed, at the rate set forth in Exhibit B, in accordance with the vast undertaking and liability involved.

6. <u>Legal Opinions for Bank Loans</u>: As a condition to loaning money, most banks require a legal opinion from the Association's attorney concerning the validity of the loan documents and collateral, the authority of the Association to borrow money and the verification that the procedures followed by the Association were correct. This is a complicated and time-consuming process, as every loan document must be reviewed and analyzed, the governing documents must be reviewed and analyzed, various other searches and due diligence must be performed, the Association's meetings, actions and procedures must be reviewed and analyzed and various communications with the bank and its attorney must be made. The Firm is exposed to potential liability for these opinions. Therefore, the Association will be value-billed by the attorneys handling the loan transaction, in accordance with the vast undertaking and liability involved.

7. <u>Attorney Testimony and Discovery Responses</u>: In the event an attorney from the Firm is asked by the Association to testify or give evidence on the Association's behalf, or if an attorney from the Firm is subpoenaed or otherwise required to testify or give evidence on behalf of or against the Association, the Association will be billed at and the Association agrees to pay the hourly

BECKER_003968

rate set forth in Exhibit "B" or at the attorney's preferred hourly rate for annual retainer clients, if the attorney's hourly rate is not listed on Exhibit "B".

8. Marketable Record Title Act ("MRTA") and Covenant Extinguishment: Please note that pursuant to Florida's Marketable Record Title Act ("MRTA") certain covenants and restrictions applicable to Associations (primarily related to homeowners' associations but also applicable to other types of associations in certain circumstances) are extinguished by law after a period of 30 years. Certain covenants and restrictions may also expire on their own terms without regard to MRTA. There are procedures for preventing MRTA extinguishment and revival after extinguishment. There may or may not be procedures for the extension or revival of covenants and restrictions which expire by their own terms. The Firm is not responsible to detect, calendar or otherwise address these issues under this Retainer Agreement unless requested in writing by the Association to do so.

9. In any action or lawsuit arising out of or related in any way to the COMMUNITY ASSOCIATION AUTHORITY TO REPRESENT AND RETAINER AGREEMENT, or any exhibit thereto, venue shall be in a court of competent jurisdiction in Broward County, Florida. IN THE EVENT OF A DISPUTE OVER THE AMOUNT OF LEGAL FEES CHARGED OR THE MANNER, NATURE OR EXTENT OF LEGAL SERVICES PROVIDED, YOU AGREE YOU HAVE WAIVED THE RIGHT TO A TRIAL BY JURY.

## LAW CLERKS AND PARALEGALS:

In our continuing effort to provide our Associations with quality legal services in the most cost-effective manner, we make use of law clerks and paralegals, both within and outside of Florida, provided that all work performed by paralegals and law clerks is reviewed by an attorney. If the Firm determines that research or other work can be efficiently handled by a law clerk or paralegal under an attorney's supervision, the time of the law clerk or paralegal will be billed at the rate specified on Exhibit "B". Collection and foreclosure paralegals, as noted above under "Assessment Collection," will be billed at the rate of $175.00 per hour.

## VALUE BILLING:

In situations where a previously-developed work product (e.g. a previously-developed management contract) is used as a primary source of an attorney's work product, a value may be applied to the previously-developed work product. This process is known as value billing. The benefit to the Association is improved legal services tailored to the Association's needs in less time and at a reduced cost. In all matters, a weighted value (value billing) will be applied to an attorney's efforts that utilize, as a primary source, a previously-developed work product. In other situations, where the Firm's exposure to liability is unrelated to the time actually spent on the legal services performed or is otherwise unusually high for the legal services performed, the Association will be value-billed based on the risk and liability imposed upon the Firm (risk billing). For these services, such as, but not limited to, loan opinions, audit opinions, or insurance coverage opinions, the Association will be charged a fee commensurate with the risk and potential liability of the Firm, which may result in a fee higher than the actual time spent performing the legal services.

If you have any questions concerning the application of value billing or risk billing to a specific matter being handled by the Firm, please feel free to write or call the attorney handling the matter.

## LEGAL SERVICES NOT COVERED BY RETAINER:

All other matters not covered by this Agreement, including, but not limited to, matters involving construction, developers, warranties, contractors, taxation, misrepresentations, accounting claims, mandatory club memberships, recreational leases, land leases, management contract disputes, real-estate transactions, zoning and land use matters, probate matters, complex foreclosure and defense of mortgage foreclosure actions (including, but not limited to, actions involving multi-units or complex lien priority questions), computer issues, bankruptcy and telecommunications issues, will be handled on a case-by-case basis, with fees determined and a separate retainer agreement entered into, if and when the need arises. If, for any reason, a separate Retainer Agreement for these other matters is not executed, non-retainer billing rates apply. If services are provided by the Firm prior to the commencement date of this Agreement and no Retainer Agreement is in effect for that period, non-retainer rates and the terms of this Retainer, including but not limited to, the terms set forth under the heading "Billing Policy", apply to those services. Any time the Association discontinues the Annual Retainer Agreement or terminates the services of the Firm for any reason, the Association must execute a new and separate agreement for each and every matter on which the Association wants the Firm to continue representing the Association and for any new matter on which the Association wants the Firm to represent the Association. **The Firm will not perform any legal services or work unless and until the new agreement is executed by the Association.** The new agreement will be on such terms and conditions as the Firm requires for a non-annual retainer association. Except to the extent expressly stated in this Retainer, the Firm only performs legal services or gives legal advice when specifically requested or specifically instructed to

5
Law Offices
Becker & Poliakoff, P.A.
1 East Broward Blvd., Suite 1800 • Ft. Lauderdale, FL  33301
Telephone (954) 987-7550

do so. The Firm does not unilaterally or proactively search for possible or potential legal issues or possible or potential problems, unless specifically and expressly asked to do so.

## BILLING POLICY:

The Firm will provide the Association monthly itemized statements for services performed. Fees billed are due and payable within ten (10) days after receiving the statement. Unpaid bills bear interest at the highest rate permissible under the law until paid, commencing 30 days after due date. All payments received on account are applied to the oldest balance then due on any matter, unless otherwise instructed by the Association. In the event that legal action by the Firm is required to collect past-due obligations from the Association, the Firm is entitled to recover its costs and reasonable attorney's fees, and the value of attorney's fees when the Firm represents itself at all pre-litigation, trial, arbitration, and appellate levels. The Firm is also entitled to recover reasonable attorney's fees to establish its right to recover attorney's fees and to establish the amount of attorney's fees to which it is entitled to recover. Should the Firm cease to represent the Association for any reason, including the Firm's voluntary withdrawal during the pendency of any matter or action, and any attorrey's fees or costs remain unpaid, the Firm is entitled to a charging lien and to payment of any costs and attorney's fees out of any eventual recovery in the action (in addition to any right to a retaining lien) or other rights retained herein. The Firm can also retain any monies held in trust for the client during the pendency of a fee dispute. In the event the annual retainer fee is not paid on or before February 28 of the calendar year for which the Annual Retainer Agreement is effective, the Association will not be on an Annual Retainer, but instead, will have discontinued the Annual Retainer Agreement.

## DOCUMENT REVIEW FOR NEW CLIENTS ONLY:

The starting point for providing legal counsel to the Association is a review of the Association's governing documents: Articles of Incorporation; By-Laws; Declaration of Condominium or Declaration of Covenants and Restrictions; and Rules and Regulations. The Association must, at its own expense, provide the Firm with a complete set of the recorded governing documents and such other documents and/or records as may be required. In the alternative, or in the event the documents provided by the Association are not complete, the Firm will order a set of the governing documents from the County Public Records, at the expense of the Association. At the discretion of the attorney, there may be a one-time charge for the review and indexing of the governing documents. The purpose of the initial document review, which is discretionary with the Attorney assigned to your matter, is for internal familiarization and organization, not to comment on legally problematic provisions, suggest changes or updates, or analyze Marketable Record Title Act ("MRTA") cr expiration issues discussed above. These services can be provided upon the written request of the Association.

## COSTS AND OTHER CHARGES:

In addition to the fees set forth above, the Association must pay the Firm for any and all costs, including, but not limited to telephone calls; facsimile transmissions, printing, scanning or other digital or electronic images; postage; overnight courier services; travel; parking; filing and electronic filing, recording, certification, registration or recording fees charged by governmental agencies; costs of preparation and investigation, computer legal research; abstracting; complex document production; processing, loading, conversion, coding, manipulation, technical assistance and project management costs for use with litigation support software; computer searches and computer generated documents and filings; and applicable taxes. Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. Scanning or other digital or electronic images and photocopying costs are twenty-five (\$.25) Cents per copy or page. Instead of charging long distance and telephone conference fees, facsimile transmissions, routine printing, scanning or other digital or electronic images, the firm may elect to charge a one-time fee of \$2.25 per megabyte of stored records rounded up to the nearest dollar. This electronic records fee will be charged only once, as records are added to the database, and will not be a recurring charge for storage.

## NON-RETAINER BILLING RATES:

Associations not on Annual Retainer or Associations who discontinue Annual Retainer Agreements or terminate the services of the Firm for any reason will be billed at the following hourly rates for general legal services that would have otherwise been covered by the Annual Retainer, which are higher than the hourly rates for Annual Retainer Associations of the Firm: \$450.00 for shareholders, \$350.00 for senior attorneys, \$300.00 for associates. Legal services that would not have otherwise been covered by the Annual Retainer will be billed at the prevailing hourly rates of the attorneys handling the matter and will be quoted prior to commencing legal services for non-retainer Associations. At any time the Association discontinues the Annual Retainer Agreement or terminates the services of the Firm for any reason, the Association will be billed at the attorneys' higher non-annual retainer hourly rates for all legal services the Firm continues to provide at the Association's request or for any new or additional legal services. Further, any and all

BECKER_003970

costs and fees that have accrued, but have not been taken by the Firm or for which payment has not been received by the Firm, are automatically and immediately due and payable in full by the Association to the Firm. The Firm will not provide any legal services unless and until all such accrued costs and fees are paid to the Firm by the Association. In addition to billing at the attorneys' higher non-annual retainer hourly rate, the Firm can require the Association to deposit with the Firm a cost and fee retainer of the Firm's choosing commensurate with the legal services the Firm is being asked to provide. If the Firm requires this cost and fee retainer, the Firm will not provide any legal services unless and until the cost and fee retainer is paid to the Firm by the Association. When an Association terminates the services of the Firm for any reason, the Firm has no obligation to transfer or copy the Firm's files it has maintained for that Association, but the Firm may choose to copy some or all its files, if the Association requests copies, provided the Association has paid all fees, costs and interest it owes to the Firm, including the cost to copy the files. **NOTE: If the Association has not renewed its retainer agreement but still requests legal work to be performed or if legal work is otherwise required, the terms and conditions of this Retainer Agreement shall apply except that the Preferred Hourly Rates specified shall not apply and the default non-retainer rates set forth elsewhere herein shall be deemed applicable, and may be adjusted retroactively.**

## DISCLOSURE OF ATTORNEY-CLIENT RELATIONSHIP:

The Association consents to the firm disclosing the attorney-client relationship existing between the Association and Becker & Poliakoff, P.A. for the firm's marketing and promotional purposes.

Our communications with the Association are subject to the attorney-client privilege, which could be waived by communications with parties not subject to the privilege. Based upon Florida case law, a court may determine on a case by case basis whether communications with a Community Association Manager (CAM) or management company constitute a privilege waiver. We recommend that our clients consult with us about this issue and determine the extent of CAM/management company involvement in legal matters. Absent same, and understanding that a privilege waiver issue could arise, it is the Firm's policy to communicate with those "authorized contacts" designated by the Association, including CAMs and management companies unless advised to the contrary.

## CONFLICTS OF INTEREST:

In instances when the Firm represents a corporation or other entity, our Client relationship is with the "entity" and not with its individual officers, executives, shareholders, members, directors, partners, or persons in similar positions, or with its parent, subsidiaries, or other affiliates. In these cases, our professional responsibilities are owed only to that entity alone and no conflict of interest will be asserted by you because we represent persons with respect to interests that are adverse to the individual persons or business organizations having a relationship with you.

## VIRUS AND COMPUTER HACKING PROTECTION:

During the course of our engagement, we may exchange electronic versions of documents and emails with you using commercially available software. Unfortunately, businesses and people are often victimized by the creation and dissemination of computer viruses, or similar destructive electronic programs. We take the issues raised by these viruses seriously and have invested in software and systems that identify and reject files containing known viruses. We also update our system with the software of various vendors' current releases at regular intervals.

By utilizing this scanning software, our system may occasionally reject an email you send to us. We, in turn, may email you something that is rejected by your system. We believe this infrequent occurrence is to be expected as part of the ordinary course of business.

Because the virus protection industry is generally one or two steps behind new viruses, we cannot guarantee that our communications and documents will always be virus free. Occasionally, a virus will go undetected as it is passed from system to system. Although we take seriously our virus protection measures, we make no warranty that our documents and communications with you will be virus free and we are not responsible for any such computer viruses.

Please inform us immediately in the event a virus enters your company's system via any electronic means originating from our Firm. Through cooperative efforts we can minimize any disruption to our communications.

Law Offices
Becker & Poliakoff, P.A.
1 East Broward Blvd., Suite 1800 • Ft. Lauderdale, FL  33301
Telephone (954) 987-7550

BECKER_003971

Similarly, we have invested in software and systems that identify and protect against computer hackers gaining access to our computers, data, email and communications with you. Nevertheless, no precautions can prevent every hacking attempt. Accordingly, we make no warranty that our computers, data, email and communications with you will be free of computer hacking and we are not responsible for any such computer hacking.

BECKER_003972

EXHIBIT "D"

## UNIFORM COLLECTION POLICY AND RETAINER AGREEMENT FOR COMMUNITY ASSOCIATION ANNUAL RETAINER CLIENTS OF BECKER & POLIAKOFF, P.A.

When a collection matter is referred to the Firm, it must be submitted on a ledger showing all charges, payments and delinquencies and dating back to a time when the delinquent owner had a zero balance. The Firm will send a letter to the delinquent owner requesting payment of the outstanding obligation and specifying the Association's intent to record a Claim of Lien and to foreclose that Claim of Lien, if the entire balance is not paid in full.

If payment in full is not received within the time allowed under the Firm's initial collection letter, after verifying that payment has not been made directly to the Association, the Firm will record of a Claim of Lien. The Firm will send the owner a copy of the Claim of Lien, together with the written notice of the Association's intent to foreclose that Claim of Lien within thirty (30) days, or forty-five (45) days, as applicable, from the date the letter is mailed, unless full payment is made.

Pursuant to the **Fair Debt Collections Practices Act,** the Firm may be defined as a debt collector when providing collection services and the assessment may fall within the definition of a debt. The law requires collection efforts to be suspended, if a debtor requests validation of the debt in writing within thirty (30) days of the initial communication between the debtor and the debt collector. The Firm will cease collection efforts until the Association verifies, in writing, the amount due. The Association agrees to cooperate with the Firm in connection with any effort to validate the debt. If the Association fails to cooperate, the Firm will take no further action on the Association's behalf. The Firm will mail a copy of the Association's verification to the debtor. Should the Association receive any notice disputing the delinquent amount or receive a request for validation of the debt, such notice or request must be immediately provided to the Firm.

As compensation for collection services provided by the Firm, the Association agrees to pay to the Firm One Hundred Seventy Five ($175.00) Dollars per hour. The billing rate and the terms of this Agreement effective for any renewal term remain the same, unless a change is announced by the Firm in writing before the renewal begins.

The Firm will provide the Association monthly itemized statements for services performed. Fees billed are due and payable within ten (10) days after receiving the statement. Unpaid bills bear interest at the highest rate permissible under the law until paid, commencing 30 days after due date. Alternative billing arrangements may be made by the Firm, at its discretion, upon the written request of the Association. If so provided, the Association must sign a separate retainer agreement setting forth the terms of representation.

In addition to the fees set forth above, the Association must pay the Firm for any and all costs, including, but not limited to telephone calls; facsimile transmissions, printing, scanning or other digital or electronic images; postage; overnight courier services; travel; parking; filing and electronic filing, recording, certification, registration or recording fees charged by governmental agencies; costs of preparation and investigation, computer legal research; abstracting; complex document production; processing, loading, conversion, coding, manipulation, technical assistance and project management costs for use with litigation support software; computer searches and computer generated documents and filings; and applicable taxes. Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. Scanning or other digital or electronic images and photocopying costs are twenty-five ($.25) Cents per copy or page. Instead of charging long distance and telephone conference fees, facsimile transmissions, routine printing, scanning or other digital or electronic images, the firm may elect to charge a one-time fee of $2.25 per megabyte of stored records rounded up to the nearest dollar. This electronic records fee will be charged only once, as records are added to the database, and will not be a recurring charge for storage.

The owners may be responsible to reimburse the Association for court costs and attorney's fees incurred in the collection of assessments. Nevertheless, the Association understands that the Firm will remit statements for services rendered and costs incurred on a monthly basis and the Association agrees to pay such amounts as billed. Any amount received from the owner will be remitted to the Association and such amount may include attorney's fees and costs previously paid to the Firm by the Association. Regardless of whether all fees and costs billed to the Association are recovered from the owner, the Association understands and agrees to pay fees and costs billed. If the Association is past due on any of its financial obligations to the Firm, the Firm may withhold delivery of any funds received from an owner at any stage of the collection or foreclosure process until the Association cures any delinquency owed to the Firm, and the Firm may apply any such funds towards any fees and costs owed to the Firm. Should the Firm cease representing the Association for any reason, including the Firm's voluntary withdrawal during the pendency of any matter or action,

BECKER_003973

and if any attorney's fees or costs remain unpaid, the Firm is entitled to a charging lien and to payment of any costs and attorney's fees out of any eventual recovery in the action (in addition to any right to a retaining lien) or other rights retained herein.

The Firm will try to recover from the owner the amount paid by the Association to the Firm for those services involved in the collection process at the time the collection matter is resolved. Legal fees billed become part of the claim against the unit (home) owner where permitted by law. At the Firm's discretion, there may be non-routine aspects of a collection matter (e.g. special assessments, developer assessment delinquency, non-assessment charges, etc.) that may require review or work by the Firm to properly represent the Association. Some charges are typically not recoverable from the delinquent owner, even though those charges are billed to and paid by the Association. The Association acknowledges that, in certain circumstances, not all legal fees billed will become part of the claim against the owner. Such fees and circumstances are determined by the Firm in its discretion. Unless authorized by the Association, the case will not be settled by the Firm without including the attorney's fees that are part of the claim. Unless Association has an account receivable with the Firm over sixty (60) days past due on any matter, the Firm will advance the cost of recording the claim of lien in the Public Records and the cost of postage, including certified or registered mail. These costs are due and payable on a monthly basis and become delinquent in the same manner as fees provided herein. If any other costs may be incurred in connection with the collection process, the Association must provide the Firm with a cost deposit, in advance of incurring the cost, when requested by the Firm. Any cost deposits not utilized will be refunded to the Association upon conclusion of the matter. However, the Firm has the right, at any time, to disburse funds recovered in the collection process and, at the conclusion of the matter or upon the Association's termination of services, the Firm has the right to disburse the balance of funds in the cost deposit account directly to the Firm to pay fees due the Firm for any collection or other matter.

Notwithstanding anything to the contrary, at any time the Association discontinues the Annual Retainer Agreement or terminates the services of the Firm for any reason, the Association will be billed at the attorneys' higher non-annual retainer prevailing hourly rates for all legal services the Firm continues to provide at the Association's request or for any new or additional legal services the Firm provides at the Association's request. Further, any and all costs and fees that have accrued, but have not been billed by the Firm or for which payment has not been received by the Firm, are automatically and immediately due and payable in full by the Association to the Firm. The Firm will not provide any legal services unless and until all such accrued costs and fees are paid to the Firm by the Association. In addition, the Firm can require the Association to deposit with the Firm a cost and fee retainer of the Firm's choosing commensurate with the legal services the Firm is being asked to provide. If the Firm requires this cost and fee retainer, the Firm will not provide any legal services unless and until the cost and fee retainer is paid to the Firm by the Association. When an Association terminates the services of the Firm for any reason, the Firm has no obligation to transfer or copy the Firm's files it has maintained for that Association, but the Firm may choose to copy some or all its files, if the Association requests copies, provided the Association has paid all fees, costs and interest it owes to the Firm, including the cost to copy the files. In the event that legal action is required to collect past-due obligations owed by Association to the Firm, the Firm is entitled to recover reasonable attorney's fees and costs, including the value of time expended by the Firm in pursuing such legal action, even when the Firm represents itself.

In the event that legal action is required to collect past-due obligations owed to the Firm by the Association, the Firm is entitled to recover reasonable costs and attorney's fees, including the value of time expended by the Firm in pursuing such legal action, even when the Firm represents itself. The Firm is also entitled to recover reasonable attorney's fees to establish its right to recover attorney's fees and to establish the amount of attorney's fees to which it is entitled to recover.

This Agreement authorizes the Firm to sign Claims of Lien and Satisfactions of Lien for and on behalf of the Association.

BECKER_003974

COMPOSITE EXHIBIT "E"

FORECLOSURE RETAINER AGREEMENT

As compensation for foreclosing the Association's Claim of Lien, the Association agrees to pay to the Firm One Hundred Seventy Five ($175.00) Dollars per hour. The Firm will provide the Association monthly itemized statements for services performed. Fees billed are due and payable within ten (10) days after receiving the statement. Unpaid bills bear interest at the highest rate permissible under the law until paid, commencing 30 days after due date. Alternative billing arrangements may be made by the Firm, at its discretion, upon the written request of the Association. If so provided, the Association must sign a separate retainer agreement setting forth the terms of representation. The billing rate and the terms of this Agreement effective for any renewal term remain the same, unless a change is announced by the Firm in writing before the renewal begins. Association acknowledges that the fees being paid under this Retainer Agreement are less than those fees charged to Associations that are not under an Annual Retainer Agreement with the Firm.

The owners may be responsible to reimburse the Association for court costs and attorney's fees in connection with foreclosing the Association's Claim of Lien. Nevertheless, the Association understands that the Firm will remit statements for services rendered and costs incurred on a monthly basis and the Association agrees to pay such amounts as billed. Any amount received from the owner will be remitted to the Association and such amount may include attorney's fees and costs previously paid to the Firm by the Association. Regardless of whether all fees and costs billed to the Association are recovered from the owner, the Association understands and agrees to pay fees and costs billed. If the Association is past due on any of its financial obligations to the Firm, the Firm may withhold delivery of any funds received from an owner at any stage of the foreclosure process, until the Association cures any delinquency owed to the Firm, and the Firm may apply any such funds towards any fees and costs owed to the Firm. Should the Firm cease representing the Association for any reason, including the Firm's voluntary withdrawal during the pendency of any matter or action, and if any attorney's fees or costs remain unpaid, the Firm is entitled to a charging lien and to payment of any costs and attorney's fees out of any eventual recovery in the action (in addition to any right to a retaining lien) or other rights retained herein.

The Firm will try to recover from the owner, or from the proceeds of the foreclosure sale, the amount paid by the Association to the Firm for those services involved in the foreclosure process, if the matter is resolved prior to a judgment entered by the court. In most circumstances, all legal fees billed become part of the claim against the owner. However, the Association acknowledges that, in certain circumstances, not all legal fees billed will become part of the claim against the owner; such fees and circumstances are determined by the Firm in its discretion. Unless authorized by the Association, the case will not be settled by the Firm without including the attorney's fees that are part of the claim. If attorney's fees are awarded by a court and are collected from a foreclosure sale or are paid by the owner, the Firm is entitled to receive such fees to the extent they exceed the amount the Association would otherwise be obligated to pay the Firm under this Agreement.

It is understood and agreed that this agreement does not apply: (1) to the defense of any counterclaim that may be filed against the Association, or (2) in the event of any factor rendering the litigation unusually complex, as set forth in a written notice from the Firm to the Association, in which case the Firm will be entitled to compensation at the hourly rates set forth in Exhibit "B" or in a separate Retainer Agreement. In the event that a covenant enforcement cause of action is brought against the owner(s) by the Association in the foreclosure action, the billing rates and procedures for covenant enforcement only is the same as those set forth in Exhibit "F". In the event an appeal of the action is filed, a different fee structure may, in the Firm's discretion, apply.

In addition to the fees set forth above, the Association must pay the Firm for any and all costs, including, but not limited to telephone calls; facsimile transmissions, printing, scanning or other digital or electronic images; postage; overnight courier services; travel; parking; filing and electronic filing, recording, certification, registration or recording fees charged by governmental agencies; costs of preparation and investigation, computer legal research; abstracting; complex document production; processing, loading, conversion, coding, manipulation, technical assistance and project management costs for use with litigation support software; computer searches and computer generated documents and filings; and applicable taxes. Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. Scanning or other digital or electronic images and photocopying costs are twenty-five ($.25) Cents per copy or page. Instead of charging long distance and telephone conference fees, facsimile transmissions, routine printing, scanning or other digital or electronic images, the firm may elect to charge a one-time fee of $2.25 per megabyte of stored records rounded up to the nearest dollar. This electronic records fee will be charged only once, as records are added to the database, and will not be a recurring charge for storage.

Some of the costs are recoverable in the event of a settlement or a favorable judgment. Any cost deposits not utilized will be refunded to the Association upon conclusion of the matter. Further, the Association agrees to submit such attorney's fee deposits,

BECKER_003975

in advance, as may be required at the discretion of the Firm, in order to insure that sufficient funds will be available to pay the services that are being rendered, based upon the circumstances of the case from time to time.

If the Association authorizes the Firm to file a foreclosure action, the Association must submit an initial cost deposit for costs, such as filing fees, process server charges and computer searches, which the Firm will deposit into a trust account in the name of the Association. The amount of the initial cost deposit is determined by the Firm, in its discretion, at the time it is requested. Additional cost deposits may be required as the action progresses. The Association agrees to submit such additional cost deposits in advance as required by the Firm. At the conclusion of the litigation or if the Association terminates the Firm's representation, the Firm has the right to disburse the balance of funds in the cost deposit account directly to the Firm to pay fees or costs due the Firm for any collection/foreclosure or other matter.

A short authorization form or other similar writing must be submitted by the Association to the Firm authorizing the Firm to proceed pursuant to the terms of this Agreement. Any additional authorizations or special instructions by the Association regarding the amounts due and/or status of the account or concerning the settlement or dismissal of the action must be submitted in writing to the Firm. This Agreement authorizes the Firm to sign satisfactions of lien for Association. Association acknowledges and agrees that the Firm relies on Association to provide accurate information regarding or in any way relating to any amounts due the Association and Association agrees to defend, indemnify and hold the Firm harmless for any claims of any kind whatsoever, including, but not limited to, any costs and attorney's fees related in any way to the Firm's reliance on the information provided by the Association or Association's agent regarding or in any way related to the amount due the Association.

At any time the Association discontinues the Annual Retainer Agreement or terminates the services of the Firm for any reason, the Association will be billed at the attorneys' higher non-annual retainer prevailing hourly rates for all legal services the Firm continues to provide at the Association's request or for any new or additional legal services the Firm provides at the Association's request. Further, any and all costs and fees that have accrued, but have not been billed by the Firm, or for which payment has not been received by the Firm, are automatically and immediately due and payable in full by the Association to the Firm. The Firm will not provide any legal services unless and until all such accrued costs and fees are paid to the Firm by the Association. In addition, the Firm can require the Association to deposit with the Firm a cost and fee retainer of the Firm's choosing commensurate with the legal services the Firm is being asked to provide. If the Firm requires this cost and fee retainer, the Firm will not provide any legal services unless and until the cost and fee retainer is paid to the Firm by the Association. When an Association terminates the services of the Firm for any reason, the Firm has no obligation to transfer or copy the Firm's files it has maintained for that Association, but the Firm may choose to copy some or all its files, if the Association requests copies, provided the Association has paid all fees, costs and interest it owes to the Firm, including the cost to copy the files. In the event that legal action is required to collect past-due obligations owed to the Firm by the Association, the Firm is entitled to recover reasonable costs and attorney's fees, including the value of time expended by the Firm in pursuing such legal action, even when the Firm represents itself. The Firm is also entitled to recover reasonable attorney's fees to establish its right to recover attorney's fees and to establish the amount of attorney's fees to which it is entitled to recover.

BECKER_003976

COMPOSITE EXHIBIT "E"

DEFENSE OF
FORECLOSURE RETAINER AGREEMENT

As compensation for defending the Association in a mortgage foreclosure, or in a community association lien foreclosure action when the Association is a defendant by virtue of its status as an alleged junior lien holder, or to assert in that lawsuit or by separate action, any claims it may have against Plaintiff or the owners, including, but not limited to, foreclosure and damages, the Association agrees to pay to the Firm One Hundred Seventy Five ($175.00) Dollars per hour. The Firm will provide the Association monthly itemized statements for services performed. Fees billed are due and payable within ten (10) days after receiving the statement. Unpaid bills bear interest at the highest rate permissible under the law until paid, commencing 30 days after due date. Alternative billing arrangements may be made by the Firm, at its discretion, upon the written request of the Association. If so provided, the Association must sign a separate retainer agreement setting forth the terms of representation. The billing rate and the terms of this Agreement effective for any renewal term remain the same, unless a change is announced by the Firm in writing before the renewal begins. Association acknowledges that the fees being paid under this Retainer Agreement are less than those fees charged to Associations that are not under an Annual Retainer Agreement with the Firm.

It is understood and agreed that this retainer does not apply: (1) to the defense of any cross-claim that may be filed against the Association, or (2) in the event of any factor rendering the litigation unusually complex, as set forth in a written notice from the Firm to the Association, in which case the Firm will be entitled to compensation at the hourly rates set forth in Exhibit "B" or in a separate Retainer Agreement. In the event that a covenant enforcement cause of action is brought against the owner(s) by the Association in the foreclosure action, the billing rates and procedures for the covenant enforcement only are the same as those set forth in Exhibit "F". In the event an appeal of the action is filed, a different fee structure may, in the Firm's discretion, apply.

In addition to the fees set forth above, the Association must pay the Firm for any and all costs, including, but not limited to telephone calls; facsimile transmissions, printing, scanning or other digital or electronic images; postage; overnight courier services; travel; parking; filing and electronic filing, recording, certification, registration or recording fees charged by governmental agencies; costs of preparation and investigation, computer legal research; abstracting; complex document production; processing, loading, conversion, coding, manipulation, technical assistance and project management costs for use with litigation support software; computer searches and computer generated documents and filings; and applicable taxes. Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. Scanning or other digital or electronic images and photocopying costs are twenty-five ($.25) Cents per copy or page. Instead of charging long distance and telephone conference fees, facsimile transmissions, routine printing, scanning or other digital or electronic images, the firm may elect to charge a one-time fee of $2.25 per megabyte of stored records rounded up to the nearest dollar. This electronic records fee will be charged only once, as records are added to the database, and will not be a recurring charge for storage.

Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. It is understood and agreed that the Firm will not be required to advance costs on behalf of the Association, except as elsewhere provided herein, and the Association agrees to submit such cost deposit funds, in advance, as are necessary to pay for out-of-pocket expenses in connection with this matter. Further, the Association agrees to submit such attorney's fee deposits, in advance, as may be required at the discretion of the Firm, in order to insure that sufficient funds will be available to pay the services that are being rendered, based upon the circumstances of the case from time to time. The Firm may, in its discretion, bill the Association for costs incurred on the Association's behalf; payment by Association is due immediately upon billing. At the conclusion of the litigation, or if the Association terminates the Firm's representation, the Firm has the right to disburse the balance of funds in the cost deposit account directly to the Firm to pay fees or costs due the Firm for any collection/foreclosure or other matter. In the event that legal action is required to collect past-due obligations owed to the Firm by the Association, the Firm is entitled to recover reasonable attorney's fees and costs, including the value of time expended by the Firm in pursuing such legal action, even when the Firm represents itself. The Firm is also entitled to recover reasonable attorney's fees to establish its right to recover attorney's fees and to establish the amount of attorney's fees to which it is entitled to recover.

The owners may be responsible to reimburse the Association for court costs and attorney's fees in connection with the proceedings contemplated herein. Nevertheless, the Association understands that the Firm will remit statements for services rendered and costs incurred on a monthly basis, and the Association agrees to pay such amounts as billed. Any amount received from the owner will be remitted to the Association, and such amount may include attorney's fees and costs previously paid to the Firm by the Association. Regardless of whether all fees and costs billed to the Association are recovered from the owner, the Association understands and agrees to pay fees and costs billed. If the Association is past due on any of its financial obligations to the Firm, the

13
Law Offices
Becker & Poliakoff, P.A.
1 East Broward Blvd., Suite 1800 • Ft. Lauderdale, FL 33301
Telephone (954) 987-7550

BECKER_003977

Firm may withhold delivery of any funds received from an owner at any stage of the collection or foreclosure process, until the Association cures any delinquency owed to the Firm, and the Firm may apply any such funds towards any fees and costs owed to the Firm. Should the Firm cease to represent the Association for any reason, including the Firm's voluntary withdrawal during the pendency of any matter or action, and if any attorney's fees or costs remain unpaid, the Firm is entitled to a charging lien and to payment of any costs and attorney's fees out of any eventual recovery in the action (in addition to any right to a retaining lien) or other rights retained herein.

If the Firm, or any of its attorneys, serves as the Association's registered agent and is served with a foreclosure action wherein the Association is named as an adverse party, this Agreement is the Association's authorization for the Firm to act on the Association's behalf to file whatever response the Firm deems appropriate in the action. Such response may include, but is not limited to, an answer to protect the Association's interest. Such response may be taken by the Firm, in its sole discretion, without any further authorization from the Association and the Association agrees to pay for attorney's fees incurred in such action. Likewise, if the Association, or any agent of the Association, delivers a foreclosure action to the Firm wherein the Association is named as an adverse party, such delivery is the Association's authorization to take whatever action is necessary to protect the Association's interest without further approval from the Association. Any additional authorizations or special instructions by the Association regarding the amounts and/or status of this account or concerning settlement or dismissal of the action must be submitted in writing to the Firm.

At any time the Association discontinues the Annual Retainer Agreement or terminates the services of the Firm for any reason, the Association will be billed at the attorneys' higher non-annual retainer prevailing hourly rates for all legal services the Firm continues to provide at the Association's request or for any new or additional legal services the Firm provides at the Association's request. Further, any and all costs and fees that have accrued, but have not been billed by the Firm or for which payment has not been received by the Firm, are automatically and immediately due and payable in full by the Association to the Firm. The Firm will not provide any legal services unless and until all such accrued costs and fees are paid to the Firm by the Association. In addition, the Firm can require the Association to deposit with the Firm a cost and fee retainer of the Firm's choosing commensurate with the legal services the Firm is being asked to provide. If the Firm requires this cost and fee retainer, the Firm will not provide any legal services unless and until the cost and fee retainer is paid to the Firm by the Association. When an Association terminates the services of the Firm for any reason, the Firm has no obligation to transfer or copy the Firm's files it has maintained for that Association, but the Firm may choose to copy some or all its files, if the Association requests copies, provided the Association has paid all fees, costs and interest it owes to the Firm, including the cost to copy the files.

BECKER_003978

EXHIBIT "F"

COVENANT
ENFORCEMENT RETAINER AGREEMENT

As compensation for pre-suit mediation, arbitration, or a court action against the unit or lot owner(s) and such other individuals as the Firm may decide, to enforce community association statutes, covenants, restrictions and/or rules and regulations, the Association agrees to pay the Firm based upon Exhibit "B". The Firm will provide the Association monthly itemized statements for services performed. Fees billed are due and payable within ten (10) days after receiving the statement. Unpaid bills bear interest at the highest rate permissible under the law until paid, commencing 30 days after due date. Alternative billing arrangements may be made by the Firm, at its discretion, upon the written request of the Association. If so provided, the Association must sign a separate retainer agreement setting forth the terms of representation. The billing rate and the terms of this Agreement effective for any renewal term remain the same, unless a change is announced by the Firm in writing before the renewal begins. Association acknowledges that the fees being paid under this Retainer Agreement are less than those fees charged to Associations that are not under an Annual Retainer Agreement with the Firm. In the event an appeal is filed, a different rate may apply.

At any time the Association discontinues the Agreement or terminates the services of the Firm, the Association will be billed at the attorneys' higher non-annual retainer prevailing hourly rates for all legal services the Firm continues to provide at the Association's request or for any new or additional legal services the Firm provides at the Association's request. Any and all costs and fees that have accrued, but have not been taken by the Firm or for which payment has not been received by the Firm, are automatically and immediately due and payable in full by the Association to the Firm. The Firm will not provide any legal services unless and until all such accrued costs and fees are paid by the Association. In addition to billing at the attorneys' higher hourly rate, the Firm can require the Association to deposit with the Firm a cost and fee retainer of the Firm's choosing commensurate with the legal services the Firm is being asked to provide. If the Firm requires this cost and fee retainer, the Firm will not provide any legal services until the cost and fee retainer is paid. When an Association terminates the services of the Firm for any reason, the Firm has no obligation to transfer or copy the Firm's files it has maintained for that Association, but the Firm may choose to copy some or all its files, if the Association requests copies, provided the Association has paid all fees, costs and interest it owes to the Firm, including the cost to copy the files.

In addition to the fees set forth above, the Association must pay the Firm for any and all costs, including, but not limited to telephone calls; facsimile transmissions, printing, scanning or other digital or electronic images; postage; overnight courier services; travel; parking; filing and electronic filing, recording, certification, registration or recording fees charged by governmental agencies; costs of preparation and investigation, computer legal research; abstracting; complex document production; processing, loading, conversion, coding, manipulation, technical assistance and project management costs for use with litigation support software; computer searches and computer generated documents and filings; and applicable taxes. Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. Scanning or other digital or electronic images and photocopying costs are twenty-five (\$.25) Cents per copy or page. Instead of charging long distance and telephone conference fees, facsimile transmissions, routine printing, scanning or other digital or electronic images, the firm may elect to charge a one-time fee of \$2.25 per megabyte of stored records rounded up to the nearest dollar. This electronic records fee will be charged only once, as records are added to the database, and will not be a recurring charge for storage.

Some such costs may include an administrative fee charged by the Firm, as determined by the Firm from time to time. It is understood and agreed that the Firm will not be required to advance costs on behalf of the Association and the Association agrees to submit such additional cost deposit funds as are necessary to pay for out-of-pocket expenses in connection with this matter. The Association agrees to submit such attorney's fee deposits as may be required at the discretion of the Firm, in order to insure that sufficient funds will be available to pay the services that are being rendered, based upon the circumstances of the case from time to time. In the event that legal action by the Firm is required to collect past-due obligations from the Association, the Firm is entitled to recover its costs and reasonable attorney's fees, including the value of time expended by the Firm in pursuing such legal action, even when the Firm represents itself. The Firm is also entitled to recover reasonable attorney's fees to establish its right to recover attorney's fees and to establish the amount of attorney's fees to which it is entitled to recover. Should the Firm cease to represent the Association for any reason, including the Firm's voluntary withdrawal during the pendency of any matter or action, and any attorney's fees or costs remain unpaid, the Firm is entitled to a charging lien and to payment of any costs and attorney's fees out of any eventual recovery in the action (in addition to any right to a retaining lien) or other rights retained herein.

BECKER_003979

The owners may be responsible for court costs, arbitration costs and attorney's fees in connection with the proceedings contemplated herein. Nevertheless, the Association understands that the Firm will remit statements for services rendered and costs incurred on a monthly basis and the Association agrees to pay such amounts as billed. Any amount received from the owner will be applied first to the unpaid balance of fees and costs, if any, and any excess returned to the Association as a reimbursement of fees and costs previously paid.

A short authorization form or other similar writing must be submitted by the Association to the Firm, authorizing the Firm to proceed pursuant to the terms of this Agreement. Any additional authorizations or special instructions by the Association regarding the services provided under this Retainer must be submitted to the Firm in writing.

BECKER_003980

# EXHIBIT 2

🔍 Search

✉ 🐦 f in



| Home<br>go to home | Membership<br>new & current members | Portal<br>member login | FLCAJ<br>the magazine | FCAP Schools<br>online training | FCAP<br>and more |
|---|---|---|---|---|---|

Partner Profile: Becker & Poliakoff

⌂ Home › FLCAJ › FLCAJ Articles › Partner Profile: Becker & Poliakoff

FLCAJ Magazine

Advertise

Advertising Portfolio

Subscribe

📖 Read Current FLCAJ Articles

# Partner Profile:

## Becker

*Published April 2018*





The law firm of Becker *(fomerly Becker & Poliakoff, P.A.)*, was established by Gary Poliakoff and Alan Becker in 1973 in Ft. Lauderdale. The firm has expanded over the years, adding offices in New York, New Jersey, and Washington, D. C. In Florida, the company serves community associations in Ft. Lauderdale, Ft. Myers, Ft. Walton Beach, Miami, Naples, Orlando, St. Augustine, Sarasota, Stuart, Tampa Bay, Tallahassee, and West Palm Beach.



Donna Berger

Representing all types of community associations is a primary area of practice, while the firm also specializes in construction defect and business litigation, land use, zoning, government law and lobbying, real estate, and corporate law, all areas of the law which eventually impact private residential communities. "The firm's growth, diversification, and expansion over the years reflect the founders' original dedication to advocating for and defending the rights of the significant percentage of Florida's population which resides in shared ownership communities," shares Ken Direktor, Chair of the Community Association Practice Group.

Becker brings decades of broad expertise to their community association clients. Their business philosophy is to first focus on being a highly responsive law firm, deeply attentive to each client's needs. They are prepared to help associations with the myriad of legal issues, both ordinary and extraordinary, that volunteer directors may encounter, from updating governing documents, collecting delinquent assessments, pursuing rights with regard to defect and insurance claims, or conducting online voting, to negotiating with the development going up next door.



**Ken Direktor**

Becker considers itself to be the board's safety net in fulfilling its fiduciary duty to the members. However, this requires being informed of actions which may have legal consequences, such as signing contracts; approving or denying leases, sales, or ESA (emotional support animal) requests; making alterations; or a host of other activities. Becker Shareholder Donna DiMaggio Berger notes, "Serving on a community association board is tough enough—don't do it without the necessary legal backup support." Working with legal counsel can protect both the association and individual board members from liability.

One challenge that Becker encounters in working with community associations is protecting boards from inaccurate or misleading information they may gather on their own. Even the decision as to whether legal advice is necessary requires some knowledge of the law. "We often assist communities who have learned the hard way that proper advice would have cost less in the long run," says Direktor.

*For any inquiries, contact the Becker Client CARE Center at 1-844-CAREBP1 (277-3271) or CARE@beckerlawyers.com.*

## Stay Informed

**First Name**

Your first name

**Last Name**

Your last name

☐ FCAP Member Advantage eNewsletter
☐ Managers Report eNewsletter

**Email address:**

Your email address

Sign up

## Go Mobile



## Professional Growth Through Learning

FCAP (Florida Community Association Professionals) is a member-based professional organization dedicated to training, equipping and advocating for Florida community association professionals including managers, service providers and community volunteer leaders.

## Contact Us

☎ 800-443-3433
🖷 501-280-9233
✉ info@fcapgroup.com

Contact Us  | Privacy  | Terms  | Refund Policy

Copyright © 2021 FCAP - Florida Community Association Professionals, LLC

# EXHIBIT 3

November 5, 2018

Certified Mail Return Receipt Requested
Emailed also:  Rosa de la Camera and CTS Manager BOD

Becker and Poliakoff PA
Rosa de La Camara, Esquire
Alhambra Towers
121 Alhambra Towers
10th Floor
Coral Gables, Fl.  33134

Champlain Towers South Board of Directors and Manager
8777 Collins Avenue
Surfside, Fl.  33154

RE:  Champlain Towers South- Special Assessments need Unit Owner's vote and Concrete
Deterioration Issues need immediate attention

I have been an owner at Champlain Towers South since 1999.

I am extremely concerned about the Structural integrity and Concrete Deterioration of
Champlain Towers South (CTS).  The building is  almost 38 years old and will require a 40 year
inspection in 2 years.  The Association has hired a Structural Engineer to begin this process. The
Engineer Morabito Consultants has determined that the building "has structural issues that
require repair and/or remediation in the immediate and near future" (Engineering Survey
Report Attached). The estimated costs of these repairs are estimated at over 9 million
Dollars.  Some owners think we can wait 2 years to begin this project.

The Engineering Report has determined that there is major structural damage in the balcony
slabs, concrete Spalling and cracking on concrete balcony edges, water infiltration caused by
sub-surface deterioration at the exterior soffits under the balcony railings. (Page 3). Soffit
damage that requires removing existing tile of all balconies, Soffit support framing is
deteriorated (Page 4) Balcony Windows and Doors are at the end of their functional lifespan.
Some units have replaced the doors and they have not been installed properly etc. to just name
a few items on the report.

The concrete deterioration is evident to the naked eye but many owners as well as members of
the Board do not understand the importance of commencing this work as soon as possible so
that it does not compromise the reinforced steel structure of our balconies . A piece of
concrete has fallen off one balcony on to another balcony recently and this deterioration has
become a life safety hazard. Postponing this work will only make the job more expensive to
repair and compromise the structure of our building. The parking garage has been leaking for

over 10 years. It was repaired incorrectly with epoxy injections at the garage level.  The building pool deck needs to be correctly re-sloped and waterproofed.  I park in space 105 and have had a storm panel covering the ceiling of my space for over 7 years.  Pretty soon pieces of concrete will be falling on to the cars in the garage.

In the meantime the Board levied a special assessment 2 years ago with a 2 year interest free payment plan which included $500,000.00 to be designated for a Hallway Renovation.  Now the Board wants to pass an additional special assessment for the Hallway Renovation because the price of completing this project has increased over the past 2 years due to inflation.  Also part of this work scope requires new door coverings for Hallway unit doors since they claim the doors some doors are cracked. The doors are the responsibility of the unit owners as are the sliding glass doors. My hallway doors are not cracked and do not need maintenance. I believe the hallway project is more of an aesthetic improvement and not necessary maintenance as is the concrete restoration the building which needs to addressed  immediately. The Board cannot go back after an assessment has been levied and increase it for the Hallways.  Also this assessment should have been voted on by the unit owners per our amended by laws. (attached and executed by your firm)

 Becker and Poliakoff executed in court an amendment to our Declaration of Condominiums, By Laws and Articles of Incorporation signed by our secretary at that time Mr.  Arnold Notkin, Secretary October 14th, 1996 and recorded in court October 31, 1996 (attached). The Bylaws were amended to say "Special Assessments require approval of 50% plus One of all unit owners."

I am a little concerned and surprised that CTS has not involved our Attorney in any of our Special Assessment meetings. The board plans on adopting a budget and a special assessment on November 29h. The board has tried to adopt the special assessment on the 23rd of October and was not successful. This special assessment cannot pass since it needs owners approval and the owners are more concerned about the structural damage at this time.

 I think it would be in the building's best interest to repair the structural flaws since it has become life threatening and necessary.

I think it would be in the Associations best interest to ask for legal advice from our Attorney on how to proceed with these issues.

I have asked the Manager to please place me on the construction committee since I want to help with any aspect of these projects. I also believe the building will have to request a loan a line of credit preferably to secure a contractor to begin this process. Structural Repairs should be addressed immediately since the cost of construction inflation will increase as well as interest rates if we have to secure a loan. This will put us in the same situation we are encountering with the additional money the Board wants to collect to complete the Hallway Renovation.

I would like your feedback and legal opinion on these matters and to please advise the BOD that per our amended By-Laws they are not authorized to levy an Assessment without Unit Owners vote.

The BOD have a fiduciary responsibility to maintain the structure of the building and needs to commence the concrete restoration and possibly use funds for this hallway project since it is necessary maintenance and an emergency at this point. The association has in the past always done band-aid approach repairs to the building to keep repair cost low and that now have put us in a costly repair situation. The building needs to repaired correctly and before any other aesthetics project.

Thank you

Susana Rodriguez
Owner 607
305-989-1730

**3 Attachments**

 **Champlain Towers South Condominium Association, Inc.**

8777 Collins Ave. Surfside, Fl 33154 tel. 305-865-4740 fax. 305-865-7800



*October 30, 2018*

*Reference: Proposed Budget for 2019*

*Dear Owner (s):*

*The Board of Directors for Champlain Towers South Condominium has reviewed the proposed budget for 2019. The budget enclosed was develop with the intent of maintaining and improving the building and its amenities.* **The board of directors will hold a meeting for the purpose of adopting the proposed budget for 2019 and the approval of the special assessment for hallway renovation and to hire a consultant to prepare a 40-year certification bids on November 15, 2019.**

Enclosed in this package are the following:

1. Agenda
2. Proposed 2019 Budget
3. Schedule of maintenance payment
4. Reserve Schedule
5. Special assessment schedule
6. Special assessment rationale
7. Schedule of special assessment payment
8. RCE estimate / hallway renovation



# Champlain Towers South Condominium Association, Inc.

8777 Collins Ave. Surfside, Fl 33154 tel. 305-865-4740 fax. 305-865-7800

## Rationale

A special assessment is needed to do complete the hallways renovation and to hire a consultant to prepare the 40-year certification bids

## Hallway Renovation:

This project has been partially funded at $473,359.00 through a prior special assessment and reserves.

Estimated cost to replace carpets, lights, painting/wallpapering, replace or repair hallway doors and related hardware:

| | |
|---|---|
| Carpet | $ 99,107.00 |
| Lighting | $ 23,125.00 |
| Painting | $ 99,100.00 |
| Doors and hardware | $ 252,027.00 (to be repurpose on our next meeting) |
| *We have total* | *$ 473,359.00* |
| We need | $ 834,376.27 |
| Performance bond | $ 14,000.00 |
| Elias and Elias | $ 17,000.00 |
| Decorative Lights | $ 23,500.00 |
| Permits | $ 10,000.00 |
| Contingency 10% | $ 83,437.62 |
| TOTAL | $ 982,313.89 |
| LESS | - 473,359.00 |
| ***TOTAL*** | ***$ 508,954.89*** |

## Consultant to prepare the 40-year certification

$ 50,000.00 estimated amount

BECKER_002207

BECKER_002208

## Special Assesment 2019

| Apt. type | Line# | propose S/A 2019 | S/A per lines | 9 months S/A per unit per month |
|---|---|---|---|---|
| A | 12 | 550,000.00 | 5,512.10 | 612.46 |
| B | 1 | 550,000.00 | 4,373.05 | 485.89 |
| C | 2-11 | 550,000.00 | 4,095.85 | 455.09 |
| D | 10 | 550,000.00 | 4,282.30 | 475.81 |
| E | 5 | 550,000.00 | 3,919.30 | 435.48 |
| F | 9 | 550,000.00 | 4,233.90 | 470.43 |
| G | 6-7 | 550,000.00 | 2,940.30 | 326.70 |
| H | 3-4 | 550,000.00 | 3,490.85 | 387.87 |
| I | 8 | 550,000.00 | 4,233.90 | 470.43 |
| J | Ph-2 | 550,000.00 | 12,324.95 | 1,369.44 |

 **Champlain Towers South Condominium Association, Inc.**

8777 Collins Ave. Surfside, Fl 33154 tel. 305-865-4740 fax. 305-865-7800

### NOTICE OF BOARD OF DIRECTORS MEETING

**TO ALL MEMBERS:**

On **Thursday, November 15, 2018, at 7:00 p.m.,** in the **Recreation Room of Champlain Towers South**, the Board of Directors will hold a meeting for the purpose of *voting on items listed in agenda below* and such other business as may lawfully be conducted.  An identification of agenda items is as follows:

1. Certifying Quorum - Call to order.
2. Proof of Notice of Meeting or Waiver of Notice.
3. Reading and Approval of Minutes.
4. New Business
   a. Consider and vote on the **Repurposing** of the ***Special Assessment*** levied on **November 29, 2016** in the amount of $252,027.00 for the door and related hardware replacement so that the purpose of said special assessment will now also be to address the hallway renovation.

   b. Consider and Adopt a ***Special Assessment*** in the approximate sum of $550,000 for hallway renovation as well as the hiring of a consultant to prepare bid sheets and obtain bids for concrete restoration of the condominium.

   c. Adopt the **Budget** for fiscal year 2019. A copy of the Budget for fiscal year 2019 is enclosed with this Notice.

   d. Vote to approve hiring RCE as the contractor to perform the hallway renovation work.

5. Adjournment.

**\*Additional Items may be added to the agenda by**
**notice to be posted not less than 48 hours prior to the meeting \***

All owners are welcomed to attend the Board of Director's Meeting.

Dated:_____, 2018.

### BY ORDER OF THE BOARD OF DIRECTORS

_____

**By:** _____
**Title:** _____

ACTIVE: C09862/231785:11620296_1

 **Champlain Towers South Condominium Association, Inc.**

8777 Collins Ave. Surfside, Fl 33154 tel. 305-865-4740 fax. 305-865-7800

### AFFIDAVIT OF MAILING, HAND DELIVERING OR ELECTRONIC TRANSMISSION AND POSTING OF NOTICE TO UNIT OWNERS

**STATE OF FLORIDA**
**COUNTY OF MIAMI-DADE**

I_____, after being duly sworn, depose and say the Notices of the Board of Directors Meeting of **CHAMPLAIN TOWERWS SOUTH CONDOMINIUM ASSOCIATION, INC.,** to be held on **Thursday, November 15, *2018,* at 7:00 p.m.,** in the Recreation Room of Champlain Towers South, was mailed, hand delivered or electronically transmitted and posted conspicuously in accordance with applicable law. The notice was mailed to each unit owner at the address last furnished to the Association, as such address appears on the books of the Association and posted as required by law and the Condominium Documents.

> **CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION, INC.**
>
> _____
> **By:** _____
> **Title:** _____

**STATE OF FLORIDA**
**COUNTY OF MIAMI-DADE**

The foregoing instrument was acknowledged before me this_____day of_____, 2018, by_____, as _____ (TITLE) of **CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION, INC.,** a Florida not-for-profit corporation.

NOTARY PUBLIC - STATE OF FLORIDA

Personally Known  \_\_ OR
Produced Identification \_\_\_\_                    sign _____
_____                    print _____
Type of Identification                          My Commission expires:

ACTIVE: C09862/231785:11620296_1

BECKER_002210





October 8, 2018

Champlain Towers South
8777 Collins Avenue
Surfside, FL 33154

Attention:     Ms. Maggie Manrara
                    Treasurer

*Re:     Champlain Towers South Condominium*
          *Structural Field Survey Report*
          *MC Job# 18217*

Dear Ms. Manrara:

Morabito Consultants, Inc. (MC) is pleased to submit this structural engineering report of the Field Survey completed at the existing Champlain Towers South Condominium Complex (CTS) in Surfside, FL. The scope of this project includes a review of the existing 12 story plus penthouse 136-unit residential building, below-grade parking garage and at-grade exterior entrance drive, pool and recreation area. MC reviewed a representative sample of ~68 condominium units (half of the total units found in the building) along with the roof, exterior façade (observed from the balconies surveyed), parking garage, pool deck, and general common areas.  The goal of our study was to understand and document the extent of structural issues that require repair and/or remediation in the immediate and near future.  As a part of this report, MC has prepared an estimate (that is attached to this report) of the probable construction cost to construct the required structural repairs & maintenance that MC recommends being completed.  These documents will enable the Condominium Board to adequately assess the overall condition of the building, notify tenants on how they may be affected, and provide a safe and functional infrastructure for the future.

To assist our office in the review of this project, MC has reviewed the following documents:
- Architectural contract drawings A1-A30 prepared by William M. Friedman & Associates Architects, Inc. last revised 11/27/1979.
- Structural contract drawings S1-S14 prepared by Breiterman Jurado & Associates, Consulting Engineers dated 08/22/1979.
- Various HVAC, Plumbing, Electrical, Plumbing and Landscape drawings.

The following conditions that require future repairs and maintenance were observed.

Structural Engineers | Parking Consultants
952 Ridgebrook Rd | Suite 1700 | Sparks, MD 21152-9472
410.467.2377 | www.morabitoconsultants.com

BECKER_002211

October 8, 2018
Re:     **Champlain Towers South Condominium**
        **Structural Field Survey Report**
        **MC Job# 18217**
Page 2

---

A.  MC understands some unit owners have complained of flooding into the interior space of their unit during a hurricane event. MC has concluded that this infiltration is occurring through the balcony sliding glass doors & windows due to the lack of proper flashing at the sill of these doors & windows and deteriorated exterior perimeter sealant between the window/door frames and masonry/concrete walls. MC recommends that the exterior sealant be removed / replaced at the sliding glass door & window perimeter to assist in providing a water-tight condition. Unfortunately, the new sliding doors in unit 209 and above were not installed properly and were fabricated too tall to allow the base flashing to be properly installed, so these unit owners have no choice but to discard the newly purchased doors and have them completely refabricated.

 

Figure A1: Exterior sealant past its serviceable lifespan at sealant between the window/door frames and masonry/concrete walls & balcony floors



Figure A2: Newly installed sliding door at unit 209 that was not properly flashed

BECKER_002212

October 8, 2018
*Re:*   ***Champlain Towers South Condominium***
       ***Structural Field Survey Report***
       ***MC Job# 18217***
Page 3

B.  MC observed that the majority of the balconies were furnished with tile or some other floor covering by choice of the tenant, making it impossible to observe the condition of the topside of the balcony slabs. Several instances were noted where balcony tile was damaged, such as in Unit 1008. Based on MC experience, cracked tile usually means structural damage exists to the balcony slab that must be repaired per the requirements of the International Concrete Repair Institute (ICRI) prior to the installation of a pedestrian waterproofing membrane.



Figure B: Damaged balcony tile that must be removed to fix structural damage

C.  MC found it fairly typical that the concrete slab edges of the balconies are experiencing concrete spalling or cracking. MC sees this as a common source of water infiltration and a main cause of the commonly found, sub-surface deterioration at the exterior soffits under the railings. MC requires that the balcony slab edges be further investigated and repaired in accordance with the recommendations of the ICRI to prevent future water penetration.



Figure C: Concrete spall at balcony slab edge in units 1008 & 211

BECKER_002213

October 8, 2018
Re:   ***Champlain Towers South Condominium***
      ***Structural Field Survey Report***
      ***MC Job# 18217***
Page 4

D.   Approximately half of the balcony soffits reviewed by MC show evidence of deterioration under the painted finished surface. These areas were identified by sounding the concrete with a golf club, checking for solidarity. In some cases, the paint finish had formed a bubble or pocket that was retaining water, while in other areas the painted soffit was peeled away leaving the concrete surface exposed. The extensive soffit damage is a systemic issue that can only be repaired by removing all of the balcony tile, repairing the damaged concrete surfaces at the top and bottom of the slab and protecting the slab by installing a pedestrian waterproofing membrane on all top-side balcony surfaces. Partial/full depth concrete repairs in these areas shall be performed in accordance with the recommendations of ICRI. It is important to note that installing tile on top of the concrete balcony surfaces results in the railing having inadequate height to meet the minimum guardrail height of 42" required by the Florida Building Code.



Figure D: Balcony Soffit paint spalling in units 208, 703, & 1301.

E.   Several areas of the entrance drive soffits under the second floor were observed by MC to have deteriorated black plywood. This condition was also observed at several light fixtures in the entrance soffit. MC could not get access into the soffit areas to observe the extent of the deteriorated soffits and support framing as CTS maintenance was too busy to assist us. MC is concerned that mold exists above these soffit areas and the soffit support framing is deteriorated which will require the complete removal and replacement of the entrance suspended soffit. Further investigation into this area is warranted.



Figure E: Deteriorated plywood soffit above entrance drive.

BECKER_002214

October 8, 2018
Re:     **Champlain Towers South Condominium**
        **Structural Field Survey Report**
        **MC Job# 18217**
Page 5

F.  It was brought to MC's attention that several units are experiencing water infiltration through the window frames and glazing as the windows are near the end of their functional lifespan. It is recommended that the window frame glazing (metal to glass), and perimeter sealant (metal to metal or metal to masonry/concrete) be removed and replaced for the entirety of the building to reduce future water penetration and minimize damage during hurricane events. MC recommends that the BOD strongly consider the replacement of all exterior windows and doors with impact resistant units.



Figure F: Exterior sealant at window frame that has aged past its serviceable lifespan

G.  Significant cracking in the stucco exterior façade often occurs at the mortar bed joint between the top of the concrete floor slab and first block masonry course. Although MC does not see this crack as a source of water infiltration into the condominium units, such cracks need to be routed and repointed to prevent future water permeation. All significant façade stucco cracking is to be repaired in accordance with the recommendations of ICRI.



Figure G: Typical cracking in the stucco exterior facade.

BECKER_002215

October 8, 2018
**Re:    *Champlain Towers South Condominium***
         ***Structural Field Survey Report***
         ***MC Job# 18217***

Page 6

___

H.  MC observed the non-existence of window washing / suspension hooks that should have been installed face-mounted to the underside of the top-level balconies and spread throughout the roof of this building structure. This failure to have suspension hooks is a violation of the present-day **Occupational Safety and Health Administration (OSHA) Rules and Regulations 29 CFR Part 1910 "Walking-Working Surfaces and Personal Protective Equipment (Fall Protection systems)"** requirements and **ANSI/IWCA I-14.1-2001 "Window Cleaning Safety Standard"**. MC recommends that new hooks be installed and waterproofed on the roof structural slab and underside of the top-level balcony slabs that meet the requirements of **OSHA 29 CFR Part 1926.502 "Fall Protection Systems Criteria and Practices"** and **ANSI/IWCA 1-14.1** prior to the commencement of façade and balcony restoration. Furthermore, MC recommends that our office meet with the contractor who is to perform the façade restoration work and the present window washing contractor so that the new fall protection system anchor quantity and location can be agreed upon to assure adequate anchor coverage for all future contractors who will be suspended on the exterior of the Champlain Towers South Condominium.



Figure H: No suspension hooks at the underside of the balconies and on the roof.

I.  MC understands that the BOD plans to pressure wash and paint the entire building façade to improve the building's aesthetics. MC recommends this work be performed following the conclusion of the aforementioned structural façade repairs.

MC was able to briefly survey the roof of the building at the 13th/14th level. The roof levels appear to be in satisfactory condition, and MC was told by maintenance personal that no present roof leaks are known to exist. The only damage noted was minor cracking at the parapet walls and some minor spalling at the stair tower walls. All identified cracking shall be routed and sealed with a urethane sealant, and all spalls repaired per the recommendations of ICRI. In addition, all mechanical equipment support steel shall be cleaned and coated with a zinc-rich galvanizing paint.

The Pool Deck and Entrance Drive areas were reviewed to observe the condition of the concrete knee walls, planters, pavers, decorative stamped concrete and railings. Minor cracking in the knee walls was found around the pool deck, which shall be routed and sealed with a urethane sealant. The handrails and rail post connections at the pool deck knee walls did not appear to be damaged and are not in need of repair at this time. Many of the existing pavers on the pool deck are cracked and showing moderate wear and tear from years of being exposed to the elements. The pavers do not appear to pose any hazard to the building occupants and are currently not in need of replacement. The joint sealant was

BECKER_002216

October 8, 2018
Re:     ***Champlain Towers South Condominium***
        ***Structural Field Survey Report***
        ***MC Job# 18217***
Page 7

observed to be beyond its useful life and are in need of complete replacement. However, the
waterproofing below the Pool Deck & Entrance Drive as well as all of the planter waterproofing is
beyond it useful life and therefore must all be completely removed and replaced. The failed
waterproofing is causing major structural damage to the concrete structural slab below these areas.
Failure to replace the waterproofing in the near future will cause the extent of the concrete
deterioration to expand exponentially. MC approach to the repair of this structure is different from
what is specified in contract documents in numerous aspects, which are briefly described below.

    a.  The main issue with this building structure is that the entrance drive/pool deck / planter
waterproofing is laid on a flat structure. Since the reinforced concrete slab is not sloped to
drain, the water sits on the waterproofing until it evaporates. This is a major error in the
development of the original contract documents prepared by William M. Friedman & Associates
Architects, Inc. and Breiterman Jurado & Associates, Consulting Engineers.

    b.  It is also important to note that the replacement of the existing deck waterproofing will be
extremely expensive as removal of the concrete topping slab to gain access to the
waterproofing membrane will take time, be disruptive and create a major disturbance to the
occupants of this condominium building. Please note that the installation of deck waterproofing
on a flat structure is a systemic issue for this building structure.

MC correct repair approach includes removing all pavers, decorative concrete paving, setting beds,
concrete topping slab and waterproofing down to the reinforced concrete structure; repairing the
concrete structure as deemed necessary; pouring a sloped bonded concrete overlay that will be sloped
to drain; installing a new waterproofing membrane, protection board and drainage panels on the new
sloped surface; and placing new pavers/decorative concrete slabs over a sand setting bed. New
stainless-steel dual-level drains will be installed at all existing drain locations that will collect rain water
at the surface of the pavers and at the waterproofing level. This system will assure that all water that
penetrates to the waterproofing layer will be able to flow freely to the deck drains, resulting in an
extended life for the replacement waterproofing membrane. This system also provides extra protection
for the existing reinforced concrete structure and allows future membrane repair/replacement to be
completed more economically. The repairs to all planters will be completed in a similar manner.

The condition of the Parking Garage levels was reviewed specifically noting any cracked or spalled
concrete members, condition of the concrete slabs and joint sealant conditions. MC was able to identify
the presence of previous epoxy injections and patch repairs which were evaluated for their long-term
effectiveness.  MC's review of the Parking Garage revealed signs of distress/fatigue as described below:

    J.  Abundant cracking and spalling of varying degrees was observed in the concrete columns,
beams, and walls. Several sizeable spalls were noted in both the topside of the entrance drive
ramp and underside of the pool/entrance drive/planter slabs, which included instances with
exposed, deteriorating rebar. Though some of this damage is minor, most of the concrete
deterioration needs to be repaired in a timely fashion. All cracking and spalling located in the
parking garage shall be repaired in accordance with the recommendations of ICRI.

BECKER_002217

October 8, 2018
Re:    *Champlain Towers South Condominium*
       *Structural Field Survey Report*
       *MC Job# 18217*
Page 8

 

Figure J1: Typical cracking and spalling at parking garage columns

 

Figure J2: Spalling with exposed steel reinforcement at topside of garage deck.

K.  MC visual observations revealed that many of the previous garage concrete repairs are failing resulting in additional concrete cracking, spalling and leaching of calcium carbonate deposits. At the underside of Entrance/Pool deck where the slab had been epoxy-injected, new cracks were radiating from the originally repaired cracks. The installed epoxy is not continuous as observed from the bottom of the slab, which is evidence of poor workmanship performed by the previous contractor.  The injection ports were not removed, and the surfaces were not ground smooth at the completion of the injection. Leaching of calcium carbonate deposits in numerous areas has surely caused CTS to pay to repaint numerous cars. This leaching will continue to increase until proper repairs are completed. MC is convinced that the previously installed epoxy injection repairs were ineffective in properly repairing the existing cracked and spalled concrete

October 8, 2018
Re:    **Champlain Towers South Condominium**
       **Structural Field Survey Report**
       **MC Job# 18217**
Page 9

slabs. MC recommends that the Entrance/Pool deck concrete slabs that are showing distress be removed and replaced in their entirely. Unfortunately, all of these failed slab areas are under brick pavers, decorative stamped concrete and planters which require completed waterproofing replacement. All repaired concrete slabs located in the parking garage are to be repaired in accordance with the recommendations of ICRI.

 

Figure K1: Previously installed failed injection repairs with leaching forming

 

Figure K2: More previously installed failed injection repairs with leaching forming

MC trusts this initial report will assist the Champlain Towers South Condominium in understanding the required maintenance that is needed to properly maintain this existing residential property. MC is available to further discuss the recommended repair work and how it coincides with the owner's desires and constraints. We look forward to working with you in maintaining the structural integrity of the Champlain Towers South Condominium.

Very truly yours,

MORABITO CONSULTANTS, INC.



Frank Morabito, PE, SECB
President
*FPM/18217/Documents/MC/MC-CTS-SurveyReport_181008.pdf*

BECKER_002219

**MORABITO CONSULTANTS, INC.**

STRUCTURAL ENGINEERS    PARKING CONSULTANTS

131 Isle Verde Way, Palm Beach Gardens, FL 33418-1710

REMEDIATION OF THE CHAMPLAIN TOWERS CONDOMINIUM                           10/7/2018

ENGINEER'S ESTIMATE OF THE PROBABLE CONSTRUCTION COST    CTS_RemediationEstimateRev.xlsx

Page 1 of 1

| # | ITEM | SUMMARY OF REMEDIATION PROBABLE CONSTRUCTION COST | Phased Estimate | Total Estimate |
|---|------|---------------------------------------------------|-----------------|----------------|
| 1 | FAC | Façade Remediation | | $3,191,312.00 |
| 2 | GEP | Garage, Entrance and Pool Deck Remediation | | $3,825,217.60 |
| 3 | ELEC | Building Electrical Remediation | | $629,760.00 |
| 4 | MECH | Building Mechanical Remediation | | $253,824.00 |
| 5 | PLUMB | Building Plumbing Remediation | | $38,400.00 |
| 6 | SPRINK | Building Sprinkler Remediation | | $81,920.00 |
| 7 | SC | Project Soft Costs | | $1,108,000.00 |
| | A | Permits Fees 2.5% | $175,000.00 | |
| | B | Permit Expeditor | $10,000.00 | |
| | C | Concrete Cylinder Testing | $5,000.00 | |
| | D | Mold, Asbestos Lead Testing | $5,000.00 | |
| | E | Valet Charges | $10,000.00 | |
| | F | A/E Design Fees | $160,000.00 | |
| | G | A/E CA Fees | $296,000.00 | |
| | H | Structural Threshold Inspector | $180,000.00 | |
| | I | Furniture, Fixtures & Equipment | $150,000.00 | |
| | J | Temporary Storage & Movers | $5,000.00 | |
| | K | Additional Building Management | $48,000.00 | |
| | L | Additional Building Security | $24,000.00 | |
| | M | Attorney Fees | $40,000.00 | |
| TOTAL SUMMARY OF REMEDIATION PROBABLE CONSTRUCTION COST | | | | $9,128,433.60 |

*18217 - Remediation of the Champlain Towers South Condominium*
*© MORABITO CONSULTANTS, INC.*

BECKER_002220

## MORABITO CONSULTANTS, INC.

### STRUCTURAL ENGINEERS    PARKING CONSULTANTS

131 Isle Verde Way, Palm Beach Gardens, FL 33418-1710

STRUCTURAL REPAIRS TO CHAMPLAIN TOWERS CONDOMINIUM

ENGINEER'S ESTIMATE OF THE PROBABLE CONSTRUCTION COST

10/7/2018

CTS_FacadeRepairEstimateRev.xlsx

Page 1 of 1

| # | ITEM | FAÇADE REPAIR ITEMS AND SCOPE | Estimated Quantity | | Unit Price | | Total Estimate |
|---|------|-------------------------------|-------------------|---|-----------|---|----------------|
| 1 | MOB | Mobilization | | | | | |
| | | Includes Mobilization/Demobilization | 1 | LS | $45,000.00 | LS | $45,000.00 |
| 2 | GC | General Conditions | | | | | |
| | | Includes Project Management, Phasing, Traffic Control, Drone Imagery, Swing Stage/Boom Lift/Rolling Scaffold, Overhead Protection, Supervision, Etc. | 1 | LS | $325,000.00 | LS | $325,000.00 |
| 3 | SAB | Complete Field Survey of Exterior, Patch Logs and Prepare Digital As-Builts | | | | | |
| | | Includes sounding and field marks in chalk for review by MC | 1 | LS | $11,000.00 | LS | $11,000.00 |
| 4 | ST | Topside Surface Slab Spall Repair | | | | | |
| | | Detail ST - Includes shoring, prep, concrete, rebar, & sealant | 1,200 | SF | $55.00 | /SF | $66,000.00 |
| 5 | SF | Full Depth Slab Repair | | | | | |
| | | Detail SF - Includes shoring, prep, concrete, rebar, & sealant | 500 | SF | $95.00 | /SF | $47,500.00 |
| 6 | SU | Underside Concrete Slab Spall Repair | | | | | |
| | | Detail SU - Includes shoring, prep, concrete, & rebar | 150 | SF | $105.00 | /SF | $15,750.00 |
| 7 | SER | Concrete Full Depth Slab Edge Repair | | | | | |
| | | Details SFT & SFE - Includes shoring, prep, concrete, & rebar | 3,000 | LF | $100.00 | /LF | $300,000.00 |
| 8 | CS | Concrete Spall Repair on Existing Columns and Walls | | | | | |
| | | Detail CS - Includes shoring, prep, concrete, & rebar | 50 | CF | $300.00 | /CF | $15,000.00 |
| 9 | NJS | New Joint Sealant at New Concrete Cracks | | | | | |
| | | Detail JS - Rout and seal new cracks with joint sealant | 2,500 | LF | $5.25 | /LF | $13,125.00 |
| 10 | RJS | Remove/Replace Joint Sealant at all Masonry/Stucco Walls to Metal Frames | | | | | |
| | | Detail JS - Replace /install joint sealant to assure a water-tight condition | 14,000 | LF | $5.75 | /LF | $80,500.00 |
| 11 | RMS | Remove/Replace Wet Seal at all Metal/Metal and Metal/Glass Conditions | | | | | |
| | | Detail JS - Replace /install joint sealant to assure a water-tight condition | 27,250 | LF | $6.25 | /LF | $170,312.50 |
| 12 | EI | Pressure Injection of Cracks with Low-Viscosity Epoxy Adhesive | | | | | |
| | | Detail EI - Includes epoxy crack injection measured on one side only | 200 | LF | $55.00 | /LF | $11,000.00 |
| 13 | NWM | New Traffic Bearing Waterproofing Membrane (Residential Balconies) | | | | | |
| | | Includes surface prep, full system installation and 5 year warantee | 37,000 | SF | $6.00 | /SF | $222,000.00 |
| 14 | MWR | Partial Depth Masonry Block Wall Repairs at Exterior | | | | | |
| | | Detail MWR - Includes sawcut, demo, prep, and approved repair mortar | 25 | SF | $80.00 | /SF | $2,000.00 |
| 15 | BR | Block Wall Joint and Crack Repairs Under Stucco | | | | | |
| | | Detail BR - Includes routing & tuckpointing of masonry cracks & joints | 200 | LF | $7.75 | /LF | $1,550.00 |
| 16 | SWR | Stucco Repair Over Masonry / Concrete Surfaces | | | | | |
| | | Includes stucco removal, surface prep, touch-up brown coat and new finish coat | 10,000 | SF | $20.00 | /SF | $200,000.00 |
| 17 | SMC | New Stucco Over Masonry / Concrete Surfaces | | | | | |
| | | Includes stucco removal, surface prep, new brown coat and finish coat | 600 | SF | $20.00 | /SF | $12,000.00 |
| 18 | SSC | Repair of Stucco Cracks Less Than 1/8" Wide | | | | | |
| | | Includes cleaning, prep, bonding agent, and stucco coat | 1,000 | LF | $5.50 | /LF | $5,500.00 |
| 19 | SLC | Repair of Stucco Cracks Greater Than 1/8" Wide | | | | | |
| | | Includes rout, cleaning, prep, and stucco mix | 1,500 | LF | $6.50 | /LF | $9,750.00 |
| 20 | RRC | Balcony and Roof Railing Repair | | | | | |
| | | Includes installation of clips, fasteners and missing members as required | 250 | LF | $40.00 | /LF | $10,000.00 |
| 21 | SBR | Shore/Support Existing Balcony Railing During Structural Repairs | | | | | |
| | | Includes steel plates, angles, and other material to avoid removal of existng railing systems | 3,500 | LF | $10.00 | /LF | $35,000.00 |
| 22 | PRA | New Permanent Window Washing Roof Anchorages | | | | | |
| | | Includes fabrication & installation of new anchorages and repair of roofing | 855 | LF | $315.00 | /LF | $269,325.00 |
| 23 | PR | Paint Existing Balcony Railings | | | | | |
| | | Includes cleaning, priming and painting | 1 | LS | $65,000.00 | /LF | $65,000.00 |
| 24 | PRA | Remove and Replace Existing Suspended Soffits Below 2nd Floor Exterior Slabs | | | | | |
| | | Includes fabrication & installation of new anchorages and repair of roofing | 12,800 | Sf | $28.00 | /SF | $358,400.00 |
| 25 | PTF | Clean, Caulk, & Paint Entire Exterior of Building Façade, Garage, Planter Walls, etc. | | | | | |
| | | Scope shall be as defined in specification section 09 9120, paragraph 1.2 | 135,000 | SF | $1.50 | LS | $202,500.00 |
| | | **ENGINEER'S INITIAL FAÇADE REPAIR ESTIMATE** | | | | | **$2,493,212.50** |
| | | **CONTRACTOR'S PERFORMANCE BOND (with Labor and Material Clauses)** | | | 3.00 | % | **$74,796.38** |
| | | **ENGINEER'S CONTINGENCY AND INFLATION** | | | 25.00 | % | **$623,303.13** |
| | | **ENGINEER'S ESTIMATE OF THE PROBABLE CONSTRUCTION COST** | | | | | **$3,191,312.00** |

*18217 - Remediation of the Champlain Towers South Condominium*
*© MORABITO CONSULTANTS, INC.*

BECKER_002221

## MORABITO CONSULTANTS, INC.

### STRUCTURAL ENGINEERS    PARKING CONSULTANTS

#### 131 Isle Verde Way, Palm Beach Gardens, FL 33418-1710

STRUCTURAL REPAIRS TO CHAMPLAIN TOWERS CONDOMINIUM                                   10/7/2018
ENGINEER'S ESTIMATE OF THE PROBABLE CONSTRUCTION COST                  CTS-GarageEntrancePoolDeckEstimate.xlsx

| ITEM | NOTE | GARAGE, ENTRANCE, PLAZA & POOL DECK REPAIR ITEMS AND SCOPE | Estimated Quantity | | Unit Price | | Total Estimate |
|---|---|---|---|---|---|---|---|
| 1 | MOB | Mobilization | | | | | |
| | | Includes Mobilization/Demobilization | 1 | LS | $45,000.00 | LS | $45,000.00 |
| 2 | GC | General Conditions | | | | | |
| | | Includes Project Management, Phasing, Traffic Control, Drone Imagery, Swing Stage/Boom Lift/Rolling Scaffold, Overhead Protection, Supervision, Etc. | 1 | LS | $275,000.00 | LS | $275,000.00 |
| 3 | SAB | Complete Field Survey of Exterior, Patch Logs and Prepare Digital As-Builts | | | | | |
| | | Includes sounding and field marks in chalk for review by MC | 1 | LS | $6,000.00 | LS | $6,000.00 |
| A | | **Entrance, Plaza & Pool Deck - New Pavers & Waterproofing** | | | | | |
| 4 | DPW | Remove Existing Pavers, Slabs, and Waterproofing Membrane in Plaza/Pool | | | | | |
| | | Includes removal and disposal of existing materials down to structural slab | 26,500 | SF | $6.50 | /SF | $172,250.00 |
| 5 | ST | Topside Surface Slab Spall Repair | | | | | |
| | | Detail ST - Includes shoring, prep, concrete, rebar, & sealant | 1,000 | SF | $55.00 | /SF | $55,000.00 |
| 6 | SF | Full Depth Slab Repair (includings at new deck drains) | | | | | |
| | | Detail SF - Includes shoring, prep, concrete, rebar, & sealant | 2,500 | SF | $95.00 | /SF | $237,500.00 |
| 7 | SE | Full Depth Slab Edge Repair at Building Expansion Joints | | | | | |
| | | Detail SE - Includes shoring, prep, coating of tendon ends, concrete, rebar & sealant | 200 | LF | $105.00 | /LF | $21,000.00 |
| 8 | EI | Pressure Injection of Cracks with Low-Viscosity Epoxy Adhesive | | | | | |
| | | Detail EI - Includes epoxy crack injection measured on one side only | 50 | LF | $55.00 | /LF | $2,750.00 |
| 9 | RJS | Replace Existing Joint Sealant | | | | | |
| | | Detail JS - Includes removal/replacement of joint sealant at existing joints and cracks | 1,800 | LF | $5.75 | /LF | $10,350.00 |
| 10 | NJS | Install New Crack and Construction Joint Sealant | | | | | |
| | | Detail JS - Includes the routing of cracks & construction joints and installation of sealant | 2,000 | LF | $5.25 | /LF | $10,500.00 |
| 11 | CJ | Install / Replace Cove Joint Sealant at elevated levels | | | | | |
| | | Install new cove joint around columns, along perimeter walls and curbs | 750 | LF | $6.25 | /LF | $4,687.50 |
| 12 | SCT | Install New Concrete Bonded Overlay Sloped to Drain | | | | | |
| | | Includes surface prep, dowels, reinforcing and sloped concrete topping (up to 7" thick) | 26,500 | SF | $8.50 | /SF | $225,250.00 |
| 13 | DLD | Replace All Deck Drains with new Dual Level Deck Drains Connected to Existing Piping | | | | | |
| | | Detail DLD - Includes new deck drain tied to waterproofing and existing piping system | 15 | EA | $1,100.00 | EA | $16,500.00 |
| 14 | DDP | Add / Replace Horizontal and Vertical Deck Drain Piping | | | | | |
| | | Includes new drain piping to new drains and existing pipe risers (piping to match ex.) | 600 | LF | $50.00 | /LF | $30,000.00 |
| 15 | WP | Install Waterproofing Membrane on New Sloped Bonded Overlay | | | | | |
| | | Includes surface prep, cove base sealant, 550 ft of backer-rod expansion joint with additional layers of sheet membrane, waterproofing membrane, drainage board and termination detail | 26,500 | SF | $8.50 | /SF | $225,250.00 |
| 16 | SBP | Install Brick/Shellock Pavers in Plaza/Pool to Match Existing Pavers | | | | | |
| | | Includes surface prep, sand/cement setting bedding & new pavers | 13,700 | SF | $10.00 | /SF | $137,000.00 |
| 17 | DFC | Install New Decorative Concrete Slab to Match Existing Finish | | | | | |
| | | Includes surface prep, reinforcement, and decorative concrete slab | 12,800 | SF | $18.00 | /SF | $230,400.00 |
| B | | **Garage and Underside of Pool - Structural Repairs** | | | | | |
| 18 | CS | Concrete Spall Repair on Existing Columns, Beams and Walls | | | | | |
| | | Detail CS - Includes shoring, prep, concrete, & rebar | 45 | CF | $300.00 | /CF | $13,500.00 |
| 19 | SU | Underside Concrete Slab Spall Repair | | | | | |
| | | Detail SU - Includes shoring, prep, concrete, & rebar | 2,000 | SF | $105.00 | /SF | $210,000.00 |
| 20 | TS | New Traffic Striping to match existing striping layout (elevated levels) | | | | | |
| | | Install new traffic striping after all repairs are complete on elevated levels | 139 | SP | $30.00 | /SP | $4,170.00 |
| 21 | RG | Remove Gutters Under Slab Cracks | | | | | |
| | | Includes removal/disposal of existing gutter, patching and painting of concrete surface | 1 | LS | $2,500.00 | LS | $2,500.00 |
| 22 | PW | Pressure Wash and Clean Entire Garage (all levels) | | | | | |
| | | Includes cleaning all garage overhead decks, walls, S.O.G., etc. at repair completion | 115,000 | SF | $0.20 | /SF | $23,000.00 |

*18217 - Remediation of the Champlain Towers South Condominium*
*© MORABITO CONSULTANTS, INC.*

BECKER_002222

**MORABITO CONSULTANTS, INC.**
STRUCTURAL ENGINEERS    PARKING CONSULTANTS
131 Isle Verde Way, Palm Beach Gardens, FL 33418-1710

STRUCTURAL REPAIRS TO CHAMPLAIN TOWERS CONDOMINIUM
ENGINEER'S ESTIMATE OF THE PROBABLE CONSTRUCTION COST

10/7/2018
CTS-GarageEntrancePoolDeckEstimate.xlsx

| ITEM | NOTE | GARAGE, ENTRANCE, PLAZA & POOL DECK REPAIR ITEMS AND SCOPE | Estimated Quantity | | Unit Price | | Total Estimate |
|---|---|---|---|---|---|---|---|
| C | | Entrance, Plaza & Pool - Planter Landscaping & Waterproofing | | | | | |
| 23 | RPM | Remove Planter Soil, Gravel, Drains, Sprinklers and Lights | | | | | |
| | | Includes removal and disposal of existing materials down to existing waterproofing | 850 | CY | $80.00 | /CY | $68,000.00 |
| 24 | RPW | Remove Existing Planter Soil, Gravel, Drains, Sprinklers, Lights and Waterproofing | | | | | |
| | | Includes removal and disposal of existing materials down to structural post-tensioned slab | 11,250 | SF | $3.00 | /SF | $33,750.00 |
| 25 | LA | Landscaping Allowance | | | | | |
| | | Includes landscaping removal & disposal, installation of drainage rock and filter fabric; new soil material; and installation of new like-kind planting materials | 11,250 | SF | $30.00 | /SF | $337,500.00 |
| 26 | ST | Topside Surface Slab Spall Repair | | | | | |
| | | Detail ST - Includes shoring, prep, concrete, rebar, & sealant | 120 | SF | $60.00 | /SF | $7,200.00 |
| 27 | RJS | Replace Existing Joint Sealant | | | | | |
| | | Detail JS - Replace joint sealant at existing joints and cracks | 900 | LF | $5.75 | /LF | $5,175.00 |
| 28 | NJS | Install New Crack and Construction Joint Sealant | | | | | |
| | | Detail JS - Includes the routing of cracks & construction joints and installation of sealant | 400 | LF | $5.25 | /LF | $2,100.00 |
| 29 | SCT | Install New Concrete Bonded Overlay Sloped to Drain | | | | | |
| | | Includes surface prep, dowels, reinforcing and new sloped concrete topping (up to 4" thick) | 11,250 | SF | $8.00 | /SF | $90,000.00 |
| 30 | PWR | Partial Depth Concrete/Masonry Planter Wall Repairs | | | | | |
| | | Detail MWR - Includes sawcut, demo, prep, and approved repair mortar | 50 | SF | $80.00 | /SF | $4,000.00 |
| 31 | PW | Install Planter Waterproofing on Concrete Bonded Overlay & Walls | | | | | |
| | | Includes surface prep, cove base sealant, waterproofing membrane, drainage board, root mat and termination detail | 11,250 | SF | $9.00 | /SF | $101,250.00 |
| 32 | SD | Planter Stem Drains | | | | | |
| | | Includes removal/replacement of planter stem drains to match existing | 30 | EA | $1,100.00 | EA | $33,000.00 |
| 33 | SDP | Add / Replace Horizontal and Vertical Stem Drain Piping | | | | | |
| | | Includes new drain piping to new drains and existing pipe risers (piping to match ex.) | 200 | LF | $50.00 | /LF | $10,000.00 |
| 34 | PLS | Planter Lighting and Electrical System | | | | | |
| | | Includes installation of new lights and electrical outlets to match existing system | 1 | LF | $45,000.00 | /LF | $45,000.00 |
| 35 | PIS | Planter Irrigation System | | | | | |
| | | Includes installation of new sprinkler system to match existing | 1 | LF | $30,000.00 | /LF | $30,000.00 |
| D | | Entrance, Plaza & Pool Deck and Garage - Miscellaneous Repairs | | | | | |
| 36 | MWR | Partial Depth Concrete/Masonry Wall Repairs Under Stucco At Building Perimeter | | | | | |
| | | Detail MWR - Includes sawcut, demo, prep, and approved repair mortar | 100 | SF | $80.00 | /SF | $8,000.00 |
| 37 | BR | Block Wall Joint and Crack Repairs Under Stucco | | | | | |
| | | Detail BR - Includes routing & tuckpointing of masonry cracks & joints | 125 | LF | $7.75 | /LF | $968.75 |
| 38 | SMC | New Stucco Over Masonry / Concrete Surfaces | | | | | |
| | | Includes stucco removal, surface prep, new brown coat and finish coat | 500 | SF | $20.00 | /SF | $10,000.00 |
| 39 | SSC | Repair of Stucco Cracks Less Than 1/8" Wide | | | | | |
| | | Includes cleaning, prep, bonding agent, and stucco coat | 300 | LF | $5.50 | /LF | $1,650.00 |
| 40 | SLC | Repair of Stucco Cracks Greater Than 1/8" Wide | | | | | |
| | | Includes rout, cleaning, prep, and stucco mix | 500 | LF | $6.50 | /LF | $3,250.00 |
| 41 | SWR | Stucco Repair Over Masonry / Concrete Surfaces | | | | | |
| | | Includes stucco removal, surface prep, touch-up brown coat and new finish coat | 500 | SF | $20.00 | /SF | $10,000.00 |
| 42 | RAR | Railing Members And Base Anchorage Repair | | | | | |
| | | Remove railing & base shoe, repair damage members, clean, powder coat and reinstall | 50 | EA | $100.00 | EA | $5,000.00 |
| 43 | PRF | Pool Repairs and Finishes | | | | | |
| | | Remove/Replace Diamond Bright finish, pool waterproofing, pool equipment, drains, railings, stairs and other finishes. | 1 | LS | $225,000.00 | LS | $225,000.00 |
| | | ENGINEER'S ESTIMATE SUBTOTAL | | | | | $2,988,451.25 |
| | | CONTRACTOR'S PERFORMANCE BOND (with Labor and Material Clauses) | | | 3.00 | % | $89,653.54 |
| | | ENGINEER'S CONTINGENCY AND INFLATION | | | 25.00 | % | $747,112.81 |
| | | ENGINEER'S ESTIMATE OF THE PROBABLE CONSTRUCTION COST | | | | | $3,825,217.60 |

18217 - Remediation of the Champlain Towers South Condominium
© MORABITO CONSULTANTS, INC.

BECKER_002223

**R C E**
CONSTRUCTION SERVICES
CGC 1523361 - 13BS00369 CTQB

5881 NW 151ST STREET, SUITE 209
MIAMI LAKES, FL 33014
O: 786.441.4818 / F: 786.429.0476

ESTIMATE ☐ X
CONTRACT ☐ _____

ESTIMATE No: 2018 - 091718
DATE: 9/17/2018
PROJECT NAME: Champlain
EXPIRATION DATE: 10/17/2018

CLIENT NAME:
Champlain Building - Option

*(handwritten: ref ASMT)*

| DIVISION | DESCRIPTION OF THE JOB | QUANTITY | PRICE/UNIT | SUBTOTAL | ALLOWANCE |
|---|---|---|---|---|---|
| 00001 | GENERAL CONDITIONS | | | | $ 50,820.00 |
| | Supervision, protect as needed during demo works & Cleaning. Estimated duration time. (44 weeks) | 44 | $ 1,155.00 | $ 50,820.00 | |
| 00002 | SITE WORK | | | | $ 18,000.00 |
| | Debris disposal (1 per floor) | 13 | $ 200.00 | $ 2,600.00 | |
| | Dumpster (2 per month) | 22 | $ 700.00 | $ 15,400.00 | |
| 06000 | WOOD & PLASTICS | | | | $ 281,150.25 |
| | DOUBLE DOOR: Supply setting material, finishes materials and labor to fabricate and install new door frames. Top panel removable for easy access. 3/4" plywood lined in Veneer Ref: FSC QTR OAK 2-230/00/Y17 o RIFT WHITE OAK 112/00Y17. Lacquered in conventional natural varnish. | 113 | $ 1,299.50 | $ 146,843.50 | |
| | SINGLE DOORS: Supply setting material, finishes materials and labor to fabricate and install new door frames. Top panel removable for easy access. 3/4" plywood lined in Veneer Ref: FSC QTR OAK 2-230/00/Y17 o RIFT WHITE OAK 112/00Y17. Lacquered in conventional natural varnish. | 23 | $ 937.25 | $ 21,556.75 | |
| | PANEL / SHELVES: Fabricate and install new wooden panel and floating shelve in hallways one side. Labor & Materials. MDF lined veneer lacquered | 11 | $ 3,312.00 | $ 36,432.00 | |
| | PANEL PH: Fabricate and install new back panel in PH foyer. Labor & Materials | 1 | $ 8,950.00 | $ 8,950.00 | |
| | Remove old baseboard, crownmolding. Supply, farbricate and install new baseboard and crownmolding | 7826 | $ 8.00 | $ 62,608.00 | |
| | Unit ID and installation - Metal Black finish 5" H | 136 | $ 35.00 | $ 4,760.00 | |
| 09000 | FINISHES | | | | $ 161,588.90 |
| | PLASTERING: Repairs existing drywall to remain after baseboard, crownmolding, electrical removal. Plaster, sanding (Skim Coat) complete floor hallways walls and ceilings. Setting materials, and labor included. | 12.5 | $ 6,800.00 | $ 85,000.00 | |
| | PAINTING: Supply setting materials, primer, paint and labor. Primer application in ceilings and walls. Paint application to Ceilings, walls, service doors, and wood trims. | 1 | $ 47,300.00 | $ 47,300.00 | |
| | WALLPAPER: Setting materials, labor, primer and sealer application, and install new vinyl wall covering. Wall paper material not included | 1 | $ 19,895.00 | $ 19,895.00 | |
| | Wall covering material as per Design Option A (2950 Yrd). 64005W Workshop Quartz | 865 | $ 10.86 | $ 9,393.90 | |
| | CARPET & TILE WORK | | | | |
| | DEMOLITION: | | | | $ 98,439.38 |
| | Carpet Demolition | 2120 | $ 3.45 | $ 7,314.00 | |
| | Tile Demolition PH | 426 | $ 2.24 | $ 954.24 | |
| | PREP WORKS: | | | | |
| | Tile Sound proofing material | 480 | $ 1.66 | $ 795.65 | |
| | Tile setting materials (PH tile) | 426 | $ 0.60 | $ 257.64 | |

BECKER_002224



**CONSTRUCTION SERVICES**
*CGC 1523361 - 13BS00369 CTQB*

5881 NW 151ST STREET, SUITE 209
MIAMI LAKES, FL 33014
O: 786.441.4818 / F: 786.429.0476

ESTIMATE _____ X _____
CONTRACT _____

ESTIMATE No: 2018 - 091718
DATE: 9/17/2018
PROJECT NAME: Champlain
EXPIRATION DATE: 10/17/2018

CLIENT NAME:
Champlain Building - Option A

| DIVISION | DESCRIPTION OF THE JOB | QUANTITY | PRICE/UNIT | SUBTOTAL | ALLOWANCE |
|---|---|---|---|---|---|
| | Carpet setting materials (ADHESIVES) | 2120 | $ 0.87 | $ 1,852.03 | |
| | **FINISH MATERIAL:** | | | | |
| | Sounproofing installation | 426 | $ 1.25 | $ 532.50 | |
| | Tile material Porcelain 12x24 (PH) | 426 | $ 5.29 | $ 2,253.54 | |
| | Carpet Material Shaw off grid 12x48 cliff | 2120 | $ 31.29 | $ 66,334.80 | |
| | **INSTALLATIONS:** | | | | |
| | Porcelain tile PH | 426 | $ 5.25 | $ 2,236.50 | |
| | Carpet | 2120 | $ 7.50 | $ 15,908.48 | |
| 15000 | **MECHANICAL** | | | | $ 4,500.00 |
| | Replace existing conventional AC Grills supply for new custom Lineal diffusers. 2 units per floor | 1 | $ 4,500.00 | $ 4,500.00 | |
| 16000 | **ELECTRICAL** | | | | $ 92,600.00 |
| TF | Supply and install 5 recessed lights. Relocate, supply and install 3 exist signs. Install 5 new boxes for scorces and installation. Replace 5 existing sconces. Supply and Install LED light on wood door top panel | 11 | $ 7,915.00 | $ 87,065.00 | |
| PH | Supply and replace 23 trims and lightbulbs. Supply and install new 4 recessed lights. Replace and install 2 sconces lights. Remove flourescent lights | 1 | $ 2,659.50 | $ 2,659.50 | |
| FF | Replace existing sconces lights. Install 1 new box for sconces lights and installation. Relocate, supply and install 2 exist signs. Install LED on top of the door wood panel | 1 | $ 2,875.50 | $ 2,875.50 | |

Total Allowance $ 707,098.53
Overhead 3% $ 21,212.96
Profit 15% $ 106,064.78
**Total Allowance $ 834,376.27**

Quotation prepared by: RCE GROUP, INC / <u>Carolina Posada</u>

This is a quotation on the goods named, subject to the conditions noted below:

This estimate is valid for sixly (60)days of issuance. This estimate was based on the information provided by client. Any alteration or
deviation from those especifications may result in cost increase, and will become an extra charge over and above the estimate, and it shall be deemed the financial
responsibility of the client. Upon acceptance of this estimate, a written contract will be issue, such contract will establish the terms of payment

**W W W . R C E C O N S T R U C T I O N . C O M**

BECKER_002225



**CONSTRUCTION SERVICES**
*CGC 1523361 - 13BS00369 CTQB*

5881 NW 151ST STREET, SUITE 209
MIAMI LAKES, FL 33014
O: 786.441.4818 / F: 786.429.0476

| ESTIMATE | X |
|---|---|
| CONTRACT | |

ESTIMATE No: 2018 - 091718
DATE: 9/17/2018
PROJECT NAME: Champlain
EXPIRATION DATE: 10/17/2018

**CLIENT NAME:**
Champlain Building - Option A

| EXCLUSIONS | INCLUDED |
|---|---|
| Permittings Fees | Setting materials - demolition |
| Expeditor Fees | Finishes materials:Carpet, Tile, Recessed Lights, LED, millwork, |
| County Fees | wall paper, padding, adhesives. |
| Building Fees | Equipment - tools if needed |
| Any bond or expenses relate to local ordinances (PB approx $14,000) | Supervision |
| Shop Drawings | Manpower - Labor |
| Wall sconces Fixtures | Electrical Demolition Included. |
| Move, or store Building Belongings | |
| Soundproofing (TBD by the building) | |
| Waterproofing | |
| Crack Isolation | |
| After Hours not included | |
| Data or low voltage | |
| Portable office if needed | |
| Attic Store | |
| Floor protection after installation | |
| Handling & Shipping | |
| Any insurance upgrade if required | |
| Repair existing doors if in bad conditions. | |
| Remove any item attached to doors or frames such as ring bells, etc | |
| **NOTES:** | |
| 10% Contingency must be accounted for any unforeseen conditions, or damages produced by the construction process. | |
| 10% of management fee will be charge to any other subcontractor not part of this proposal Such as Cabinet maker, or any other sub that requires coordination thru RCE. Client must approve such coordination prior. | |
| Unforeseen conditions will be consulted prior to address or excecute a resolution. | |
| Subcontractor's Certificate of insurance, and workers compensations must be issue to RCE Group as holder and additional insured. | |
| Quantities, fabrication and installation cost such as walls appliactions, carpet, tile, mirror, etc are subject to fiedl measurements after building is completed or other installations. | |
| Handling and shipping of any fixture is not included. | |
| Final Architectural plans & MEP plan, if apply, are required to be reviewed, in order to adjust any cost. | |
| A formal contract will be provided upon estimate approval | |
| Estimated time of completion: 11 monts approx. upon permit approval | |

Quotation prepared by: <u>Carolina Posada</u>

This is a quotation on the goods named, subject to the conditions noted below:

This estimate is valid for sixty (60)days of issuance. This estimate was based on the information provided by client. Any alteration or

deviation from those especifications may result in cost increase, and will become an extra charge over and above the estimate, and it shall be deemed the financial

responsibility of the client. Upon acceptance of this estimate, a written contract will be issue, such contract will establish the terms of payment

This estimate is accepetd by:_____

**W W W . R C E C O N S T R U C T I O N . C O M**

BECKER_002226

# CHAMPLAIN TOWERS SOUTH

### 2017 BUDGET INFORM

**TO:** CTS RESIDENTS

**FROM:** **THE BOARD**

**DATE:** **NOVEMBER 14, 2016**

**RE:** **2017 BUDGET INFORMATION**

We hope this communication finds each of you wel

We have noticed the meeting to discuss and vote on the 2017 Budget for **Monday, November 28, 2016, to commence at 7:00 p.m.** Additionally, we will also take up the items which had originally been scheduled for our meeting of Thursday, November 10, 2016, which will include voting on the vendor for the Elevator Project as well as Fire Alarm Project.

With this communication you will find the following attachments:

1. Board Of Directors Budget <u>Meeting Agenda,</u> Monday, November 28, 2016, At 7:00 p.m, Recreation Room **(Attachment A)**

2. <u>Affidavit Of Delivery Of Notice</u> To Owners Of Budget Meeting And With Budget Related Documents **(Attachment B)**

3. Champlain Towers South <u>Proposed Budget for 2017</u> **(Attachment C)**

4. Chart on <u>Funding of Reserve Accounts for 2017</u> **(Attachment D)**

5. Chart of <u>Monthly Maintenance Fee Per Unit Line</u> **(Attachment E)**

6. Chart on <u>Special Assessments Calculation for 2017 By Unit Line</u> **(Attachment F)** (refer to Memorandum for Projects Being Funded Which

1

2017 Budget Memorandum

Show Which Are Funded Fully By Reserves, Which Are Partially Funded By Reserves and Special Assessment and Which Are Funded Fully By Special Assessment)

The Board wants to thank Margarita Brito, Maggie Mayhew and Maggie Manrara for their hard work in preparing the Budget and assisting with the information provided herein. Each has spent countless hours working to ensure we can move forward with a financial plan for 2017.

Below we provide some helpful information which may assist in your understanding the Attachments:

## ATTACHMENT A:

### BOARD OF DIRECTORS BUDGET MEETING AGENDA

Attachment A is the Board Of Directors Budget Meeting Agenda scheduling the meeting for Monday, November 28, 2016, at 7:00 p.m., in the Recreation Room **(Attachment A)**

******

## ATTACHMENT B:

### AFFIDAVIT OF DELIVERY OF NOTICE TO OWNERS

Attachment B is the Affidavit Of Delivery Of Notice To Owners Of Budget Meeting And With Budget Related Documents **(Attachment B).**

******

2

2017 Budget Memorandum

**CTS - BUDGET PACKET 000002**

BECKER_002228

**ATTACHMENT C:**

## CHAMPLAIN TOWERS SOUTH PROPOSED
## OPERATING BUDGET FOR 2017

**Attachment A** is the Proposed Operating Budget For 2017. During the calendar year 2016, the Board managed its operating expenses to ensure that we stayed within budget. We did stay within budget. The additional good news is that for 2017, even though operating expenses have increased, the **Monthly Maintenance has only increased by a few dollars ($6.00) to account for the increase in cable cost. However, the cost to operate CTS will remain the same.**

Note that the Operating Budget for 2017 is divided in 2 main parts:

1. The **"Income Accounts"** (which begins on the first page)

2. The **"Expense Accounts"** (which start on the second page and through the last page).

Please note that in the "Income Accounts" there are many items which are not filled in; this is because CTS did not historically track certain Income so we are unable to identify the historical data which relates to certain Income items. As you may all recall, this Board amended the Budget to adopt a more detailed list of accounts; moving forward we are working with the more detailed account. Therefore, this budget simply provides some estimates (where available) based on past amounts; these are conservative estimates but in many cases there is nothing filled in because historically it had never been tracked.

Moving forward we will do detailed tracking and future budgets will have the benefit of this detailed historical data. Therefore, our Income projections are conservative (low) and we expect to have more income than projected but do not precisely what the amounts would be.

Some of the highlights to consider as you evaluate the Proposed 2017 Operating Budget:

3

2017 Budget Memorandum

- **Operating Budget Overall:** The Operating Budget for 2017 will remain the same as for 2016, with a total Operating Budget of $1,120,982.

- **Funding of Reserves:** We will <u>continue to fund</u> the Reserve Funds at the same rate we did in 2016, funding reserves in 2017 in the total amount of $120,000.00 (as compared to the 2016 Budget which funded them at $117,803.00).

- **Cable Service Increase:** The Cable Service had an increase from $68.00 per unit to $74.00. This represents a 9% increase. The increase was the result of "pass through" charges. We are currently negotiating with the Cable Company to reduce this amount. The increase reflects an amount of $10,000 for the year more than what was paid in 2016. Because 2017 will be our last and final year under the Cable Contract, and the last year we will have pass through charges (which were agreed to under the 5 year contract we are operating under), the next contract will be a 5 year contract with fixed 5% increases and no pass through charges; the cost of the pass through charges have been in the range of 10% each year, so the fixed 5% increase and no pass through will be favorable.

- **Maintenance Employee Wages Increased (3%):** We increased the wages of maintenance employees by 3%.

- **Concierge and Security Services Contract Increase:** There was an increase in Concierge and Security Services Contract which amounts to $10,000.

- **Electricity Increase**: There will be an increase in electricity costs of $6,000.00 from $70,000.00 to $76,000.00

- **Administration Increase:** There is an increased cost with administration of $8,000.00 for the 2017 calendar year. This reflects payment of a Manager salary of $60,000.00, plus the increased costs of a bookkeeping service ($6,500) and the purchase of in-house software which is specially designed to manage a condominium ($2,400.00).

4

2017 Budget Memorandum

CTS - BUDGET PACKET 000004

BECKER_002230

\*\*\*\*\*\*\*

## ATTACHMENT D:

## CHART ON FUNDING OF RESERVE ACCOUNTS FOR 2017

**Attachment B** is a <u>Chart on Funding of Reserve Accounts for 2017</u>.  You will note that we will continue to fund the Reserve Accounts each month as we always have done.

Please note that the "Life Expectancy" and "Replacement Costs" are projections and estimates which were done years ago and which the Board hopes to more closely look at in the future to establish more precise Life Expectancy and Replacement Cost projections.

You can confirm the funding of the Reserve Accounts by turning to the Proposed Operating Budget for 2017 which contains a line item reflecting the funding at $120,000.00.

\*\*\*\*\*\*\*\*

## ATTACHMENT E:

## MONTHLY MAINTENANCE FEE

**Attachment C** is a <u>Maintenance Schedule for 2017</u>.  You will note that that the Maintenance has remained the same, however, the cost of the cable has increased by $6.00 per unit.

We have intentionally separated the Maintenance from the cost of Cable because the Maintenance fee is prorated by unit based on unit size, where the Cable is evenly divided among all units.

The Monthly Maintenance Fee is what you must pay each month as a contribution towards the Operating Budget of CTS.

**We encourage all unit owners to consider having the Monthly Maintenance Fee set up for automatic payment.  This arrangement significantly reduces the administrative costs and time associated with collecting Maintenance Fees**

5

CTS - BUDGET PACKET 000005

BECKER_002231

**each month. It also ensures Maintenance Fees are timely paid. We would be most grateful if you could assist the Association by setting up for an automatic payment of the Maintenance Fee. Please contact the Management Office and speak with Manager Cristina Pino at: (305) 865-4740 to set up the automatic payment.**

*********

## ATTACHMENT F:

## CHART ON SPECIAL ASSESSMENTS
## CALCULATION FOR 2017 BY UNIT LINE

**Attachment D** is a <u>Chart on Special Assessments Calculation For 2017 By Unit Line</u>. The Special Assessment will fund a number of Projects and we explain those below in detail.

With the support of the residents, the Board has been and remains committed to improving CTS. The Board has spent 2016 doing a lot of internal improvements (some visible some not) and improving on a host of administrative as well as quality of life issues. We will have a "Special Assessment" which will amount to <u>roughly</u> the equivalent of what each unit pays during one year. We say "roughly" because assessments are based on unit size and prorated accordingly. The Maintenance fee, on the other hand has a portion which is based on unit size and another portion which is a flat fee for each unit (the cable fee). Therefore, while the Special Assessment amount approximates what a unit pays for one year of Maintenance, the dollar amounts are not exactly the same and there is some modest discrepancy.

We seek to continue this into 2017, by tackling some very significant projects.

6

2017 Budget Memorandum

## *Payment Options*

The Board will vote on the various options for payment of the Special Assessment. The Board will consider a number of options, including, the following:

1.  Unit Owners may pay the entire amount up front as one lump sum

2.  Unit Owners may pay the entire amount in 4 equal parts

3.  Unit Owners may opt to send an extra check each month along with their maintenance to ensure their total special assessment is paid in 12 or 24 months.

## *Identification of Projects To Be Funded*

In 2017, the **most significant improvements (Elevator/Fire Alarm)** are life safety concerns and will position us well for the 40 year inspection. Other smaller projects also involve life safety (Plumbing/Cameras/Replacement and Repair of Rusted Beams on Roof).

In addition to the life safety/40 year inspection related concerns, we also have real practical issues which need to be addressed (having or Engineering and Architectural Drawings on CAD so we do not have to provide vendors with our original drawings).

Lastly, and the most visible, are projects designed to make us proud of where we live. For this we will embark on projects related to coming up with a design for the interior hallways that updates the 80s look we currently have. We also have plans to study the parking situation and come up with creative and aesthetically pleasing solutions which may provide for more parking.

While CTS has healthy reserves, the reserves do not cover all expenses. Below are the Projects for 2017. These will be funded as demonstrated below. In some cases they are funded fully from Reserve Accounts; in other cases by a combination of Reserve Accounts and Amounts funds through the Special Assessment; in other cases the Special Assessment is funding the Project.

2017 Budget Memorandum

CTS - BUDGET PACKET 000007

BECKER_002233

**As you will note some Projects are fully funded by Reserve Accounts, others are funded through a combination of Reserve Accounts and Special Assessments and other Projects are funded solely by the Special Assessment.**

## PROJECTS FUNDED COMPLETELY
## FROM RESERVE ACCOUNTS

| PROJECT | PROJECT COST COMPLETELY FUNDED BY EXISTING RESERVE ACCOUNT | TOTAL COST OF PROJECT |
|---|---|---|
| New Fire Alarm System Including Fire Detection Sensors In Each Unit And Change of Fire Panel Which Will Connect Directly to Fire Station | Electrical Reserve | $120,000 |
| Install Cameras On Each Floor And Garage Level and Upgrade Legacy Cameras | Electrical Reserve | $24,000 |
| Continue Garage Pipe Replacement | Plumbing Reserve | $10,000 |
| Rooftop Air Conditioning Units (Numbering, Insulation, Replacement Beams Where Rusted ) | Roof Reserve | $20,000 |
| **TOTAL COSTS** | **PAID IN FULL FROM RESERVE ACCOUNTS** | **$174,000.00** |

## PROJECTS TO BE FUNDED BY COMBINATION OF

8

2017 Budget Memorandum

**CTS - BUDGET PACKET 000008**

BECKER_002234

## RESERVE ACCOUNT AND SPECIAL ASSESSMENT

| PROJECT | AMOUNT TO BE COVERED BY EXISTING RESERVE ACCOUNT | AMOUNT TO BE COVERED BY SPECIAL ASSESSMENT | TOTAL COST OF PROJECT |
|---|---|---|---|
| Replacement of Both Elevator Systems and Cabs | $180,000<br><br>Elevator Reserve | $280,000.00<br><br>PARTIALLY FUNDED THROUGH SPECIAL ASSESSMENT | $460,000 |
| Landscape (New sod in rear; fixing pavers in front; restructure front) | $30,774<br><br>Decoration Reserve | $116,226<br><br>PARTIALLY FUNDED THROUGH SPECIAL ASSESSMENT | $147,000 |
| Exterior Concrete Restoration | $49,918<br><br>Balconies Concrete Restoration Reserve | $101,082<br><br>PARTIALLY FUNDED THROUGH SPECIAL ASSESSMENT | $150,000 |
| Exterior Painting | $140,000<br><br>Painting Reserve | $110,000<br><br>PARTIALLY FUNDED THROUGH SPECIAL ASSESSMENT | $250,000 |
| Change of Carpets for Hallways As Part of Interior Design Renovation | $49,503<br><br>Interior Design Reserve | $53,279<br><br>PARTIALLY FUNDED THROUGH SPECIAL ASSESSMENT | $102,782 |

2017 Budget Memorandum

CTS - BUDGET PACKET 000009

BECKER_002235

| Interior Hallway Lighting As Part of Interior Design Renovation | $23,907 Electrical Reserve | $93.00 | $24,000 |
|---|---|---|---|
| **TOTAL COSTS** | | | **$1,133,782.00** |

## PROJECTS TO BE FUNDED
## COMPLETELY THROUGH SPECIAL ASSESSMENT

| PROJECT | AMOUNT TO BE COVERED BY EXISTING RESERVE ACCOUNT | AMOUNT TO BE COVERED BY SPECIAL ASSESSMENT | TOTAL COST OF PROJECT |
|---|---|---|---|
| Scanning All Building Drawings/Plans into CAD so we do not have to provide original drawings/plans to vendors | NONE No Reserve Exists | $8,000 FULLY FUNDED FROM SPECIAL ASSESSMENT | $8,000 |
| Preparation of Interior Design Sketches and Drawings for Renovation of Interior Spaces and Reallocation of Spaces and Study to Maximize Parking By Changing Front Exterior | NONE NONE No Reserve Exists | $15,000 FULLY FUNDED THROUGH SPECIAL ASSESSMENT | $15,000 |

10

2017 Budget Memorandum

CTS - BUDGET PACKET 000010

BECKER_002236

| Painting of Interior Hallways As Part of Interior Design Renovation | NONE<br><br>No Reserve Exists | $99,100<br><br>FULLY FUNDED THROUGH SPECIAL ASSESSMENT | $99,100 |
|---|---|---|---|
| **TOTAL COSTS** | | | **$122,100** |

4819-8094-0348, v. 1

11

2017 Budget Memorandum

**CTS - BUDGET PACKET 000011**

BECKER_002237

**Champlain Towers South Condominium Association, Inc.**
8777 Collins Ave. Surfside, FL 33154 Ph. 305-865-4740 Fax. 305-865-7800

# Champlain Towers South

NOTICE IS HEREBY GIVEN, pursuant to applicable provisions of the Florida Statutes, the Declaration of Condominium, the By-Laws, and the Articles of Incorporation of Champlain Towers Association, Inc., that a meeting of the Board of Directors will be held:

## BOARD OF DIRECTORS BUDGET MEETING

### AGENDA

### Monday November 28, 2016
### At 7:00 PM
### Recreation Room

#### AGENDA

- ❖ Call to Order
- ❖ Roll Call of Directors
- ❖ President's Report
- ❖ Treasurer's Report
- ❖ Review Minutes of Previous Meeting

**Old Business:**
- ❖ Approval of Board's Last Minutes

**New Business:**
  Management:
  - Termination of Contract With Florida Property Solutions; Resuming of In-House Management of CTS.
  - Thanking of Haley Delano
  - Introduction of New Manager Veronica Cristina Pino
  - Institution of Property Management Software

  Status of Compliance Issues:
  - Updating of Resident Information
  - Unit Key Compliance

1

BECKER_002238

- Storage Unit Key Compliance
- Lease Compliance Issues
- Delinquent Accounts
- Parking Garage Door Scanner

**Status of Projects:**
- Status of Sprint Tower
- Pool Automatic Chemical Dispenser
- Repair of Cracked Pool Tiles
- Jacuzzi Jet Repair
- Disposal of Large Trash Items – Furniture, Mattresses, Large Items
  (Pick Up Wednesday; Bring Down No Earlier Than Tuesday Evening)

**Approval of Major Projects for 2017:**
- Elevator – Selection of Vendor
- Fire Alarm – Selection of Vendor

**2017 Budget:**
- **Consideration and Adoption of Proposed Budget for 2017**

**Adjournment**

All unit owners are invited to attend the Board of Director's Budget Meeting.

Refreshments will be served starting at 6:45 PM.

FINAL

4830-1621-3308, v. 1

2

BECKER_002239



**Champlain Towers South Condominium Association, Inc.**
8777 Collins Ave. Surfside, FL 33154 Ph. 305-865-4740 Fax. 305-865-7800

## AFFIDAVIT OF DELIVERY OF NOTICE TO OWNERS OF BUDGET MEETING AND WITH BUDGET RELATED DOCUMENTS

I, the undersigned, President of the Condominium Association whose name appears at the bottom of this affidavit, do hereby swear and affirm that notice of the First Notice of Budget Meeting to be held on Monday, November 28, 2016 at 7:00 PM, was either hand delivered, sent by electronic mail (to the email provided by the unit owner), posted on Concierge Plus or mailed (to the unit owner address on file with the Association) to each unit owner in accordance with Section 718.112 of the Florida Statutes.

### *CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION, INC.*

Printed Name of President: Pedro P. Forment

Signature: _____

Date: ___11/14/16___

Final

4837-7282-6428, v. 1

CTS - BUDGET PACKET 000014

BECKER_002240

# CHAMPLAIN TOWERS SOUTH

## ATTACHMENT C:

## CHAMPLAIN TOWERS SOUTH PROPOSED
## OPERATING BUDGET FOR 2017

| Ledger Accounts | Budget 2017 | Revised Budget 2016 | Change | % |
|---|---|---|---|---|
| **Income Accounts** | | | | |
| **Income Accounts** | | | | |
| | | | | |
| **Application to board by Prospective Purchaser  (Purchaser)** | | | | |
| US Based Background Screening | 750.00 | 700.00 | 50.00 | 7% |
| International Background Screening | 1,250.00 | 1,300.00 | (50.00) | -4% |
| Combined US/International Background Screening | | | - | |
| | | | | |
| **Application to board by Prospective Occupant   (Authorized Non-Renter Occ.)** | | | | |
| US Based Background Screening | | | - | |
| International Background Screening | | | - | |
| Combined US/International Background Screening | | | - | |
| **Application to board by Prospective Renter   (Renter)** | | | - | |
| US Based Background Screening | | | - | |
| International Background Screening | | | - | |
| Combined US/International Background Screening | | | - | |
| Cell Phone Tower Income | | | - | |
| Common Area Non-Refundable Reservation Fees - BBQ Non-Refundable Fees | 200.00 | 200.00 | - | 0% |
| Common Area Non-Refundable Reservation  Fees  -  Recreation/Party room  Non-Refundable Fees | 1,000.00 | 1,000.00 | - | 0% |
| Common Area Non-Refundable Reservation Fees - Pool (15+) Non-Refundable Fees | | | - | |
| Covenant Enforcement Fees - Daily Fee for Non-Compliance | | | - | |
| Hard Copy of Declaration | 500.00 | 500.00 | - | 0% |
| Hard Copy of By Laws | | | - | |
| Hard Copy of Articles of Incorporation | | | - | |
| Sending Documents via Overnight Mail plus Addtl | | | - | |
| Non-Refundable Fees - Bldg. Maintenance Emergency Response fees | | | - | |
| Non-Refundable Fees - Cleaning Service for spillage fees | | | - | |
| Non-Refundable Fees - Unit Construction/Remodeling Fees | | | - | |
| Non-Refundable Fees - Trash Disposable Fees | | | - | |
| Non-Refundable Fees - Exterior Unit - Windows/Sliding Doors | | | - | |
| Estoppel Letter fees - Letter for Sellers | 500.00 | 500.00 | - | 0% |
| **Non-Refundable Social Activity Fees** | | | - | |
| BBQ Non-Refundable fee | | | - | |
| Cleaning Services for Events | | | | |
| Recreation/Party Room Non-Refundable fee | | | - | |
| Pool Invitees (10 or more invitees) Non-Refundable fee | 100.00 | | 100.00 | |

CTS - BUDGET PACKET 000015       Rev. 11/11/16

BECKER_002241

CHAMPLAIN TOWERS SOUTH

ATTACHMENT C:

## CHAMPLAIN TOWERS SOUTH PROPOSED OPERATING BUDGET FOR 2017

| Ledger Accounts | Budget 2017 | Revised Budget 2016 | Change | % |
|---|---|---|---|---|
| Concierge Services for Events Non-Refundable fee | 850.00 | 850.00 | - | |
| Valet Service for Events Non-Refundable fee | 180.00 | 250.00 | (70.00) | -28% |
| | | | | |
| **FOB/Barcode Device Fees (Non-Refundable)** | | | | |
| FOB Device Activation Fee - Purchase & Initial Activation (per FOB) | 260.00 | | 260.00 | |
| FOB Device Activation Fee - Replacement fee (per FOB) | 250.00 | 1,000.00 | (750.00) | -75% |
| Vehicle Garage Barcode Sticker Purchase & Initial Activation (per Sticker) | | | - | |
| Vehicle Garage Barcode Sticker Activation Fee - Replacement fee (per Sticker) | 250.00 | | 250.00 | |
| **Key Replacement Fees (Non-Refundable)** | | | | |
| Replacement key to Lower Level Storage Units | | | - | |
| Replacement key to Residential Level Storage Units | | | - | |
| Replacement key to Laundry, Gym or Other | 300.00 | 300.00 | - | 0% |
| Interest Income | | | - | |
| Monthly Maintenance Late Payment Fees | 2,000.00 | 1,200.00 | 800.00 | 67% |
| Returned Check Bank Fees (Insufficient Funds) | | | - | |
| Maintenance Fees Income | 1,120,982.00 | 1,120,982.00 | - | 0% |
| Move In/Out Fees - Freight Elevator Reservation Use | 500.00 | | 500.00 | |
| Move In/Out Fees - Move related Security Guard Services | | | - | |
| Move In/Out Fees - Deliveries - Furniture/ Boxes Fees | | | - | |
| Move In/Out Fees - Improperly disposed Trash Fees | | | - | |
| Owners Miscellaneous | 550.00 | 550.00 | - | 0% |
| Annual Storage Fee (Cable Rooms on Floors | 3,500.00 | 3,250.00 | 250.00 | 8% |
| Annual Storage Fee (West Side Rooms Floors | 7,500.00 | 7,000.00 | 500.00 | 7% |
| Vending Operations Income - Laundry Income | 730.00 | 550.00 | 180.00 | 33% |
| Vending Operations Income - Snack Vending Machine | 750.00 | 700.00 | 50.00 | 7% |
| Vending Operations Income - Soda Vending Machine | 750.00 | 1,000.00 | (250.00) | -25% |
| Sub-total | 1,143,642.00 | 1,140,982.00 | | |
| Cable | 120,000.00 | 110,000.00 | 10,000.00 | 9% |
| **TOTAL BUDGET - INCOME** | $ 1,263,642.00 | $ 1,250,982.00 | 12,660.00 | 1% |
| | | | | |
| **Expenses accounts** | | | | |
| Bad Debts Expenses | 3,000.00 | 14,000.00 | (11,000.00) | |
| **Application Process Expenses** | | | | |
| Application Processing - Background Check Process Expenses (Domestic) | 600.00 | 600.00 | - | 0% |
| Application Processing - Background Check Process Expenses (Foreign) | 700.00 | 700.00 | - | 0% |
| Bank Fees | 1,150.00 | 1,000.00 | 150.00 | 15% |
| Cell-Phone Tower Expense | | | - | |
| Common Area Maintenance - BBQ area expenses | | 500.00 | (500.00) | -100% |

CTS - BUDGET PACKET 000016    Rev. 11/11/16

BECKER_002242

# CHAMPLAIN TOWERS SOUTH

## ATTACHMENT C:

## CHAMPLAIN TOWERS SOUTH PROPOSED
## OPERATING BUDGET FOR 2017

| Ledger Accounts | Budget 2017 | Budget 016 Revised | Change | % |
|---|---|---|---|---|
| Common Area Maintenance - Flowers & Plants - Exterior | 2,500.00 | 2,500.00 | - | 0% |
| Common Area Maintenance - Flowers & Plants - Interior | 3,000.00 | 4,500.00 | (1,500.00) | -33% |
| Common Area Maintenance - Landscaping | 2,000.00 | 2,000.00 | - | 0% |
| Common Area Maintenance - Landscaping - Holiday Projects | 500.00 | 500.00 | - | 0% |
| Common Area Maintenance - Recreation/Party Room Expenses | 200.00 | 200.00 | - | 0% |
| Computers & Software Expenses- Computer Hardware | 2,000.00 | 2,000.00 | - | 0% |
| Computers & Software Expenses- IT Services | 1,500.00 | 600.00 | 900.00 | 150% |
| Computers & Software Expenses- Software & Program Subscriptions | 3,000.00 | 600.00 | 2,400.00 | 400% |
| Contract Services - Concierge/Security Services Contract | 150,000.00 | 140,000.00 | 10,000.00 | 7% |
| Contract Services - Elevator Contract | 6,200.00 | 6,000.00 | 200.00 | 3% |
| Contract Services - Housekeeping Contract | 95,100.00 | 91,000.00 | 4,100.00 | 5% |
| Contract Services - HVAC Contract | 4,800.00 | 4,788.00 | 12.00 | 0% |
| Contract Services - Landscaping Contract | 14,400.00 | 14,400.00 | - | 0% |
| Contract Services - Pest Control Contract | 4,620.00 | 4,620.00 | - | 0% |
| Contract Services - Pool Contract | 6,600.00 | 6,600.00 | - | 0% |
| Contract Services - Valet Services Contract | 73,130.00 | 71,000.00 | 2,130.00 | 3% |
| Contract Services - Window Cleaning Contract | 5,800.00 | 3,000.00 | 2,800.00 | 93% |
| In-House Contractor Service Expenses - Bonus & Gifts | 8,000.00 | 6,000.00 | 2,000.00 | 33% |
| In-House Contractor Service Expenses - Valet Services for Special Events | 200.00 | 200.00 | - | 0% |
| Insurance - Insurance - Bldg/ GL | 172,700.00 | 174,000.00 | (1,300.00) | -1% |
| Insurance - Insurance - Flood | 37,900.00 | 36,083.00 | 1,817.00 | 5% |
| Insurance - Insurance - Health | 6,000.00 | 4,008.00 | 1,992.00 | 50% |
| Insurance - Insurance - Workers Comp | 4,065.00 | 4,065.00 | - | 0% |
| Licenses and Permits - Corporate Annual Report | 62.00 | 62.00 | - | 0% |
| Licenses and Permits - Elevator Permits | 200.00 | 200.00 | - | 0% |
| Licenses and Permits - Fire Permits & Inspections | 1,200.00 | 1,200.00 | - | 0% |
| Licenses and Permits - Local Business Tax | 100.00 | 100.00 | - | 0% |
| Licenses and Permits - Pool & Spa Permits | 375.00 | 375.00 | - | 0% |
| Locksmith Service - Building Locksmith Service Fees | 200.00 | 200.00 | - | 0% |
| Contingencies | - | - | - | |
| Office Supplies | 5,000.00 | 8,000.00 | (3,000.00) | -38% |
| Postage and Delivery | 300.00 | 300.00 | - | 0% |
| Professional Fees - Accounting Services | 2,500.00 | 4,500.00 | (2,000.00) | -44% |
| Professional Fees - Bookkeeping Services | 9,000.00 | 2,500.00 | 6,500.00 | 260% |
| Professional Fees - Legal Fees | 5,000.00 | 5,000.00 | - | 0% |
| Professional Fees - Legal Fees - Terra Project | - | 15,000.00 | (15,000.00) | -100% |
| Manager Salary | 60,000.00 | 52,000.00 | 8,000.00 | 15% |
| Professional Fees - Other Terra Project Expenses | - | 2,475.00 | (2,475.00) | -100% |
| Repairs & Maint. Expenses - A/C Repairs (HVAC) | 4,000.00 | 3,500.00 | 500.00 | 14% |

CTS - BUDGET PACKET 000017

Rev. 11/11/16

BECKER_002243

CHAMPLAIN TOWERS SOUTH

ATTACHMENT C:

## CHAMPLAIN TOWERS SOUTH PROPOSED OPERATING BUDGET FOR 2017

| Ledger Accounts | Budget 2017 | Budget 2016 Revised | Change | % |
|---|---|---|---|---|
| Repairs & Maint. Expenses - Building Supplies | 26,000.00 | 15,000.00 | 11,000.00 | 73% |
| Repairs & Maint. Expenses - Cleaning and Maintenance Supplies | 1,000.00 | 2,500.00 | (1,500.00) | -60% |
| Repairs & Maint. Expenses - Elevator Repairs | 1,500.00 | 3,000.00 | (1,500.00) | -50% |
| Repairs & Maint. Expenses - Emergency Generator | 1,200.00 | 1,160.00 | 50.00 | 4% |
| Repairs & Maint. Expenses - Fire Alarm & Equipment Repairs | 1,000.00 | 3,000.00 | (2,000.00) | -67% |
| Repairs & Maint. Expenses - Fire sprinklers repairs & maintenance | 5,000.00 | 5,000.00 | - | 0% |
| Repairs & Maint. Expenses - Fitness Room Repairs | 1,000.00 | 2,000.00 | (1,000.00) | -50% |
| Repairs & Maint. Expenses - Parking Lot Maintenance | 1,000.00 | 1,000.00 | - | 0% |
| Repairs& MaintExpenses–Pest Control Exterminators | 500.00 | (500.00) | -100% |
| Repairs & Maint. Expenses - Pool Repairs | 5,000.00 | 5,000.00 | - | 0% |
| Repairs & Maint. Expenses - Plumbing | 3,000.00 | 10,000.00 | (7,000.00) | -70% |
| Repairs & Maint. Expenses - Video Equipment R&M (Cameras) | 1,500.00 | 10,000.00 | (8,500.00) | -85% |
| Staff Recognition Programs | 1,000.00 | 1,000.00 | - | 0% |
| Staff Bonus & Gifts | 3,000.00 | 3,000.00 | - | 0% |
| Staff - Uniforms | 370.00 | 400.00 | (30.00) | -8% |
| Taxes - Corporate Taxes | 700.00 | 700.00 | - | 0% |
| Taxes - Payroll Taxes (Maintenance Dept) | 9,570.00 | 8,250.00 | 1,320.00 | 16% |
| Utilities - Cable | 120,000.00 | 110,000.00 | 10,000.00 | 9% |
| Utilities - Electricity | 76,000.00 | 70,000.00 | 6,000.00 | 9% |
| Utilities - Gas | | | - | |
| Utilities - Telephone | 2,000.00 | 1,500.00 | 500.00 | 33% |
| Utilities - Trash collection | 36000.00 | 36,000.00 | - | 0% |
| Utilities - W&S- Fire Line | 180.00 | 180.00 | - | 0% |
| Utilities - W&S- Sewer Services | 32,200.00 | 32,972.00 | (772.00) | -2% |
| Utilities - W&S- Sprinklers/Pools | 10,500.00 | 11,390.00 | (890.00) | -8% |
| Utilities - W&S- Storm water Utility | 17,220.00 | 18,295.00 | (1,075.00) | -6% |
| Utilities - W&S- Water Services | 22,900.00 | 24,083.00 | (1,183.00) | -5% |
| Vending Operations - Laundry Room Repairs | 200.00 | 200.00 | - | 0% |
| Vending Operations - Vending Machine Repairs | - | 200.00 | (200.00) | -100% |
| Vending Operations - Vending Machine Supplies | 983.00 | (983.00) | -100% |
| Salaries - O.T. (Maintenance Crew) | 5,000.00 | 5,000.00 | - | 0% |
| Salaries - Reg. (Maintenance Crew) | 62,000.00 | 60,000.00 | 2,000.00 | 3% |
| Reserves - Non-Operating Expense | 120,000.00 | 117,803.00 | 2,197.00 | 2% |
| **TOTAL BUDGET - EXPENSES** | $ 1,263,642.00 | $ 1,250,982.00 | 12,660.00 | |

CTS - BUDGET PACKET 000018
Rev. 11/11/16

BECKER_002244

## CHAMPLAIN TOWERS SOUTH

### ATTACHMENT D:
### CHART ON FUNDING OF RESERVE ACCOUNTS FOR 2017

| RESERVE CATEGORY | LIFE EXPECTANCY | REPLACEMENT COST | PROJECTED RESERVE ACCOUNT BALANCE AS OF 12/31/16 | ANNUAL FUNDING OF RESERVE ACCOUNT DURING CALENDAR YEAR 2017 | MONTHLY CONTRIBUTION TOWARDS RESERVE ACCOUNT DURING 2017 |
|---|---|---|---|---|---|
| 301-Roof | 25 | 250,000.00 | 7,758.75 | 12,116.00 | 1009.67 |
| 302-Painting | 7 | 125,000.00 | 124,999.00 | 14,742.00 | 1228.50 |
| 303-Elevators | 33 | 180,000.00 | 179,001.00 | 0.00 | 0.00 |
| 304-A/C | 15 | 59,000.00 | 31,140.00 | 4,643.00 | 386.92 |
| 305-Sauna/Gym | 18 | 12,000.00 | 4,816.00 | 423.00 | 35.25 |
| 306-Eme Gen | 26 | 35,000.00 | 24,370.00 | 532.00 | 44.33 |
| 308-Pool | 15 | 37,000.00 | 8,728.00 | 3,819.00 | 318.25 |
| 309-Jaccuzzi | 15 | 9,000.00 | 1,800.00 | 554.00 | 46.17 |
| 310-Int. Dec. | 25 | 120,000.00 | 37,792.00 | 11,711.00 | 975.92 |
| 311-Ext. Pavers & Dec. | 25 | 76,500.00 | 21,628.86 | 9,145.00 | 762.08 |
| 312-Fire Alarm | 19 | 150,000.00 | 100,070.00 | 4,187.00 | 348.92 |
| 313-Plumbing | 49 | 390,000.00 | 71,299.00 | 13,526.00 | 1127.17 |
| 314-Electrical | 49 | 390,000.00 | 113,419.76 | 9,616.00 | 801.33 |
| 316-Balconies/ Concrete Rest. | 20 | 320,000.00 | 18,932.00 | 29,986.00 | 2498.83 |
| 317-Ins. Deductible | 12 | 400,000.00 | 230,306.00 | 5,000.00 | 416.67 |
| 315-Reserve Interest | | | 1,019.00 | | 0.00 |
| | | | | | 0.00 |
| | | 2553500.00 | 977,079.37 | 120000.00 | 10000.00 |

*Please note that the life expectancy and replacement costs are not precise and we will look in the future to having more precise estimates based on professional opinions regarding life expectancy/replacement costs.

* You can refer to the proposed 2017 operating budget to confirm the funding of these reserves.

**CTS - BUDGET PACKET 000019**

Rev. 11/11/16

BECKER_002245

# CHAMPLAIN TOWERS SOUTH

# ATTACHMENT E

## MAINTENANCE SCHEDULE 2017

| LINE | # UNITS | MAINTENANCE | CABLE | MAINTENANCE PLUS CABLE |
|---|---|---|---|---|
| 1 | 12 | 743.00 | 74.00 | 817.00 |
| 2 | 11 | 696.00 | 74.00 | 770.00 |
| 3 | 11 | 592.00 | 74.00 | 667.00 |
| 4 | 11 | 592.00 | 74.00 | 667.00 |
| 5 | 11 | 666.00 | 74.00 | 740.00 |
| 6 | 11 | 499.00 | 74.00 | 573.00 |
| 7 | 11 | 499.00 | 74.00 | 573.00 |
| 8 | 11 | 719.00 | 74.00 | 793.00 |
| 9 | 11 | 719.00 | 74.00 | 793.00 |
| 10 | 11 | 727.00 | 74.00 | 801.00 |
| 11 | 12 | 696.00 | 74.00 | 770.00 |
| 12 | 12 | 936.00 | 74.00 | 1010.00 |
| PH 2 | 1 | 2093.00 | 74.00 | 2167.00 |
| | | | | |

CTS - BUDGET PACKET 000020
Rev. 11/11/16

BECKER_002246

## ATTACHMENT F

## CHART ON SPECIAL ASSESSMENT PER UNIT LINE

Below is the total amount of the Special Assessment by Unit Line.  The Board will discuss and vote regarding how the amount will become due and over how many months.

**WHEN MAKING PAYMENT FOR SPECIAL ASSESSMENT YOU MUST IDENTIFY "SPECIAL ASSESSMENT PAYMENT" ON THE CHECK.**

**When due, payment checks must reflect that the check is for payment of the "Special Assessment" so that it does NOT get deposited as Monthly Maintenance.**
Amount

| UNIT LINE | TOTAL AMOUNT OF SPECIAL ASSESSMENT |
|---|---|
| 1 | $ 8,228 |
| 2 | $ 7,706 |
| 3 | $ 6,568 |
| 4 | $ 6,568 |
| 5 | $ 7,374 |
| 6 | $ 5,532 |
| 7 | $ 5,532 |
| 8 | $ 7,966 |
| 9 | $ 7,966 |
| 10 | $ 8,057 |
| 11 | $ 7,706 |
| 12 | $ 10,371 |
| PH 2 | $ 23,188 |

Final
4823-2115-6668, v. 1

# Proposed Budget 2019

| account numbers | Ledger Accounts | Budget 2019 | Budget 2018 | Difference | % | Jan-Sept 30 Actual | Jan-Sept 30 Budget |
|---|---|---|---|---|---|---|---|
| | **Income Accounts** | | | | | | |
| 4009 4015 4001 4017 | Application to board by Prospective Purchaser,renters and occupant | 900.00 | 900.00 | 0.00 | | 1,200.00 | 675.00 |
| 4300 | Cell Phone Tower Income | 27,600.00 | 27,600.00 | 0.00 | | 20,700.00 | 18,400.00 |
| 4075 | Common Area Non-Refundable Reservation Fees - Recreation/Party room | 1,000.00 | 1,000.00 | 0.00 | | 76.00 | 825.01 |
| 4025 | Hard Copy of Declaration of condominium, By Laws, Articles of Incorporation | 100.00 | 0.00 | 100.00 | | 76.00 | |
| 4045 | Estoppel Letter fees - Letter for Sellers | 300.00 | 300.00 | 0.00 | | 750.00 | 225.00 |
| 4079 | Concierge Services for Events Non-Refundable fee | 100.00 | 100.00 | 0.00 | | | 75.01 |
| 4081 | Valet Service for Events Non-Refundable fee | 900.00 | 900.00 | 0.00 | | 400.00 | 675.00 |
| 4049 | FOB/Barcode Device Fees (Non-Refundable) | 200.00 | 0.00 | 200.00 | | 510.00 | |
| 4059 | Replacement key to Lower Level Storage Units | 100.00 | 300.00 | -200.00 | | 35.00 | 225.00 |
| 4047 | Interest Income | | 0.00 | 0.00 | | 1,245.33 | |
| 4065 | Monthly Maintenance Late Payment Fees | 2,000.00 | 2,000.00 | 0.00 | | 1,625.00 | 1,500.01 |
| 4069/4991 | Returned Check Bank Fees (Insufficient Funds) | 200.00 | 200.00 | 0.00 | | 140.00 | 150.01 |
| 4089 | Maintenance Fees Income | 1,163,155.00 | 1,163,155.00 | 0.00 | | 872,334.00 | 872,334.00 |
| 4095/other | Move In/Out Fees - Move related Security Guard Services | 346.00 | 0.00 | 346.00 | | 2,460.00 | |
| 4100/4900/4990 | Owners Miscellaneous | | 0.00 | 0.00 | | 1,005.00 | |
| 4085 | Annual Storage Fee (Cable Rooms on Floors | 3,500.00 | 3,500.00 | 0.00 | | 2,625.03 | 2,625.01 |
| 4087 | Annual Storage Fee (West Side Rooms Floors | 7,500.00 | 7,500.00 | 0.00 | | 5,625.00 | 5,625.00 |
| 4101 | Vending Operations Income - Laundry Income | 830.00 | 830.00 | 0.00 | | 312.70 | 622.51 |
| 4103 | Vending Operations Income - Snack Vending Machine | 300.00 | 300.00 | 0.00 | | 260.90 | 225.00 |
| 4105 | Vending Operations Income - Soda Vending Machine | 400.00 | 400.00 | 0.00 | | 130.50 | 300.01 |
| 4200 | Cable | 120,000.00 | 120,000.00 | 0.00 | | 90,576.00 | 90,000.00 |
| | **TOTAL BUDGET - INCOME** | 1,329,431.00 | 1,328,985.00 | 446.00 | | 1,002,010.46 | 994,481.57 |
| | | | | | | | |
| | **Expense Accounts** | | | | | | |
| 5000 | Bad Debt Expense | 2,000.00 | 3,000.00 | -1,000.00 | | 1,830.00 | 2,250.00 |
| | **Application Process Expenses** | | | | | | |
| 5003, 5005 | Background screening check domestic | 1,000.00 | 1,300.00 | -300.00 | | 458.25 | 975.01 |
| 5007 | Bank Fees | 1,200.00 | 1,150.00 | 50.00 | | 916.48 | 862.51 |
| | **COMMON AREAS EXPENSES** | | | | | | |
| 5017 | Common Area Maintenance - BBQ area expenses | 0.00 | 300.00 | -300.00 | | 1,181.59 | |
| 5019 | Common Area Maintenance - Flowers & Plants - Exterior | 2,500.00 | 2,500.00 | 0.00 | | 1,250.00 | 1,875.01 |
| 5021 | Common Area Maintenance - Flowers & Plants - Interior | 3,000.00 | 3,000.00 | 0.00 | | 2,589.12 | 2,250.00 |
| | Common Area Maintenance - Landscaping | 0.00 | 2,000.00 | -2,000.00 | | | 1,500.01 |
| | Common Area Maintenance - Landscaping - Holiday Projects | 500.00 | 500.00 | 0.00 | | | 375.01 |
| | Common Area Maintenance - Recreation/Party Room Expenses | 0.00 | 200.00 | -200.00 | | | 150.01 |
| | **COMPUTERS** | | | | | | |
| 5011,5013, 5015 | Computer-IT services, Hardware Software, Programs | 4,000.00 | 7,000.00 | -3,000.00 | | 4,949.80 | 5,250.01 |
| | **CONTRACT SERVICES** | | | | | | |

BECKER_002248

BECKER_002249

| account numbers | Ledger Accounts | Budget 2019 | Budget 2018 | Difference | % | Jan-Sept 30 Actual | Jan-Sept 30 Budget |
|---|---|---|---|---|---|---|---|
| | **Income Accounts** | | | | | | |
| 5029 | Contract Services - Concierge/Security Services Contract | 157,500.00 | 157,500.00 | 0.00 | | 105,326.64 | 118,125.00 |
| 5031 | Contract Services - Elevator Contract | 6,840.00 | | | | | |
| 5033 | Contract Services - Housekeeping Contract | 97,680.00 | 95,100.00 | 2,580.00 | | 71,377.33 | 71,325.00 |
| 5035 | Contract Services - HVAC Contract | 4,740.00 | 6,000.00 | -1,260.00 | | 3,469.69 | 4,500.00 |
| 5037 | Contract Services - Landscaping Contract | 15,240.00 | 14,400.00 | 840.00 | | 11,900.00 | 10,800.00 |
| 5039 | Contract Services - Pest Control Contract | 5,000.00 | 4,620.00 | 380.00 | | 3,850.00 | 3,465.00 |
| 5043 | Contract Services - Valet Services Contract | 73,130.00 | 73,130.00 | 0.00 | | 51,295.62 | 54,847.51 |
| 5045 | Contract Services - Window Cleaning Contract | 6,000.00 | 4,000.00 | 2,000.00 | | 5,188.20 | 3,000.01 |
| 5051 | Fire Alarm Monitor Company | 1,350.00 | 450.00 | 900.00 | | 224.64 | 337.50 |
| 5047 | In-House Contractor Service Expenses - Bonus & Gifts | 6,000.00 | 6,000.00 | 0.00 | | 2,150.00 | 6,000.01 |
| 5049 | In-House Contractor Service Expenses - Valet Services for Special Events | 0.00 | 500.00 | -500.00 | | 371.23 | 375.01 |
| | **INSURANCE** | | | | | | |
| 5053 | Insurance - Insurance - Bldg/ GL | 175,400.00 | 175,400.00 | 0.00 | | 114,017.40 | 116,550.00 |
| 5035 | Insurance - Insurance - Flood | 43,300.00 | 43,300.00 | 0.00 | | 31,614.35 | 32,474.99 |
| 5057 | Insurance - Insurance - Health | 4,000.00 | 4,000.00 | 0.00 | | 1,025.44 | 2,999.99 |
| 5059 | Insurance - Insurance - Workers Comp | 5,000.00 | 5,000.00 | 0.00 | | 3,329.28 | 3,749.99 |
| 5060 | Claims | | | | | 3,750.88 | |
| | **LICENSES AND PERMIT** | | | | | | |
| 5073 | Corporate Annual Report | 70.00 | 70.00 | 0.00 | | 70.00 | 52.49 |
| 5075 | Elevator Permits | 570.00 | 570.00 | 0.00 | | 150.00 | 427.50 |
| 5077 | Fire permits & Inspections | 1,400.00 | 1,400.00 | 0.00 | | 345.00 | 1,049.99 |
| 5081 | Local Business Tax | 200.00 | 45.00 | 155.00 | | 185.00 | 33.75 |
| 5079 | Pool & Spa Permits | 375.00 | 375.00 | 0.00 | | 375.00 | 281.25 |
| 5082 | Locksmith Service - Building Locksmith Service Fees | 500.00 | 200.00 | 300.00 | | | 150.01 |
| | Condo Fees Annual | 540.00 | 540.00 | 0.00 | | | 405.00 |
| | **OFFICE EXPENSES** | | | | | | |
| 5085 | Office Supplies | 5,000.00 | 5,000.00 | 0.00 | | 6,180.29 | 3,750.01 |
| 5087 | Postage and Delivery | 300.00 | 300.00 | 0.00 | | 50.00 | 225.00 |
| | **PROFESSIONAL FEES** | | | | | | |
| 5061 | Professional Fees - Accounting Services | 5,000.00 | 5,000.00 | 0.00 | | 4,750.00 | 3,749.99 |
| 5063 | Professional Fees - Bookkeeping Services | 14,000.00 | 10,000.00 | 4,000.00 | | 14,549.00 | 7,499.99 |
| 5069 | Professional Fees - Legal Fees | 10,000.00 | 10,000.00 | 0.00 | | 8,212.93 | 7,499.99 |
| 5172 | Professional fees-Update Condo Documents | 6,000.00 | 15,000.00 | -9,000.00 | | 9,530.50 | 11,250.00 |
| 5048 | Payroll Fees | 3,000.00 | 0.00 | 3,000.00 | | 2,578.68 | |
| | **REPAIRS & MAINTENANCE** | | | | | | |
| 5089 | Repairs & Maint. Expenses - A/C Repairs and **New (HVAC)** | 9,000.00 | 4,000.00 | 5,000.00 | | 8,080.90 | 2,999.99 |
| 5091 | Repairs & Maint. Expenses - Building Supplies | 20,000.00 | 20,000.00 | 0.00 | | 28,255.05 | 15,000.01 |
| 5093 | Repairs & Maint. Expenses - Cleaning and Maintenance Supplies | 5,000.00 | 1,000.00 | 4,000.00 | | 4,882.63 | 749.99 |
| 5095 | Repairs & Maint. Expenses - Elevator Repairs | 500.00 | 0.00 | 500.00 | | 1,090.00 | |
| 5097 | Repairs & Maint. Expenses - Emergency Generator | 1,500.00 | 1,500.00 | 0.00 | | 2,958.47 | 1,125.00 |
| 5099 | Repairs & Maint. Expenses - Fire Alarm & Equipment Repairs | 500.00 | | | | 1,828.94 | |
| 5101 | Repairs & Maint. Expenses - Fire sprinklers repairs & maintenance | 3,000.00 | 5,000.00 | -2,000.00 | | 12,516.50 | 3,749.99 |

| account numbers | Ledger Accounts | Budget 2019 | Budget 2018 | Difference | % | Jan-Sept 30 Actual | Jan-Sept 30 Budget |
|---|---|---|---|---|---|---|---|
| | **Income Accounts** | | | | | | |
| 5103 | Repairs & Maint. Expenses - Fitness Room Repairs | 500.00 | 1,000.00 | -500.00 | | | 749.00 |
| 5105 | Repairs & Maint. Expenses - Parking Lot Maintenance | 400.00 | 1,000.00 | -600.00 | | 360.00 | 749.00 |
| 5109 | Repairs & Maint. Expenses - Plumbing | 2,000.00 | 2,000.00 | 0.00 | | 5,895.25 | 2,250.00 |
| 5111 | Repairs & Maint. Expenses - Pool Repairs | 2,000.00 | 3,000.00 | -1,000.00 | | 7,326.61 | 1,499.99 |
| 5113 | Repairs & Maint. Expenses - Video Equipment R&M (Cameras) | 1,000.00 | 1,500.00 | -500.00 | | 3,099.79 | 1,125.00 |
| | **STAFF** | | | | | | |
| 5117 | Staff Recognition Programs | 1,000.00 | 1,000.00 | 0.00 | | 433.65 | 749.99 |
| 5115/5154 | Staff Bonus & Gifts | 3,000.00 | 3,000.00 | 0.00 | | 1,200.00 | 2,250.00 |
| 5119 | Staff - Uniforms | 370.00 | 370.00 | 0.00 | | 346.16 | 277.49 |
| | **TAXES** | | | | | | |
| 5123 | Taxes - Corporate Taxes | 0.00 | 700.00 | -700.00 | | | 524.99 |
| 5121 | Taxes - Payroll Taxes (Maintenance Dept) | 9,600.00 | 10,900.00 | -1,300.00 | | 7,131.38 | 8,174.99 |
| 5122 | Taxes SUI Taxes | 2,000.00 | 0.00 | 2,000.00 | | 1,744.31 | |
| | **UTILITIES** | | | | | | |
| 5125 | Utilities - Cable | 120,000.00 | 120,000.00 | 0.00 | | 84,856.53 | 90,000.00 |
| 5127 | Utilities - Electricity | 75,000.00 | 80,125.00 | -5,125.00 | | 53,373.89 | 60,093.76 |
| 5129 | Utilities- Gas | 670.00 | 670.00 | 0.00 | | | 502.49 |
| 5131 | Utilities - Telephone | 3,200.00 | 2,000.00 | 1,200.00 | | 2,440.86 | 1,499.99 |
| 5133 | Utilities - Trash collection | 36,000.00 | 36,000.00 | 0.00 | | 26,537.12 | 27,000.00 |
| 57,5135,5145,5143,5 | Utilities Water | 85,000.00 | 82,470.00 | 2,530.00 | | 64,201.76 | 61,852.48 |
| | **VENDING OPERATIONS** | | | | | | |
| 5145 | Vending Operations - Laundry Room Repairs | 200.00 | 200.00 | 0.00 | | | 149.99 |
| 5147 | Vending Operations - Vending Machine Repairs | | | | | | |
| 5149 | Vending Operations - Vending Machine Supplies | | | | | | |
| | **WAGES & SALARIES** | | | | | | |
| 5030 | Salaries manager | 60,000.00 | 75,000.00 | -15,000.00 | | 42,211.61 | 56,250.00 |
| 5051 | Salaries(maintenance crew) OT | 3,000.00 | 3,000.00 | 0.00 | | 1,956.00 | 2,250.00 |
| 5153 | Salaries - Reg. (Maintenance Crew) | 71,456.00 | 63,900.00 | 7,556.00 | | 51,492.01 | 51,492.01 |
| 5200 | RESERVES- Non-Operating Expense | 151,200.00 | 151,200.00 | 0.00 | | 113,400.00 | 113,400.00 |
| | **TOTAL BUDGET EXPENSES** | **1,329,431.00** | **1,329,385.00** | **-7,294.00** | | **999,887.64** | |

BECKER_002250

TAB 4

BECKER_002251

# Maintenance Schedule 2019

| Line# | Maintanance per unit per month | Cable | Maintanance with Cable |
|---|---|---|---|
| 12 | $972 | 74.00 | 1,046.00 |
| 1 | $771 | 74.00 | 845.00 |
| 2-11 | $722 | 74.00 | 796.00 |
| 10 | $755 | 74.00 | 829.00 |
| 5 | $691 | 74.00 | 765.00 |
| 9 | $746 | 74.00 | 820.00 |
| 6-7 | $518 | 74.00 | 592.00 |
| 3-4 | $615 | 74.00 | 689.00 |
| 8 | $746 | 74.00 | 820.00 |
| Ph-2 | $2,173 | 74.00 | 2,247.00 |

BECKER_002252

| Reserves 2019 | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|
| | LIFE | Replacement | Fund | 2018 | 2018 | 2018 | Acc. Funds | Remaining | C5-H5 | 2019 |
| | EXP | Estimate Cost | Dec.31/2017 | Assessments | Interest | Replacements | Dec.31/2018 | Life | | annual cost |
| 3230-Roof | 25.00 | 250,000.00 | 19,878.00 | 11,506.30 | | | 31,384.30 | 20.00 | 218,615.70 | 11,506.30 |
| 3224-Painting | 7.00 | 150,000.00 | 139,742.00 | 10,258.00 | | | 150,000.00 | 1.00 | 0.00 | |
| 3206-Elevators | 35.00 | 460,000.00 | 107,743.00 | 5,000.00 | | 107,894.12 | 4,848.88 | 35.00 | 455,151.12 | 1,000.00 |
| 3216-A/C | 15.00 | 59,000.00 | 35,783.00 | 11,608.50 | | 11,476.22 | 35,915.28 | 5.00 | 23,084.72 | 1,000.00 |
| 3214-Fitness Center | 18.00 | 12,000.00 | -3,449.00 | 502.96 | | 4,555.14 | -603.18 | 17.00 | 12,603.18 | 502.96 |
| 3208-Eme Gen | 26.00 | 35,000.00 | 24,900.13 | 531.63 | | | 25,431.76 | 19.00 | 9,568.24 | 1,000.00 |
| 3228-Pool | 15.00 | 37,000.00 | 12,548.00 | 2,037.67 | | 11,000.00 | 3,585.67 | 12.00 | 33,414.33 | 2,037.67 |
| 3222-Jaccuzzi | 15.00 | 9,000.00 | 1,416.00 | 632.00 | | | 2,048.00 | 12.00 | 6,952.00 | 632.00 |
| 3220-Int. Dec. | 25.00 | 120,000.00 | 49,503.00 | 23,488.33 | 6,112.13 | | 79,103.46 | 5.00 | 40,896.54 | 10,000.00 |
| 3210-Ext.Pavers&Dec. | 25.00 | 76,500.00 | 30,775.00 | 9,145.00 | | | 39,920.00 | 5.00 | 36,580.00 | 10,000.00 |
| 3212-Fire Alarm | 35.00 | 120,000.00 | 22,204.00 | 3,298.48 | | 25,875.00 | -372.52 | 35.00 | 120,372.52 | 1,000.00 |
| 3226-Plumbing | 49.00 | 390,000.00 | 71,441.00 | 13,850.34 | | 20,618.00 | 64,673.34 | 10.00 | 325,326.66 | 35,000.00 |
| 3204-Electrical | 49.00 | 390,000.00 | 120,691.00 | 10,332.46 | | 91,195.96 | 39,827.50 | 8.00 | 350,172.50 | 40,000.00 |
| 3202-Balconies/Concrete R | 20.00 | 320,000.00 | 43,618.00 | 34,008.33 | | | 77,626.33 | 9.00 | 242,373.67 | 16,300.00 |
| 3218-Ins. Deductible | 12.00 | 400,000.00 | 215,598.00 | 15,000.00 | | 36,866.58 | 193,731.42 | 9.00 | 206,268.58 | 21,221.07 |
| 3234-Reserve Interest | | | 6,019.00 | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | 2,828,500.00 | 905,308.13 | 151,200.00 | 6,112.13 | 339,481.02 | 747,120.24 | | 2,081,379.76 | 151,200.00 |

BECKER_002253



U.S. POSTAGE PAID
FCM LETTER
HIALEAH, FL
33012
NOV 07, 18
AMOUNT
$8.88
R2305H127243-30

33134



1020

BECKER & POLIAKOFF PA
Attn: ROSA DE LA CAMARA, ESQ
ALHAMBRA TOWERS
121 ALHAMBRA PLAZA
10th FLOOR
CORAL GABLES, FL 33134

SUSANA RODRIGUEZ
8777 Collins Ave #607
Surfside, FL. 33154



CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7018 2290 0002 0630 6084

# EXHIBIT 4

| | |
|---|---|
| **From:** | Margarita <marbrito08@gmail.com> |
| **Sent:** | 11/5/2018 3:34:01 PM -0500 |
| **To:** | "Perez-Martinez, Marilyn" <MPerez-Martinez@beckerlawyers.com>; gatormaggie@aol.com |
| **CC:** | "Suarez, Ana" <ASuarez@beckerlawyers.com> |
| **Subject:** | FW: Champlain Towers South- Special Assessments need Unit Owner's vote and Concrete Deterioration Issues need immediate attention |
| **Attachments:** | cts ammendment to bylaws 1.jpg; cts ammended by law owner vote required special assessment.jpg |

-----Original Message-----
From: CTS Manager <manager@champlainsouth.com>
Sent: Monday, November 5, 2018 3:31 PM
To: 'Margarita Brito' <marbrito08@gmail.com>
Subject: FW: Champlain Towers South- Special Assessments need Unit Owner's vote and Concrete Deterioration Issues need immediate attention

Thank You,

[cid:image001.png@01D37A45.E2A19A10]
Alexandria Santamaria, LCAM
Champlain Towers South
8777 Collins Avenue
Surfside, FL   33154
Front Desk: (305) 865-7570
Office: (305) 865-4740<tel:305%20361-1691> | Fax: (305) 865-7800<tel:305%20361-1691>
E-mail: manager@champlainsouth.com<mailto:manager@champlainsouth.com>

This message, including any attachments, may contain confidential and privileged information for the sole use of the intended recipient(s). Review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient, or authorised to receive information on behalf of the recipient, please contact the sender by reply email, and delete all copies of this message. While we have taken reasonable precautions to ensure that this message and any attachments are free from viruses, we cannot guarantee that they are virus free and accept no liability for any damage caused by this message or any attachments. Messages sent or received through our networks may be monitored to ensure compliance with the law, regulation and/or our policies.

From: Susie Rodriguez <susier78@gmail.com>
Sent: Monday, November 5, 2018 3:12 PM
To: CTS Manager <manager@champlainsouth.com>; RDELACAMARA@beckerlawyers.com
Cc: sr4flowers@aol.com
Subject: Champlain Towers South- Special Assessments need Unit Owner's vote and Concrete Deterioration Issues need immediate attention

November 5, 2018

Certified Mail Return Receipt Requested

Emailed also:   Rosa de la Camera and CTS Manager BOD

Becker and Poliakoff PA

Rosa de La Camara, Esquire

Alhambra Towers

121 Alhambra Towers

10th Floor

Coral Gables, Fl.   33134


Champlain Towers South Board of Directors and Manager

8777 Collins Avenue

Surfside, Fl.   33154



I have been an owner at Champlain Towers South since 1999.


I am extremely concerned about the Structural integrity and Concrete Deterioration of Champlain Towers South (CTS).   The building is   almost 38 years old and will require a 40 year inspection in 2 years.   The Association has hired a Structural Engineer to begin this process. The Engineer Morabito Consultants has determined that the building "has structural issues that require repair and/or remediation in the immediate and near future" (Engineering Survey Report Attached). The estimated costs of these repairs are estimated at over 9 million Dollars.   Some owners think we can wait 2 years to begin this project.


The Engineering Report has determined that there is major structural damage in the balcony slabs, concrete Spalling and cracking on concrete balcony edges, water infiltration caused by sub-surface deterioration at the exterior soffits under the balcony railings. (Page 3). Soffit damage that requires removing existing tile of all balconies, Soffit support framing is deteriorated (Page 4) Balcony Windows and Doors are at the end of their functional lifespan. Some units have replaced the doors and they have not been installed properly etc. to just name a few items on the report.


The concrete deterioration is evident to the naked eye but many owners as well as members of the Board do not understand the importance of commencing this work as soon as possible so that it does not compromise the reinforced steel structure of our balconies .   A piece of concrete has fallen off one balcony on to another balcony recently and this deterioration has become a life safety hazard. Postponing this work will only make the job more expensive to repair and compromise the structure of our building. The parking garage has been leaking for over 10 years. It was repaired incorrectly with epoxy injections at the garage level.   The building pool deck needs to be correctly re-sloped and waterproofed.   I park in space 105 and have had a storm panel covering the ceiling of my space for over 7 years.   Pretty soon pieces of concrete will be falling on to the cars in the garage.


In the meantime the Board levied a special assessment 2 years ago with a 2 year interest free payment plan which included $500,000.00 to be designated for a Hallway Renovation.   Now the Board wants to pass an additional special assessment for the Hallway Renovation because the price of completing this project has increased over the past 2 years due to inflation.   Also part of this work scope requires new door coverings for Hallway unit doors since they claim the doors some doors are cracked. The doors are the responsibility of the unit owners as are the sliding glass doors. My hallway doors are not cracked and do not need maintenance. I believe the hallway project is more of an aesthetic improvement and not necessary maintenance as is the concrete restoration the building which needs to addressed   immediately. The Board cannot go back after an assessment has been levied and increase it for the Hallways.   Also this assessment should have been voted on by the unit owners per our amended by laws. (attached and executed by your firm)


 Becker and Poliakoff executed in court an amendment to our Declaration of Condominiums, By Laws and Articles of Incorporation signed by our secretary at that time Mr.   Arnold Notkin, Secretary October 14th, 1996 and recorded in court October 31, 1996 (attached). The Bylaws were amended to say "Special Assessments require approval of 50% plus One of all unit owners."

BECKER_004890

I am a little concerned and surprised that CTS has not involved our Attorney in any of our Special Assessment meetings. The board plans on adopting a budget and a special assessment on November 29h. The board has tried to adopt the special assessment on the 23rd of October and was not successful. This special assessment cannot pass since it needs owners approval and the owners are more concerned about the structural damage at this time.

I think it would be in the building's best interest to repair the structural flaws since it has become life threatening and necessary.

I think it would be in the Associations best interest to ask for legal advice from our Attorney on how to proceed with these issues.

I have asked the Manager to please place me on the construction committee since I want to help with any aspect of these projects. I also believe the building will have to request a loan a line of credit preferably to secure a contractor to begin this process. Structural Repairs should be addressed immediately since the cost of construction inflation will increase as well as interest rates if we have to secure a loan. This will put us in the same situation we are encountering with the additional money the Board wants to collect to complete the Hallway Renovation.

I would like your feedback and legal opinion on these matters and to please advise the BOD that per our amended By-Laws they are not authorized to levy an Assessment without Unit Owners vote.

The BOD have a fiduciary responsibility to maintain the structure of the building and needs to commence the concrete restoration and possibly use funds for this hallway project since it is necessary maintenance and an emergency at this point.   The association has in the past always done band-aid approach repairs to the building to keep repair cost low and   that now have put us in a costly repair situation. The building needs to repaired correctly and before any other aesthetics project.

Thank you

Susana Rodriguez

Owner 607

305-989-1730

BECKER_004891